# 15-2454-cr

## United States Court of Appeals

*for the*

## Second Circuit

—————

UNITED STATES OF AMERICA,

*Appellee,*

— v. —

GUSTAVO PEREZ-GARCIA, AKA Sealed Defendant 2, AKA Gato, MANUEL
MAMADI MANE, AKA Mario, AKA Quecuto, SALIU SISSE, AKA Serifo,
ANTONIO INDJAI, AKA Antonio Injai,

*Defendants,*

RAFAEL ANTONIO GARAVITO-GARCIA, AKA Sealed Defendant 1,
AKA El Viejo,

*Defendant-Appellant.*

———————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## APPENDIX
### Volume 1 of 2 (Pages A-1 to A-210)

FOX ROTHSCHILD LLP
*Attorneys for Defendant-Appellant*
100 Park Avenue, 15th Floor
New York, New York 10017
(212) 878-7900

i

# TABLE OF CONTENTS

**Page**

District Court Docket Entries .................................... A-1

Superseding Indictment, dated January 8, 2013 ........ A-18

Declaration of Robert W. Ray in Support of
Defendant Rafael A. Garavito-Garcia's Motion to
Dismiss for Lack of Jurisdiction, dated
November 13, 2014 ................................................ A-37

Defendant's Memorandum of Law in Support of
Motion to Dismiss for Lack of Jurisdiction, dated
November 13, 2014 ................................................ A-89

Government's Declaration in Opposition to Motion
to Dismiss for Lack of Jurisdiction, dated
December 11, 2014 ................................................ A-103

Government's Opposition Memorandum to
Defendant's Motion to Dismiss for Lack of
Jurisdiction, dated December 11, 2014 .................. A-105

Defendant's Reply Memorandum of Law in Support
of Motion to Dismiss for Lack of Jurisdiction,
dated December 15, 2014 ...................................... A-130

District Court's Order denying Defendant's Motion
to Dismiss for Lack of Jurisdiction, dated
December 30, 2014 ................................................ A-137

District Court's Opinion denying Defendant's
Motion to Dismiss, dated March 12, 2015 ............ A-138

Excerpts of Trial Transcript (CS Ricardo Juardinero
Direct Examination), dated March 17, 2015.......... A-145

Excerpts of Trial Transcript (Ricardo Juardinero
Cross-Examination), dated March 19, 2015 .......... A-162

ii

**Page**

Excerpts of Trial Transcript, dated March 20, 2015 ..    A-187

Excerpts of Trial Transcript (Re: Entrapment
    Defense), dated March 24, 2015 ...........................    A-189

Government's Trial Exhibit 100T-A –
    Transcript of Breakfast Meeting, dated
    June 25, 2012 .......................................................    A-195

Government's Trial Exhibit 100T-C –
    Transcript of First Meeting, dated June 30, 2012 ..    A-211

Government's Trial Exhibit 100T-D –
    Transcript of Second Meeting, dated
    June 30, 2012 .......................................................    A-250

Government's Trial Exhibit 100T-E –
    Transcript of First Meeting, dated July 2, 2012 .....    A-267

Government's Trial Exhibit 100T-I –
    Transcript from Track 002 of CD, undated............    A-277

Government's Trial Exhibit 100T-P –
    Transcript, dated September 21, 2012 ...................    A-289

Government's Trial Exhibit 100T-R –
    Transcript, dated September 21, 2012 ...................    A-296

Defendant's Proposed Specifically Requested Jury
    Instructions, dated March 18, 2015 ......................    A-299

Government's Response to Defendant's Proposed
    Specifically Requested Jury Instructions, dated
    March 20, 2015 ....................................................    A-305

District Court's Draft Charge to the Jury, dated
    March 20, 2015 ....................................................    A-311

Excerpts of Trial Transcript (Jury Charge), dated
    March 25, 2015 ....................................................    A-335

iii

**Page**

Excerpts of Trial Transcript (Proposed
    Supplemental Jury Charge on Mere Presence),
    dated March 26, 2015 ............................................ A-363

Court's Trial Exhibit 4 –
    Text of Judge Rakoff's Supplemental Jury
    Charge (delivered to jury room) on Mere
    Presence, dated March 26, 2015 ........................... A-377

Press Release following jury verdict from the
    United States Attorney's Office, Southern District
    of New York, dated March 27, 2015 ...................... A-378

Defendant's Sentencing Memorandum, dated
    July 13, 2015 ......................................................... A-381

    Exhibit A to Sentencing Memorandum –
    Diplomatic Note, dated February 5, 2014 ............. A-393

    Exhibit B to Sentencing Memorandum –
    Republic of Colombia Resolution Number 293,
    dated October 28, 2013 .......................................... A-396

    Exhibit C to Sentencing Memorandum –
    Letter from daughter Brenda Scarpelli to the
    Honorable Jed S. Rakoff, dated May 28, 2015 ...... A-406

Government's Sentencing Memorandum, dated
    July 16, 2015 ......................................................... A-408

Transcript of Sentencing, dated July 20, 2015 ........... A-413

Notice of Appeal, filed August 4, 2015 ..................... A-436

A-1

APPEAL,ECF

# U.S. District Court
# Southern District of New York (Foley Square)
# CRIMINAL DOCKET FOR CASE #: 1:12-cr-00839-JSR-1

Case title: USA v. Garavito-Garcia et al

Date Filed: 11/15/2012
Date Terminated: 07/22/2015

Assigned to: Judge Jed S. Rakoff

**Defendant (1)**

**Rafael Antonio Garavito-Garcia**
*TERMINATED: 07/22/2015*
*also known as*
Sealed Defendant 1
*also known as*
El Viejo

represented by **Justin Jared Krane**
Fox Rothschild, Attorneys at Law
(NYC)
100 Park Avenue, Suite 1500
New York, NY 10017
(212)-878-1421
Email: jkrane@foxrothschild.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: CJA Appointment*

**Robert William Ray**
Fox Rothschild, Attorneys at Law
(NYC)
100 Park Avenue, Suite 1500
New York, NY 10017
212-878-7900
Fax: 212-798-0940
Email: rwray@foxrothschild.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: CJA Appointment*

**Steven R. Kartagener**
233 Broadway, Suite 2340
New York, NY 10007
(212) 732-9600
Fax: 212-732-6966
Email: kartlaw1@gmail.com
*TERMINATED: 08/07/2014*
*LEAD ATTORNEY*
*Designation: CJA Appointment*

| **Pending Counts** | **Disposition** |
|---|---|
| 21:960D=NI.F NARCOTICS - IMPORTATION/EXPORTATION (CONSPIRACY TO COMMIT NARCO-TERRORISM) (1) | Imprisonment for a total term of On Count 1- Two Hundred Forty (240) months. On Count 2 - One Hundred Twenty (120) months. On Count 3- One Hundred twenty (120) months. On Count 4- Three Hundred (300) months. TO RUN CONCURRENT TO EACH OTHER. Supervised release for a term of Counts 1, 2 and 4 - Five ( 5) years. On Count Three - Three (3) years. TO RUN CONCURRENT TO EACH OTHER |
| 21:963=CI.F ATTEMPT/CONSPIRACY - CONTROLLED SUBSTANCE - IMPORT/EXPORT (2) | Imprisonment for a total term of On Count 1- Two Hundred Forty (240) months. On Count 2 - One Hundred Twenty (120) months. On Count 3- One Hundred twenty (120) months. On Count 4- Three Hundred (300) months. TO RUN CONCURRENT TO EACH OTHER. Supervised release for a term of Counts 1, 2 and 4 - Five ( 5) years. On Count Three - Three (3) years. TO RUN CONCURRENT TO EACH OTHER |
| 18:2339B.F CONSPIRACY TO PROVIDE MATERIAL SUPPORT OR RESOURCES TO TERRORISTS (3) | Imprisonment for a total term of On Count 1- Two Hundred Forty (240) months. On Count 2 - One Hundred Twenty (120) months. On Count 3- One Hundred twenty (120) months. On Count 4- Three Hundred (300) months. TO RUN CONCURRENT TO EACH OTHER. Supervised release for a term of Counts 1, 2 and 4 - Five ( 5) years. On Count Three - Three (3) years. TO RUN CONCURRENT TO EACH OTHER |
| 18:2332AA.F USE OF CERTAIN WEAPONS OF MASS DESTRUCTION (CONSPIRACY TO ACQUIRE AND TRANSFER ANTI-AIRCRAFT MISSILES) (4) | Imprisonment for a total term of On Count 1- Two Hundred Forty (240) months. On Count 2 - One Hundred Twenty (120) months. On Count 3- One Hundred twenty (120) months. On Count 4- Three Hundred (300) months. TO RUN CONCURRENT TO EACH OTHER. Supervised release for a term of Counts 1, 2 and 4 - Five ( 5) years. On Count Three - |

A-3

Three (3) years. TO RUN
CONCURRENT TO EACH OTHER

**Highest Offense Level (Opening)**

Felony

**Terminated Counts**                    **Disposition**

None

**Highest Offense Level
(Terminated)**

None

**Complaints**                           **Disposition**

None

---

**Plaintiff**

**USA**                    represented by    **Aimee Hector**
                                            U.S. Attorney's Office, SDNY (St
                                            Andw's)
                                            One St. Andrew's Plaza
                                            New York, NY 10007
                                            (212) 637-2203
                                            Fax: (212) 637-2937
                                            Email: aimee.hector@usdoj.gov
                                            *ATTORNEY TO BE NOTICED*

                                            **Glen Alexander Kopp**
                                            United State Attorney's Office
                                            SDNY
                                            1 Saint Andrew's Plaza
                                            New York, NY 10007
                                            (212)-637-2210
                                            Email: glen.kopp@bgllp.com
                                            *TERMINATED: 12/23/2013*
                                            *ATTORNEY TO BE NOTICED*

                                            **Ilan Tuviah Graff**
                                            U.S. Attorney's Office, Southern
                                            District of New York
                                            1 St. Andrew's Plaza
                                            New York, NY 10007
                                            (212)-637-2296
                                            Fax: (212) 637-2527

A-4

Email: ilan.graff@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Shane Thomas Stansbury**
United States Attorney's Office,
SDNY
One Saint Andrew's Plaza
New York, NY 10007
(212) 637-2000 x2641
Fax: (212) 637-2527
Email: Shane.Stansbury@usdoj.gov
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 11/19/2012 | 1 | SEALED DOCUMENT placed in vault. (mps) (Entered: 11/19/2012) |
| 11/21/2012 | 2 | SEALED DOCUMENT placed in vault. (mps) (Entered: 11/21/2012) |
| 11/21/2012 | 3 | SEALED DOCUMENT placed in vault. (mps) (Entered: 11/21/2012) |
| 11/26/2012 | 4 | SEALED DOCUMENT placed in vault. (nm) (Entered: 11/26/2012) |
| 01/08/2013 | 11 | SEALED S(5)INDICTMENT as to Sealed Defendant 1 (1) count(s) 1, 2, 3, 4, Sealed Defendant 2 (2) count(s) 1, 2, 3. (jm) (Entered: 04/08/2013) |
| 01/09/2013 | 5 | SEALED DOCUMENT placed in vault. (nm) (Entered: 01/09/2013) |
| 01/09/2013 | 6 | SEALED DOCUMENT placed in vault. (nm) (Entered: 01/09/2013) |
| 01/09/2013 | 7 | SEALED DOCUMENT placed in vault. (nm) (Entered: 01/09/2013) |
| 03/15/2013 | 8 | SEALED DOCUMENT placed in vault. (mps) (Entered: 03/15/2013) |
| 03/15/2013 | 9 | SEALED DOCUMENT placed in vault. (mps) (Entered: 03/15/2013) |
| 03/26/2013 | 10 | SEALED DOCUMENT placed in vault. (nm) (Entered: 03/26/2013) |
| 04/05/2013 | 12 | Order to Unseal S(5) Indictment as to Sealed Defendant 1, Sealed Defendant 2. (Signed by Magistrate Judge Kevin Nathaniel Fox on 4/5/13)(jm) (Entered: 04/08/2013) |
| 04/05/2013 | | S(5)INDICTMENT UNSEALED as to Rafael Antonio Garavito-Garcia, Gustavo Perez-Garcia. (jm) (Entered: 04/08/2013) |
| 04/05/2013 | | Case Designated ECF as to Rafael Antonio Garavito-Garcia, Gustavo Perez-Garcia. (jm) (Entered: 04/08/2013) |
| 04/05/2013 | | Case as to Rafael Antonio Garavito-Garcia, Gustavo Perez-Garcia ASSIGNED to Judge Judge Jed S. Rakoff. Judge Judge Unassigned no longer assigned to the case. (jm) (Entered: 04/08/2013) |
| 06/07/2013 | 29 | SEALED DOCUMENT placed in vault. (mps) (Entered: 06/07/2013) |
| 06/14/2013 | 31 | SEALED DOCUMENT placed in vault. (mps) (Entered: 06/14/2013) |

| 11/25/2013 | 33 | SEALED DOCUMENT placed in vault. (mps) (Entered: 11/26/2013) |
|---|---|---|
| 11/25/2013 | 34 | SEALED DOCUMENT placed in vault. (mps) (Entered: 11/26/2013) |
| 11/25/2013 | 35 | SEALED DOCUMENT placed in vault. (mps) (Entered: 11/26/2013) |
| 12/23/2013 | 36 | ENDORSED LETTER as to Rafael Antonio Garavito-Garcia, Gustavo Perez-Garcia, Manuel Mamadi Mane, Saliu Sisse, Antonio Indjai addressed to Judge Jed S. Rafoff from Glen A. Kopp dated 12/16/2013 re: Counsel for the government writes to respectfully request that he be permitted to withdraw as counsel of record for the United States of America in this matter. November 1, 2013 was my last day as an employee of the United States Attorney's Office for the Southern District of New York. ENDORSEMENT: SO ORDERED. (Signed by Judge Jed S. Rakoff on 12/23/2013)(dnd) (Entered: 12/23/2013) |
| 01/24/2014 | 37 | SEALED DOCUMENT placed in vault. (nm) (Entered: 01/24/2014) |
| 05/19/2014 | 38 | SEALED DOCUMENT placed in vault. (rz) (Entered: 05/19/2014) |
| 07/23/2014 | 39 | CJA 23 Financial Affidavit by Rafael Antonio Garavito-Garcia. CJA Attorney Steve Kartagener. (Signed by Judge Magistrate Judge Frank Maas) (ft) Modified on 7/23/2014 (ft). (Entered: 07/23/2014) |
| 07/23/2014 | | Minute Entry for proceedings held before Magistrate Judge Frank Maas:Initial Appearance as to Rafael Antonio Garavito-Garcia held on 7/23/2014. Defendant Rafael Antonio Garavito-Garcia present with CJA Attorney Steve Katagener, AUSA Michael Lochard present for the Government. All parties present via iPhone. Spanish interpreter present. Defendant enters a plea of not guilty. Defendant detained on consent without prejudice. (ft) (Entered: 07/23/2014) |
| 07/23/2014 | | Minute Entry for proceedings held before Magistrate Judge Frank Maas: Arraignment as to Rafael Antonio Garavito-Garcia (1) Counts 1, 2, 3, 4. Defendant Rafael Antonio Garavito-Garcia present with CJA Attorney Steve Katagener, AUSA Michael Lochard present for the Government. All parties present via iPhone. Spanish interpreter present. Defendant enters a plea of not guilty. (ft) (Entered: 07/23/2014) |
| 07/23/2014 | 40 | CJA 20 as to Rafael Antonio Garavito-Garcia: Appointment of Attorney Steven Kartagener for Rafael Antonio Garavito-Garcia. (Appointed by Magistrate Judge Michael H. Dolinger on 7/23/14)(ade) (Entered: 08/11/2014) |
| 08/07/2014 | | Minute Entry on "Disposition Sheet" for proceedings held before Magistrate Judge Sarah Netburn: Status Conference (Substitution of Counsel) as to Rafael Antonio Garavito-Garcia (1) held on 8/7/2014. AUSA Aimee Hector. Defense Counsel: Steven R. Kartegener (Out), Robert Ray (In). (bw) (Entered: 08/08/2014) |
| 08/07/2014 | | Attorney update in case as to Rafael Antonio Garavito-Garcia (1). Attorney Robert William Ray for Rafael Antonio Garavito-Garcia |

| | | |
|---|---|---|
| | | added. Attorney Steven R. Kartagener terminated. (bw) (Entered: 08/08/2014) |
| 08/07/2014 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Pretrial Conference as to Rafael Antonio Garavito-Garcia held on 8/7/2014. PTC. Deft NOT pres, defense atty Steven Kartagener, present. Gov't pres by Aimee Hector, AUSA. Court reporter present. Presence of defendant waived. Close discovery 8-21-2014. PTC to be held 8-19-2014. Exclude Time until that date. RAKOFF, J (ajc) (Entered: 09/08/2014) |
| 08/07/2014 | | ORAL ORDER as to Rafael Antonio Garavito-Garcia: Time excluded from 8/7/2014 until 8/19/2014. (Signed by Judge Jed S. Rakoff on 8/7/2014)(ajc) (Entered: 09/08/2014) |
| 08/19/2014 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Pretrial Conference as to Rafael Antonio Garavito-Garcia held on 8/19/2014. PTC. Deft NOT pres, defense atty Robert Ray, present. Gov't pres by Aimee Hector, AUSA. Court reporter present. Presence of defendant waived. Defense motions by 11-3-2014. Relpies 12-10-2014. ARGUMENT 12-17-14 AT 2:00PM. Time is excluded until thatr date in the interest of justice pursuant to section 3161 Title 18. RAKOFF, J (ajc) (Entered: 09/08/2014) |
| 08/19/2014 | | ORAL ORDER as to Rafael Antonio Garavito-Garcia: Time excluded from 8/19/2014 until 12/17/2014. As to Rafael Antonio Garavito-Garcia( Defense motions due by 11/3/2014. Replies due by 12/10/2014. Oral Argument set for 12/17/2014 at 02:00 PM before Judge Jed S. Rakoff.) (Signed by Judge Jed S. Rakoff on 8/19/2014) (ajc) (Entered: 09/08/2014) |
| 09/09/2014 | 42 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Rafael Antonio Garavito-Garcia. Notice is hereby given that an official transcript of a Conference proceeding held on 8/7/2014 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 09/09/2014) |
| 09/10/2014 | 43 | TRANSCRIPT of Proceedings as to Rafael Antonio Garavito-Garcia re: Arraignment held on 7/23/2014 before Magistrate Judge Michael H. Dolinger. Court Reporter/Transcriber: Pamela Utter, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 10/6/2014. Redacted Transcript Deadline set for 10/17/2014. Release of Transcript Restriction set for 12/12/2014. (McGuirk, Kelly) (Entered: 09/10/2014) |
| 09/17/2014 | 44 | |

| | | TRANSCRIPT of Proceedings as to Rafael Antonio Garavito-Garcia re: Conference held on 8/19/2014 before Judge Jed S. Rakoff. Court Reporter/Transcriber: Lisa Picciano Fellis, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 10/14/2014. Redacted Transcript Deadline set for 10/23/2014. Release of Transcript Restriction set for 12/19/2014. (McGuirk, Kelly) (Entered: 09/17/2014) |
|---|---|---|
| 09/17/2014 | 45 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Rafael Antonio Garavito-Garcia. Notice is hereby given that an official transcript of a Conference proceeding held on 8/19/2014 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 09/17/2014) |
| 11/07/2014 | 46 | ENDORSED LETTER as to Rafael Antonio Garavito-Garcia addressed to Judge Jed S. Rakoff from Robert W. Ray dated 11/3/2014 re: Adjustment of the motion schedule by 10 days. ENDORSEMENT: SO ORDERED. (Motions due by 11/13/2014, Replies due by 12/15/2014, Responses due by 12/11/2014, Oral Argument set for 12/17/2014 at 02:00 PM before Judge Jed S. Rakoff.) (Signed by Judge Jed S. Rakoff on 11/5/2014)(ft) (Entered: 11/07/2014) |
| 11/13/2014 | 47 | MOTION to Dismiss for Lack of Jurisdiction . Document filed by Rafael Antonio Garavito-Garcia. (Ray, Robert) (Entered: 11/13/2014) |
| 11/13/2014 | 48 | DECLARATION of Robert W. Ray in Support as to Rafael Antonio Garavito-Garcia re: 47 MOTION to Dismiss for Lack of Jurisdiction .. (Attachments: # 1 Part 2 of Declaration)(Ray, Robert) (Entered: 11/13/2014) |
| 11/13/2014 | 49 | MEMORANDUM in Support by Rafael Antonio Garavito-Garcia re 47 MOTION to Dismiss for Lack of Jurisdiction .. (Ray, Robert) (Entered: 11/13/2014) |
| 11/25/2014 | 50 | DECLARATION of Robert W. Ray in Support as to Rafael Antonio Garavito-Garcia re: 47 MOTION to Dismiss for Lack of Jurisdiction .. (Attachments: # 1 Exhibits Including Ex E - Translation)(Ray, Robert) (Entered: 11/25/2014) |
| 12/11/2014 | 51 | MEMORANDUM in Opposition by USA as to Rafael Antonio Garavito-Garcia re 47 MOTION to Dismiss for Lack of Jurisdiction .. (Stansbury, Shane) (Entered: 12/11/2014) |
| 12/11/2014 | 52 | DECLARATION of Shane T. Stansbury in Opposition by USA as to Rafael Antonio Garavito-Garcia re: 47 MOTION to Dismiss for Lack of Jurisdiction .. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 |

| | | |
|---|---|---|
| | | Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J)(Stansbury, Shane) (Entered: 12/11/2014) |
| 12/15/2014 | 53 | REPLY MEMORANDUM OF LAW in Support by Rafael Antonio Garavito-Garcia as to Rafael Antonio Garavito-Garcia, Gustavo Perez-Garcia, Manuel Mamadi Mane, Saliu Sisse, Antonio Indjai re: 47 MOTION to Dismiss for Lack of Jurisdiction . . (Ray, Robert) (Entered: 12/15/2014) |
| 12/18/2014 | 54 | NOTICE OF ATTORNEY APPEARANCE Shane Thomas Stansbury appearing for USA. (Stansbury, Shane) (Entered: 12/18/2014) |
| 12/30/2014 | 55 | ORDER denying 47 Motion to Dismiss for Lack of Jurisdiction as to Rafael Antonio Garavito-Garcia. Pending before the Court is defendant Rafael Antonio Garavito-Garcia's motion to dismiss the indictment for lack of jurisdiction. Upon consideration, the Court hereby denies the motion. A memorandum explaining the reasons for this ruling will issue in due course. The Clerk of the Court is directed to close document number 47 on the docket of this case. (Signed by Judge Jed S. Rakoff on 12/29/14) (jw) (Entered: 12/30/2014) |
| 01/09/2015 | 56 | TRANSCRIPT of Proceedings as to Rafael Antonio Garavito-Garcia re: Conference held on 12/17/2014 before Judge Jed S. Rakoff. Court Reporter/Transcriber: Patricia Kaneshiro-Miller, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 2/2/2015. Redacted Transcript Deadline set for 2/12/2015. Release of Transcript Restriction set for 4/13/2015. (McGuirk, Kelly) (Entered: 01/09/2015) |
| 01/09/2015 | 57 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Rafael Antonio Garavito-Garcia. Notice is hereby given that an official transcript of a Conference proceeding held on 12/17/2014 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 01/09/2015) |
| 01/13/2015 | 58 | MOTION for Psychiatric Exam *Psychological Examination of Defendant*. Document filed by Rafael Antonio Garavito-Garcia. (Ray, Robert) (Entered: 01/13/2015) |
| 01/13/2015 | 59 | DECLARATION of Robert W. Ray in Support as to Rafael Antonio Garavito-Garcia re: 58 MOTION for Psychiatric Exam *Psychological Examination of Defendant*.. (Ray, Robert) (Entered: 01/13/2015) |
| 01/15/2015 | 60 | SEALED DOCUMENT placed in vault. (mps) (Entered: 01/15/2015) |
| 01/15/2015 | 61 | SEALED DOCUMENT placed in vault. (mps) (Entered: 01/15/2015) |

| 01/30/2015 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Telephone Conference as to Rafael Antonio Garavito-Garcia held on 1/30/2015. (jbo) (Entered: 01/30/2015) |
|---|---|---|
| 02/02/2015 | 62 | NOTICE OF ATTORNEY APPEARANCE Ilan Tuviah Graff appearing for USA. (Graff, Ilan) (Entered: 02/02/2015) |
| 02/09/2015 | 63 | ORDER as to Rafael Antonio Garavito-Garcia. Pending before the Court is the motion of defendant Rafael Antonio Garavito-Garcia for the Court to appoint a psychologist to conduct a competency evaluation of Garavito-Garcia and for the Court to hold a competency hearing thereafter. The Court hereby grants the motion and appoints Dr. Barry Rosenfeld. In addition, the Court orders that Dr. Rosenfeld and an accompanying Spanish-language interpreter be granted access to Garavito-Garcia at the Kingsbrook Jewish Medical Center on February 10, 2015 at 9:00AM for the purposes of conducting the examination. Upon receipt of Dr. Rosenfeld's report, the parties are directed to promptly call into Chambers to set a date and time for the competency hearing. SO ORDERED. (Signed by Judge Jed S. Rakoff on 2/6/2015) (ft) (Entered: 02/09/2015) |
| 02/24/2015 | 64 | ORDER as to Rafael Antonio Garavito-Garcia. Trial will begin, as planned, on March 16, 2015, and no competency hearing will be held beforehand. SO ORDERED. (Signed by Judge Jed S. Rakoff on 2/23/2015)(ft) (Entered: 02/24/2015) |
| 03/01/2015 | 65 | **FILING ERROR - DEFICIENT DOCKET ENTRY** - FIRST MOTION in Limine *to Preclude Entrapment Defense and Admit Certain Evidence*. Document filed by USA as to Rafael Antonio Garavito-Garcia. (Graff, Ilan) Modified on 3/2/2015 (ka). (Entered: 03/01/2015) |
| 03/02/2015 | | **\*\*\*NOTICE TO ATTORNEY TO RE-FILE DOCUMENT - DEFICIENT DOCKET ENTRY ERROR as to Rafael Antonio Garavito-Garcia: Notice to Attorney Ilan Tuviah Graff to RE-FILE Document 65 FIRST MOTION in Limine *to Preclude Entrapment Defense and Admit Certain Evidence*. ERROR(S): Incorrect Title of Document\*\*\*NOTE: Title should read Motion in Limine. (ka)** *(Entered: 03/02/2015)* |
| 03/02/2015 | 66 | FIRST MOTION in Limine . Document filed by USA as to Rafael Antonio Garavito-Garcia. (Graff, Ilan) (Entered: 03/02/2015) |
| 03/06/2015 | 67 | SEALED DOCUMENT placed in vault. (nm) (Entered: 03/06/2015) |
| 03/12/2015 | 68 | MEMORANDUM as to Rafael Antonio Garavito-Garcia. Defendant Rafael Antonio Garavito-Garcia was extradited to the United States from Colombia on July 22, 2014 to face charges that he conspired to commit narcoterrorism, to distribute cocaine intending and knowing that it would be imported into the United States, to provide support to a foreign terrorist organization, and to acquire and transfer anti-aircraft missiles. On November 13, 2014, Garavito- Garcia moved pursuant to |

| | | |
|---|---|---|
| | | Federal Rule of Criminal Procedure 12 (b) (3) (A) to dismiss the indictment for lack of subject matter jurisdiction, asserting that his removal to the United States violated the extradition treaty between the United States and Colombia and that the treaty required he be set free. In a December 30, 2014 Order, this Court denied the motion. This Memorandum explains the reasons for that ruling. For the foregoing reasons, the Court reaffirms its denial of Garavito-Garcia's motion to dismiss the indictment. (Signed by Judge Jed S. Rakoff on 3/11/2015) (jw) (Entered: 03/12/2015) |
| 03/13/2015 | 70 | PROTECTIVE ORDER as to (S5-12-Cr-839-01) Rafael Antonio Garavito-Garcia. Upon the application of the United States of America, Preet Bharara, United States Attorney for the Southern District of New York, by and through Assistant United States Attorneys Shane T. Stansbury and Ilan Graff, of counsel, for an order precluding the dissemination of material pursuant to 18 U.S.C. § 3500 for all confidential sources and cooperating witnesses (the "CS and Cooperator 3500 material"), it is hereby ORDERED that (1) defense counsel must destroy or return to the Government the cs and Cooperator 3500 material (including all copies), at the conclusion of the trial of this matter or when any appeal has become final; (2) the defense is precluded from disseminating the CS and Cooperator 3500 material (and any copies) to anyone beyond the defendant, defense counsel, and any paralegals or staff employed by the defense; (3) the defendant is precluded from taking the CS and Cooperator 3500 material (or any copies) into his own possession either before, during, or after trial, except that the defendant may review the 3500 material in the possession of defense counsel when in the presence of defense counsel; and (4) the defendant and the defense are precluded from disseminating any identifying information regarding any confidential source and any cooperating witness (e.g., names, addresses, occupations, personal and family information) in any form. SO ORDERED: (Signed by Judge Jed S. Rakoff on 3/12/2015)(bw) (Entered: 03/13/2015) |
| 03/16/2015 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Voir Dire held on 3/16/2015 as to Rafael Antonio Garavito-Garcia. (jbo) (Entered: 04/08/2015) |
| 03/16/2015 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Jury Selection as to Rafael Antonio Garavito-Garcia held on 3/16/2015. (jbo) (Entered: 04/08/2015) |
| 03/16/2015 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Jury Trial as to Rafael Antonio Garavito-Garcia held on 3/16/2015. Deft pres w/atty Robert Ray. Gov't pres by Shane Stansbury AUSA & Ilan Graff AUSA. Spanish Interpreter present. Court reporter present. (jbo) (Entered: 04/08/2015) |
| 03/17/2015 | | |

| | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Jury Trial as to Rafael Antonio Garavito-Garcia held on 3/17/2015. (jbo) (Entered: 04/08/2015) |
|---|---|---|
| 03/18/2015 | 71 | Proposed Jury Instructions by Rafael Antonio Garavito-Garcia. (Ray, Robert) (Entered: 03/18/2015) |
| 03/18/2015 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Jury Trial as to Rafael Antonio Garavito-Garcia held on 3/18/2015. (jbo) (Entered: 04/08/2015) |
| 03/19/2015 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Jury Trial as to Rafael Antonio Garavito-Garcia held on 3/19/2015. (jbo) (Entered: 04/08/2015) |
| 03/20/2015 | 72 | **FILING ERROR - WRONG EVENT TYPE SELECTED FROM MENU -** Proposed Jury Instructions by USA as to Rafael Antonio Garavito-Garcia. (Stansbury, Shane) Modified on 3/23/2015 (ka). (Entered: 03/20/2015) |
| 03/20/2015 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Jury Trial as to Rafael Antonio Garavito-Garcia held on 3/20/2015. (jbo) (Entered: 04/08/2015) |
| 03/23/2015 | | **NOTICE TO ATTORNEY TO RE-FILE DOCUMENT - EVENT TYPE ERROR as to Rafael Antonio Garavito-Garcia: Notice to Attorney Shane Thomas Stansbury to RE-FILE Document 72 Proposed Jury Instructions. Use the event type Letter found under the event list Other Documents. (ka)** (Entered: 03/23/2015) |
| 03/23/2015 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Jury Trial as to Rafael Antonio Garavito-Garcia held on 3/23/2015. (jbo) (Entered: 04/08/2015) |
| 03/24/2015 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Jury Trial as to Rafael Antonio Garavito-Garcia held on 3/24/2015. (jbo) (Entered: 04/08/2015) |
| 03/25/2015 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Jury Trial as to Rafael Antonio Garavito-Garcia held on 3/25/2015. (jbo) (Entered: 04/08/2015) |
| 03/26/2015 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Jury Trial as to Rafael Antonio Garavito-Garcia held on 3/26/2015. After due deliberation, the jury returns a verdict of GUILTY n all 4 counts of the indictment. SENS July 20, 2015 at 4:00pm. PSI REF TO PROB. DEFT CONTD REMANDED. (jbo) (Entered: 04/08/2015) |
| 03/26/2015 | | JURY VERDICT as to Rafael Antonio Garavito-Garcia (1) Guilty on Count 1,2,3,4. (jbo) (Entered: 04/08/2015) |
| 03/26/2015 | | Set/Reset Hearings as to Rafael Antonio Garavito-Garcia: Sentencing set for 7/20/2015 at 04:00 PM before Judge Jed S. Rakoff. (jbo) (Entered: 04/08/2015) |

| 03/26/2015 | | Order of Referral to Probation for Presentence Investigation and Report as to Rafael Antonio Garavito-Garcia. (Signed by Judge Jed S. Rakoff on 3/26/15)(jbo) (Entered: 04/08/2015) |
|---|---|---|
| 04/24/2015 | 75 | TRANSCRIPT of Proceedings as to Rafael Antonio Garavito-Garcia re: Trial held on 3/16/15 before Judge Jed S. Rakoff. Court Reporter/Transcriber: Andrew Walker, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 5/18/2015. Redacted Transcript Deadline set for 5/29/2015. Release of Transcript Restriction set for 7/27/2015. (McGuirk, Kelly) (Entered: 04/24/2015) |
| 04/24/2015 | 76 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Rafael Antonio Garavito-Garcia. Notice is hereby given that an official transcript of a Trial proceeding held on 3/16/15 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 04/24/2015) |
| 04/24/2015 | 77 | TRANSCRIPT of Proceedings as to Rafael Antonio Garavito-Garcia re: Trial held on 3/17/15 before Judge Jed S. Rakoff. Court Reporter/Transcriber: Denise Richards, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 5/18/2015. Redacted Transcript Deadline set for 5/29/2015. Release of Transcript Restriction set for 7/27/2015. (McGuirk, Kelly) (Entered: 04/24/2015) |
| 04/24/2015 | 78 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Rafael Antonio Garavito-Garcia. Notice is hereby given that an official transcript of a Trial proceeding held on 3/17/15 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 04/24/2015) |
| 04/24/2015 | 79 | TRANSCRIPT of Proceedings as to Rafael Antonio Garavito-Garcia re: Trial held on 3/18/15 before Judge Jed S. Rakoff. Court Reporter/Transcriber: Andrew Walker, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 5/18/2015. Redacted Transcript Deadline set |

| | | |
|---|---|---|
| | | for 5/29/2015. Release of Transcript Restriction set for 7/27/2015. (McGuirk, Kelly) (Entered: 04/24/2015) |
| 04/24/2015 | 80 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Rafael Antonio Garavito-Garcia. Notice is hereby given that an official transcript of a Trial proceeding held on 3/18/15 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 04/24/2015) |
| 04/24/2015 | 81 | TRANSCRIPT of Proceedings as to Rafael Antonio Garavito-Garcia re: Trial held on 3/19/15 before Judge Jed S. Rakoff. Court Reporter/Transcriber: Denise Richards, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 5/18/2015. Redacted Transcript Deadline set for 5/29/2015. Release of Transcript Restriction set for 7/27/2015. (McGuirk, Kelly) (Entered: 04/24/2015) |
| 04/24/2015 | 82 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Rafael Antonio Garavito-Garcia. Notice is hereby given that an official transcript of a Trial proceeding held on 3/19/15 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 04/24/2015) |
| 04/24/2015 | 83 | TRANSCRIPT of Proceedings as to Rafael Antonio Garavito-Garcia re: Trial held on 3/20/15 before Judge Jed S. Rakoff. Court Reporter/Transcriber: Andrew Walker, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 5/18/2015. Redacted Transcript Deadline set for 5/29/2015. Release of Transcript Restriction set for 7/27/2015. (McGuirk, Kelly) (Entered: 04/24/2015) |
| 04/24/2015 | 84 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Rafael Antonio Garavito-Garcia. Notice is hereby given that an official transcript of a Trial proceeding held on 3/20/15 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public |

| | | |
|---|---|---|
| | | without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 04/24/2015) |
| 04/24/2015 | 85 | TRANSCRIPT of Proceedings as to Rafael Antonio Garavito-Garcia re: Trial held on 3/23/15 before Judge Jed S. Rakoff. Court Reporter/Transcriber: Andrew Walker, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 5/18/2015. Redacted Transcript Deadline set for 5/29/2015. Release of Transcript Restriction set for 7/27/2015. (McGuirk, Kelly) (Entered: 04/24/2015) |
| 04/24/2015 | 86 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Rafael Antonio Garavito-Garcia. Notice is hereby given that an official transcript of a Trial proceeding held on 3/23/15 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 04/24/2015) |
| 04/24/2015 | 87 | TRANSCRIPT of Proceedings as to Rafael Antonio Garavito-Garcia re: Trial held on 3/24/15 before Judge Jed S. Rakoff. Court Reporter/Transcriber: Andrew Walker, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 5/18/2015. Redacted Transcript Deadline set for 5/29/2015. Release of Transcript Restriction set for 7/27/2015. (McGuirk, Kelly) (Entered: 04/24/2015) |
| 04/24/2015 | 88 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Rafael Antonio Garavito-Garcia. Notice is hereby given that an official transcript of a Trial proceeding held on 3/24/15 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 04/24/2015) |
| 04/24/2015 | 89 | TRANSCRIPT of Proceedings as to Rafael Antonio Garavito-Garcia re: Trial held on 3/25/15 before Judge Jed S. Rakoff. Court Reporter/Transcriber: Andrew Walker, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 5/18/2015. Redacted Transcript Deadline set |

| | | |
|---|---|---|
| | | for 5/29/2015. Release of Transcript Restriction set for 7/27/2015. (McGuirk, Kelly) (Entered: 04/24/2015) |
| 04/24/2015 | 90 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Rafael Antonio Garavito-Garcia. Notice is hereby given that an official transcript of a Trial proceeding held on 3/25/15 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 04/24/2015) |
| 04/24/2015 | 91 | TRANSCRIPT of Proceedings as to Rafael Antonio Garavito-Garcia re: Trial held on 3/26/15 before Judge Jed S. Rakoff. Court Reporter/Transcriber: Denise Richards, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 5/18/2015. Redacted Transcript Deadline set for 5/29/2015. Release of Transcript Restriction set for 7/27/2015. (McGuirk, Kelly) (Entered: 04/24/2015) |
| 04/24/2015 | 92 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Rafael Antonio Garavito-Garcia. Notice is hereby given that an official transcript of a Trial proceeding held on 3/26/15 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 04/24/2015) |
| 06/19/2015 | 104 | SEALED DOCUMENT placed in vault. (mps) (Entered: 06/19/2015) |
| 06/19/2015 | 105 | SEALED DOCUMENT placed in vault. (mps) (Entered: 06/19/2015) |
| 06/19/2015 | 106 | SEALED DOCUMENT placed in vault. (mps) (Entered: 06/19/2015) |
| 07/13/2015 | 107 | SENTENCING SUBMISSION by Rafael Antonio Garavito-Garcia. (Ray, Robert) (Entered: 07/13/2015) |
| 07/16/2015 | 108 | SENTENCING SUBMISSION by USA as to Rafael Antonio Garavito-Garcia. (Stansbury, Shane) (Entered: 07/16/2015) |
| 07/20/2015 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Sentencing held on 7/20/2015 for Rafael Antonio Garavito-Garcia (1) Count 1,2,3,4. SENTENCE. Deft pres w/atty Robert Ray. Gov't pres by Ilan Graff, AUSA & Shane Stansbury, AUSA. Spanish Interpreter present. Court reporter present. SENTENCE:On count 1- 240 months, 2- 120 months, 3- 120 months, 4- 300 months.TO RUN CONCURRENT TO EACHOTHER. SR: Count 1-5 years, Count 2 - 5 years, Count 3- 3 years, Count 4 - 5 years. TO RUIN CONCURRENT |

| | | TO EACH OTHER $400 ASSESSMENT.Deft cont'd remanded. RAKOFF, J (ajc) (Entered: 07/22/2015) |
|---|---|---|
| 07/22/2015 | 109 | JUDGMENT as to Rafael Antonio Garavito-Garcia (1), Found guilty on Count(s) 1, Count(s) 2, Count(s) 3, Count(s) 4, Imprisonment for a total term of On Count 1- Two Hundred Forty (240) months. On Count 2 - One Hundred Twenty (120) months. On Count 3- One Hundred twenty (120) months. On Count 4- Three Hundred (300) months. TO RUN CONCURRENT TO EACH OTHER. Supervised release for a term of Counts 1, 2 and 4 - Five ( 5) years. On Count Three - Three (3) years. TO RUN CONCURRENT TO EACH OTHER. The Court makes the following recommendations to the Bureau of Prisons: Incarceration in FMC Carswell, Texas. The defendant shall receive credit for the approximately 16 months spent in jail in Colombia awaiting extradition. The defendant shall comply with the directives of the Department of Homeland Security - Bureau of Immigration and Customs Enforcement and obey the immigration laws. If deported, the defendant is not to reenter the United States without the permission of the U.S. Attorney General. Special Assessment of $400 which is due immediately. (Signed by Judge Jed S. Rakoff on 7/22/2015)(jw) (Entered: 07/22/2015) |
| 08/04/2015 | 110 | NOTICE OF APPEAL by Rafael Antonio Garavito-Garcia from 109 Judgment. (tp) (Entered: 08/04/2015) |
| 08/04/2015 | 111 | TRANSCRIPT REQUEST by Rafael Antonio Garavito-Garcia for a Sentence proceeding held on 7/20/2015 before Judge Jed S. Rakoff re: 110 Notice of Appeal - Final Judgment. Transcript due by 8/17/2015. (tp) (Entered: 08/04/2015) |
| 08/04/2015 | | Appeal Remark as to Rafael Antonio Garavito-Garcia re: 110 Notice of Appeal - Final Judgment. ATTORNEY CJA. (tp) (Entered: 08/04/2015) |
| 08/04/2015 | | Transmission of Notice of Appeal and Certified Copy of Docket Sheet as to Rafael Antonio Garavito-Garcia to US Court of Appeals re: 110 Notice of Appeal - Final Judgment. (tp) (Entered: 08/04/2015) |
| 08/04/2015 | | Appeal Record Sent to USCA (Electronic File). Certified Indexed record on Appeal Electronic Files as to Rafael Antonio Garavito-Garcia re: 110 Notice of Appeal - Final Judgment, 111 Appeal Transcript Request were transmitted to the U.S. Court of Appeals. (tp) (Entered: 08/04/2015) |
| 09/18/2015 | 112 | ORDER as to Rafael Antonio Garavito-Garcia. IT IS HEREBY ORDERED, that: JUSTIN KRANE, Esq. and GLENNA GRINNELL are appointed as associate counsel, nunc pro tune, to assist in the representation of RAFAEL ANTONIO GARA VITO-GARCIA, in the above-captioned matter, pursuant to the Criminal Justice Act 18 U.S.C. § 3006A and 2d Circuit CJA Policy and Procedure Manual, 11.A.1.a.. and are authorized to bill at a rate of eighty dollars ($80.00) per hour and seventy dollars ($70.00) per hour, respectively, and authorization |

A-17

| | | to bill in excess of 10 hours, but not to exceed 19 hours and 24 hours, respectively, is granted. (Signed by Judge Jed S. Rakoff on 9/17/2015) (ft) (Entered: 09/18/2015) |
|---|---|---|

| PACER Service Center | | | |
|---|---|---|---|
| Transaction Receipt | | | |
| 10/23/2015 15:56:32 | | | |
| **PACER Login:** | fr000009:2550901:0 | **Client Code:** | 137383.00002 |
| **Description:** | Docket Report | **Search Criteria:** | 1:12-cr-00839-JSR |
| **Billable Pages:** | 15 | **Cost:** | 1.50 |

A-18

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA

       - v. -

RAFAEL ANTONIO GARAVITO-GARCIA,
  a/k/a "El Viejo," and
GUSTAVO PEREZ-GARCIA,
  a/k/a "Gato,"

          Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

**SEALED**
**SUPERSEDING INDICTMENT**

S5 12 Cr. 839

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 1/8/13

## BACKGROUND

### *Guinea Bissau*

1.    The Republic of Guinea Bissau is located on the west coast of Africa.  It is situated between Guinea to the south and Senegal to the north, with a population of approximately 1,600,000.  One of the poorest countries in the world, Guinea Bissau's legal economy is largely dependent on fishing and farming.  In recent years, Guinea Bissau has become a major transshipment point for narcotics produced in South America, shipped across the Atlantic Ocean, and then sent on to various locations in Europe and elsewhere.

### *Fuerzas Armadas*
### *Revolucionarias de Colombia*

2.    From its founding in or about 1964 to the present, the Fuerzas Armadas Revolucionarias de Colombia (the "FARC") has been dedicated to the violent overthrow of the Government of Colombia.  To fund its activities, the FARC actively engages in narcotics trafficking and has evolved into the world's largest supplier of cocaine.  The FARC is styled as a military group and is comprised of thousands of armed guerillas.  To further its activities, the

1

FARC obtains automatic rifles, ammunition, machine guns, explosives, and surface-to-air missiles from various other entities.  Over the years, the FARC has targeted United States persons and United States property interests.  For example, the FARC leadership has ordered FARC members to kidnap and murder United States citizens.  In recent years, and in response to law-enforcement pressure on traditional supply routes, narcotics traffickers based in South America have begun shipping drugs – including FARC-cocaine – across the Atlantic, to countries located on the west coast of Africa.  From there, it is believed that the drugs can more readily be shipped on to other countries.

3.     In October 1997, the United States Secretary of State designated the FARC as a foreign terrorist organization pursuant to Section 219 of the Immigration and Nationality Act.  The FARC remains so designated.

**THE DEFENDANTS**

4.     At all times relevant to this Indictment, RAFAEL ANTONIO GARAVITO-GARCIA, a/k/a "El Viejo," the defendant, a Colombian national, was a narcotics trafficker based in Colombia, who supplied cocaine to customers based in Guinea Bissau, among other locations.

5.     At all times relevant to this Indictment, GUSTAVO PEREZ-GARCIA, a/k/a "Gato," the defendant, a Colombian national, was a narcotics trafficking associate of RAFAEL ANTONIO GARAVITO-GARCIA, a/k/a "El Viejo," the defendant; PEREZ-GARCIA operated in Colombia.

**MEANS AND METHODS OF THE CONSPIRACY**

6.     From at least in or about May 2012, RAFAEL ANTONIO GARAVITO-GARCIA, a/k/a "El Viejo," and GUSTAVO PEREZ-GARCIA, a/k/a "Gato," the defendants,

and four co-conspirators not named as defendants herein, CC-1, CC-2, CC-3, and CC-4, worked together to ship ton-quantities of FARC-owned cocaine across the Atlantic Ocean to Guinea Bissau, and then to store the cocaine in Guinea Bissau before its shipment to other locations, including the United States.  In doing so, the defendants interacted with two individuals who purported at all times to be representatives and/or associates of the FARC; these two individuals were, in fact, confidential sources working for the Drug Enforcement Administration ("DEA") ("CS-1" and "CS-2"; collectively, the "Confidential Sources").  In addition, GARAVITO-GARCIA, CC-1, CC-2, CC-3, and CC-4, agreed to supply weapons, including surface-to-air missiles, to be used in the FARC's armed conflict with United States counter-narcotics forces in Colombia; in doing so, these defendants worked with the Confidential Sources.

7.      RAFAEL ANTONIO GARAVITO-GARCIA, a/k/a "El Viejo," and GUSTAVO PEREZ-GARCIA, a/k/a "Gato," the defendants, participated in the conspiracy by, among other things, introducing the Confidential Sources to CC-2 and CC-3.  CC-2 and CC-3 were contacts in Guinea Bissau of GARAVITO-GARCIA and PEREZ-GARCIA who could facilitate the storage of FARC cocaine; the subsequent transport of that cocaine to the United States; and the purchase of weapons for use by the FARC, including surface-to-air missiles.  CC-2 and CC-3 arranged for the Confidential Sources to meet with CC-1, a high-level official in the Guinea Bissau Military, and CC-4, who agreed: (1) to permit the receipt and storage of large quantities of FARC cocaine in Guinea Bissau; and (2) to arrange to purchase weapons for the FARC, by importing them into Guinea Bissau for the nominal use of the Guinea Bissau military; these weapons included surface-to-air missiles.

## COUNT ONE

## NARCOTERRORISM CONSPIRACY

The Grand Jury charges:

8.     The allegations set forth in Paragraphs One through Seven above are incorporated by reference as if set forth fully herein.

9.     From at least in or about May 2012, up to and including the date of the filing of this Indictment, in an offense begun and committed outside of the jurisdiction of any particular State or district of the United States, RAFAEL ANTONIO GARAVITO-GARCIA, a/k/a "El Viejo," and GUSTAVO PEREZ-GARCIA, a/k/a "Gato," the defendants, at least one of whom will be first brought to and arrested in the Southern District of New York, and others known and unknown, intentionally and knowingly did combine, conspire, confederate and agree together and with each other to violate Title 21, United States Code, Section 960a.

10.     It was a part and an object of said conspiracy that RAFAEL ANTONIO GARAVITO-GARCIA, a/k/a "El Viejo," and GUSTAVO PEREZ-GARCIA, a/k/a "Gato," the defendants, and others known and unknown, would and did engage in conduct that would be punishable under Title 21, United States Code, Section 841(a) if committed within the jurisdiction of the United States, to wit, the distribution, and possession with the intent to distribute, of five kilograms and more of mixtures and substances containing a detectable amount of cocaine, knowing and intending to provide, directly and indirectly, something of pecuniary value to a person and organization that has engaged and engages in terrorism and terrorist activity, to wit, the FARC (which has been designated by the United States Secretary of State as a foreign terrorist organization pursuant to Section 219 of the Immigration and Nationality Act and remains so designated), and its members, operatives and associates, having knowledge that

such organization and persons have engaged and engage in terrorism and terrorist activity, which prohibited drug activity and terrorist offense violate the criminal laws of the United States, occur in and affect foreign commerce, and cause and are designed to cause death and serious bodily injury to nationals of the United States while the nationals are outside the United States, and substantial damage to the property of a legal entity organized under the laws of the United States while that property is outside of the United States, in violation of Section 960a of Title 21, United States Code.

## Overt Acts

11.     In furtherance of the conspiracy, and to effect the illegal object thereof, the following overt acts, among others, were committed:

a.      On or about June 25, 2012, in a hotel in Brazil, RAFAEL ANTONIO GARAVITO-GARCIA, a/k/a "El Viejo," the defendant, met with the Confidential Sources.  The Confidential Sources recorded the meeting.  The meeting focused principally on the shipment of cocaine from South America to Guinea Bissau that would ultimately be shipped to, among other places, the United States.

b.      On or about June 30, 2012, in Guinea Bissau, RAFAEL ANTONIO GARAVITO-GARCIA, a/k/a "El Viejo," the defendant, CC-2, and CC-3 met with the Confidential Sources.  The Confidential Sources recorded the meeting.  The meeting focused primarily on the shipment of cocaine from South America to Guinea Bissau, and the need to involve Guinea Bissau government officials in the operation.  During the meeting, CC-2 and CC-3 agreed to assist in the distribution of FARC cocaine by facilitating the shipment of cocaine to Guinea Bissau inside loads of military uniforms, and by establishing a front company in Guinea

Bissau to export the cocaine from Guinea Bissau to the United States. In addition, CC-2 agreed to assist in obtaining weapons for the FARC by arranging a meeting, through CC-4, with CC-1.

       c.      Later that same day, on or about June 30, 2012, RAFAEL ANTONIO GARAVITO-GARCIA, a/k/a "El Viejo," the defendant, CC-2, and CC-3 met again with the Confidential Sources. The Confidential Sources recorded the meeting. The meeting focused primarily on the shipment of cocaine to Guinea Bissau and, thereafter, the importation of a portion of the cocaine to the United States. During the meeting, CC-2 agreed to purchase some of the cocaine for 14,000 Euros per kilogram. In addition, both CC-2 and CC-3 advised that government officials in Guinea Bissau would retain a percentage of the cocaine shipped to Guinea Bissau and that they (CC-2 and CC-3) would discuss the exact amount with the relevant Guinea Bissau officials.

       d.      On or about July 2, 2012, in Guinea Bissau, RAFAEL ANTONIO GARAVITO-GARCIA, a/k/a "El Viejo," the defendant, CC-2, and CC-3 met with the Confidential Sources. The Confidential Sources recorded the meeting. During the meeting, CC-2 instructed the Confidential Sources that they would be meeting that day with CC-1, who would provide land for a front company in Guinea Bissau that would store cocaine pending its transportation to the United States and Europe. In addition, CC-3 explained that for this service, Guinea Bissau government officials would, as a fee, expect 13% of the cocaine shipped to Guinea Bissau.

       e.      On or about July 2, 2012, at a military facility in Guinea Bissau, RAFAEL ANTONIO GARAVITO-GARCIA, a/k/a "El Viejo," the defendant, CC-1, and CC-4 met with the Confidential Sources. The Confidential Sources recorded the meeting. At the meeting, CS-1 explained that he had wanted to meet with CC-1 face-to-face to obtain CC-1's

approval to move forward with the plan to ship tons of cocaine into Guinea Bissau, using loads of military uniforms to mask the illicit nature of the shipment. CC-4 then explained to CC-1 that the Confidential Sources were also in Guinea Bissau to purchase weapons. In response, CC-1 acknowledged that the weapons procurement plan would go through him and the Guinea Bissau government; CC-1 stated, "It is through me that you can do that …. It is through the government and I am only an intermediary." CS-1 then confirmed how the weapons deal would work: half of the weapons ordered by the Guinea Bissau military would go to the FARC, and the other half would go to the Guinea Bissau military. CS-1 noted, that unlike a country such as Guinea Bissau, the FARC could not simply ask a weapons manufacturer to supply it with weapons. CS-1 described the FARC's need for surface-to-air missiles to combat United States helicopters that are used to destroy cocaine in Colombia. CS-1 suggested that a single plane could be used to deliver the cocaine to Guinea Bissau from Colombia, and then to return to Colombia, loaded in Guinea Bissau with weapons for the FARC. Towards the end of the meeting, CS-1 explained to CC-1 that once the cocaine from Colombia arrived in Guinea Bissau, the plan would be to utilize a front company to provide cover for the shipment of the cocaine out of Guinea Bissau to, among other places, the United States. CC-1 agreed with the proposal to ship FARC cocaine to Guinea Bissau for later distribution in the United States and to procure weapons for the FARC, including surface-to-air missiles. CC-1 also stated that he would discuss the plan with the President of Guinea Bissau. He stated, "The day after tomorrow, I'll talk to the President of the Republic."

    f. Later that same day, on or about July 2, 2012, CC-2 met again with the Confidential Sources. CC-2 advised that, per instructions he received from CC-4, CC-1 required a payment of approximately 20,000 Euros, as proof that the Confidential Sources were serious about the proposed cocaine and weapons transactions and to begin doing business under

the protection of the Guinea Bissau government.  Thereafter, CC-2 gave CS-1 two telephone numbers for an associate in Rotterdam, the Netherlands (the "Rotterdam Contact"), who would receive the approximately 20,000 Euros and make sure that the money was transferred to CC-1.

g.    On or about July 2, 2012, in Guinea Bissau, RAFAEL ANTONIO GARAVITO-GARCIA, a/k/a "El Viejo," the defendant, CC-2, CC-3, and a member of the Guinea Bissau military ("Guinea Bissau Military Official-1") met with the Confidential Sources. The Confidential Sources recorded the meeting.  During the meeting, CC-2 said that Guinea Bissau Military Official-1 was appointed by CC-1 to be in charge of the weapons transaction. CC-2 further explained that Guinea Bissau Military Official-1 would handle the receipt of the shipment of cocaine from Colombia at the airport in Guinea Bissau.  Guinea Bissau Military Official-1 stated that, when the cocaine arrived, the weapons would be ready to load onto a plane bound for Colombia.

h.    On or about July 3, 2012, at a hotel in Guinea Bissau, RAFAEL ANTONIO GARAVITO-GARCIA, a/k/a "El Viejo," the defendant, CC-2, CC-3, and CC-4 met with the Confidential Sources.  The Confidential Sources recorded the meeting.  During the meeting, CC-2 introduced the Confidential Sources to a Guinea Bissau military representative ("Guinea Bissau Military Official-2") who CC-2 explained would serve as a representative of CC-1.  CS-1 explained the benefits of using Guinea Bissau as a transshipment point for cocaine obtained in South America and destined for the United States, and CC-3 described how the cocaine would be offloaded once it arrived in Guinea Bissau.  Later in the meeting, CS-1 described the weapons to be supplied to the FARC to combat American forces in Colombia, including surface-to-air missiles and AK-47 assault rifles with grenade launchers.

8

        i.      On or about July 24, 2012, CC-2 spoke by telephone with CS-1. CS-1 recorded the telephone call.  During the conversation, CS-1 and CC-2 discussed the payment to the Rotterdam Contact of the approximately 20,000 Euros for CC-1.  CS-1 and CC-2 also discussed the military uniforms that would serve as the cover load for the cocaine to be shipped to Guinea Bissau, and CC-2 agreed to send CS-1 an order form to facilitate the shipment of the military uniforms to Guinea Bissau.

        j.      On or about August 9, 2012, RAFAEL ANTONIO GARAVITO-GARCIA, a/k/a "El Viejo," the defendant, spoke by telephone with the Confidential Sources. The Confidential Sources recorded the telephone call.  During the conversation, GARAVITO-GARCIA said that a request from the Guinea Bissau government for the military uniforms had been signed.

        k.      On or about August 18, 2012, CC-2 spoke by telephone with CS-1. CS-1 recorded the telephone call.  During the conversation, CC-2 confirmed that he personally delivered approximately 20,000 Euros to CC-1 who, according to CC-2, was pleased with the payment and was interested in moving forward expeditiously, especially with the weapons deal.

        l.      On or about August 28, 2012, CC-2 conveyed a request for military uniforms and related equipment, dated August 24, 2012, from the Prime Minister of Guinea Bissau.  The request was sent to an email address that had been provided by the Confidential Sources.

        m.     On or about August 31, 2012, in Bogota, Colombia, RAFAEL ANTONIO GARAVITO-GARCIA, a/k/a "El Viejo," and GUSTAVO PEREZ-GARCIA, a/k/a "Gato," the defendants, met with CS-2.  CS-2 recorded the meeting.  During the meeting, PEREZ-GARCIA and GARAVITO-GARCIA agreed to facilitate the receipt of approximately

4,000 kilograms of cocaine from the FARC in Guinea Bissau, approximately 500 kilograms of which would later be sent to customers in the United States and Canada.

n.     On or about September 22, 2012, in Guinea Bissau, CC-2 and CC-3 met with the Confidential Sources. The Confidential Sources recorded the meeting. During the meeting, CC-2 explained that an office was being prepared for use for the front company that would ship cocaine from Guinea Bissau to the United States and Canada. CS-1 reminded CC-2 and CC-3 that the FARC wanted surface-to-air missiles, and CC-3 replied by acknowledging, in sum and substance, that he understood that the weapons were needed to attack United States helicopters in Colombia.

o.     On or about September 23, 2012, in Guinea Bissau, CC-2 and another co-conspirator not named as a defendant herein ("CC-5"), met with the Confidential Sources. The Confidential Sources recorded the meeting. During the meeting, CS-1 provided CC-5 with a list of the weapons that the FARC was requesting, which included, among other things, surface-to-air missiles, AK-47 assault rifles, and machine guns. CC-2 said that he and CC-5 would speak with the President and Prime Minister of Guinea Bissau about the weapons order for the FARC.

p.     On or about September 25, 2012, in Guinea Bissau, CC-2 and CC-3 met with the Confidential Sources. The Confidential Sources recorded the meeting. During the meeting, CC-2 showed the Confidential Sources documentation for establishing the front company that would be used to send cocaine from Guinea Bissau to, among other places, the United States.

q.     On or about September 26, 2012, in Guinea Bissau, RAFAEL ANTONIO GARAVITO-GARCIA, a/k/a "El Viejo," and GUSTAVO PEREZ-GARCIA, a/k/a

10

"Gato," the defendants, CC-2, and CC-3 met with the Confidential Sources.  During the meeting, CC-2 gave documentation referred to in paragraph p, above, to the Confidential Sources.  In addition, PEREZ-GARCIA provided the Confidential Sources with a list of equipment that was needed to receive and transport the cocaine shipments in Guinea Bissau, including trucks with hidden compartments in them for secreting the cocaine.

(Title 21, United States Code, Section 960a.)

## COUNT TWO

## COCAINE IMPORATION CONSPIRACY

The Grand Jury further charges:

12.     The allegations set forth in Paragraphs One through Seven above are incorporated by reference as if set forth fully herein.

13.     From at least in or about May 2012, up to and including the date of the filing of this Indictment, in an offense committed outside the territorial jurisdiction of the United States, RAFAEL ANTONIO GARAVITO-GARCIA, a/k/a "El Viejo," and GUSTAVO PEREZ-GARCIA, a/k/a "Gato," the defendants, at least one of whom will be first brought to and arrested in the Southern District of New York, and others known and unknown, unlawfully, intentionally and knowingly did combine, conspire, confederate and agree together and with each other to violate the narcotics laws of the United States.

14.     It was a part and an object of the conspiracy that RAFAEL ANTONIO GARAVITO-GARCIA, a/k/a "El Viejo," and GUSTAVO PEREZ-GARCIA, a/k/a "Gato," the defendants, and others known and unknown, would and did distribute a controlled substance, intending and knowing that such substance would be unlawfully imported into the United States

11

or into waters within a distance of 12 miles of the coast of the United States, in violation of

Sections 812, 959(a), and 960(a)(3) of Title 21, United States Code.

15.    The controlled substance involved in the offense was five kilograms and

more of mixtures and substances containing a detectable amount of cocaine, in violation of

Section 960(b)(1)(B) of Title 21, United States Code.

**Overt Acts**

16.    In furtherance of the conspiracy and to effect the illegal object thereof,

RAFAEL ANTONIO GARAVITO-GARCIA, a/k/a "El Viejo," and GUSTAVO PEREZ-

GARCIA, a/k/a "Gato," the defendants, and others known and unknown, committed the overt

acts set forth in Paragraphs 11a through 11q of this Indictment, which are fully incorporated by

reference herein.

(Title 21, United States Code, Section 963.)

**COUNT THREE**

**CONSPIRACY TO PROVIDE MATERIAL SUPPORT
TO A FOREIGN TERRORIST ORGANIZATION**

The Grand Jury further charges:

17.    The allegations set forth in Paragraphs One through Seven above are

incorporated by reference as if set forth fully herein.

18.    From in or about May 2012, up to and including the date of the filing of

this Indictment, in an offense occurring in and affecting foreign commerce, and begun and

committed outside of the jurisdiction of any particular State or district of the United States,

RAFAEL ANTONIO GARAVITO-GARCIA, a/k/a "El Viejo," and GUSTAVO PEREZ-

GARCIA, a/k/a "Gato," the defendants, at least one of whom will be first brought to and arrested

in the Southern District of New York, and others known and unknown, unlawfully and

knowingly did combine, conspire, confederate and agree together and with each other to provide weapons and other material support and resources to a foreign terrorist organization, namely, the FARC, which was designated as a foreign terrorist organization in October 1997 by the United States Secretary of State, re-designated as such on October 2, 2003 and October 11, 2005, and is currently designated as such as of the date of the filing of this Indictment, knowing that the FARC engages and has engaged in terrorist activity (as defined in section 212(a)(3)(B) of the Immigration and Nationality Act), and that the FARC engages and has engaged in terrorism (as defined in section 140(d)(2) of the Foreign Relations Authorization Act, Fiscal Years 1988 and 1989).

19.     It was a part and an object of the conspiracy that RAFAEL ANTONIO GARAVITO-GARCIA, a/k/a "El Viejo," and GUSTAVO PEREZ-GARCIA, a/k/a "Gato," the defendants, and others known and unknown, would and did agree to provide material support and resources, including, among other things, (i) providing logistical support for cocaine distribution for the FARC, (ii) facilitating the sale of FARC cocaine in the United States, and (iii) providing weapons to the FARC, knowing that the FARC was a designated foreign terrorist organization (as defined in Title 18, United States Code, Section 2339B(g)(6)), that the FARC had engaged and was engaging in terrorist activity (as defined in section 212(a)(3)(B) of the Immigration and Nationality Act), and that the FARC had engaged and was engaging in terrorism (as defined in section 140(d)(2) of the Foreign Relations Authorization Act, Fiscal Years 1988 and 1989), in violation of Title 18, United States Code, Section 2339B.

**Overt Acts**

20.     In furtherance of the conspiracy and to effect the illegal object thereof,

RAFAEL ANTONIO GARAVITO-GARCIA, a/k/a "El Viejo," and GUSTAVO PEREZ-

GARCIA, a/k/a "Gato," the defendants, and others known and unknown, committed the overt

acts set forth in Paragraphs 11a through 11q of this Indictment, which are fully incorporated by

reference herein.

(Title 18, United States Code, Sections 2339B(a)(1), (d)(1) and 3238.)

**COUNT FOUR**

**CONSPIRACY TO ACQUIRE AND TRANSFER ANTI-AIRCRAFT MISSILES**

The Grand Jury further charges:

21.     The allegations set forth in Paragraphs One through Seven above are

incorporated by reference as if set forth fully herein.

22.     From at least in or about May 2012, up to and including the date of the

filing of this Indictment, in an offense begun and committed outside of the jurisdiction of any

particular State or district of the United States, RAFAEL ANTONIO GARAVITO-GARCIA,

a/k/a "El Viejo," the defendant, who will be first brought to and arrested in the Southern District

of New York, and others known and unknown, unlawfully and knowingly did combine, conspire,

confederate and agree together and with each other to violate Section 2332g of Title 18, United

States Code.

23.     It was a part and an object of the conspiracy that RAFAEL ANTONIO

GARAVITO-GARCIA, a/k/a "El Viejo," the defendant, and others known and unknown, would

and did produce, construct, otherwise acquire, transfer directly and indirectly, receive, possess,

import, and use (1) an explosive and incendiary rocket and missile that is guided by a system

designed to enable the rocket and missile to seek and proceed toward energy radiated and reflected from an aircraft and toward an image locating an aircraft, and otherwise direct and guide the rocket and missile to an aircraft; (2) a device designed and intended to launch and guide said rocket and missile; and (3) a part and combination of parts designed and redesigned for use in assembling and fabricating said rocket, missile, and device; to wit, GARAVITO-GARCIA agreed with others to acquire and transfer surface-to-air missile systems to enable the FARC to attack United States aircraft in Colombia, in violation of Title 18, United States Code, Section 2332g.

### Overt Acts

24.     In furtherance of the conspiracy and to effect the illegal object thereof, RAFAEL ANTONIO GARAVITO-GARCIA, a/k/a "El Viejo," the defendant, and others known and unknown, committed the overt acts set forth in Paragraphs 11a through 11q of this Indictment, which are fully incorporated by reference herein.

(Title 18, United States Code, Sections 2332g(a)(1), (b), (c), and 3238.)

### FORFEITURE ALLEGATION

(As to Counts One and Two)

25.     As a result of committing the controlled substance offenses alleged in Counts One and Two of this Indictment, RAFAEL ANTONIO GARAVITO-GARCIA, a/k/a "El Viejo," and GUSTAVO PEREZ-GARCIA, a/k/a "Gato," the defendants, shall forfeit to the United States, pursuant to Title 21, United States Code, Sections 853 and 970, any and all property constituting or derived from any proceeds that the defendants obtained directly or indirectly as a result of the offenses and any and all property used or intended to be used in any manner or part to commit and to facilitate the commission of the offenses alleged in Counts One

15

and Two of this Indictment, including, but not limited to, a sum of money representing the

amount of proceeds obtained as a result of the offenses described in Counts One and Two of this

Indictment.

## Substitute Assets Provision

26.    If any of the property described above as being subject to forfeiture, as a

result of any act or omission of the defendants:

a.    cannot be located upon the exercise of due diligence;

b.    has been transferred or sold to, or deposited with, a third person;

c.    has been placed beyond the jurisdiction of the Court;

d.    has been substantially diminished in value; or

e.    has been commingled with other property which cannot be subdivided

without difficulty;

it is the intention of the United States, pursuant to Title 21, United States Code, Sections 853(p)

and 970, to seek forfeiture of any other property of the defendants up to the value of the above

forfeitable property.

(Title 21, United States Code, Sections 853 and 970.)

## FORFEITURE ALLEGATION

(As to Counts Three and Four)

27.    As a result of committing the terrorism offenses alleged in Counts Three

and Four of this Indictment, RAFAEL ANTONIO GARAVITO-GARCIA, a/k/a "El Viejo," the

defendant, and GUSTAVO PEREZ-GARCIA, a/k/a "Gato," the defendant, who is only charged

in Count Three, shall forfeit to the United States, pursuant to Title 18, United States Code,

Sections 981(a)(1)(G) and 2332b(g)(5), and Title 28, United States Code, Section 2461:

a.       all right, title, and interest in all assets, foreign and domestic;

b.       all right, title, and interest in all assets, foreign and domestic, affording a source of influence over the FARC;

c.       all right, title and interest in all assets, foreign and domestic, acquired and maintained with the intent and for the purpose of supporting, planning, conducting, and concealing a Federal crime of terrorism against the United States, citizens and residents of the United States, and their property; and

d.       all right, title and interest in all assets, foreign and domestic, derived from, involved in, and used and intended to be used to commit a Federal crime of terrorism against the United States, citizens and residents of the United States, and their property; including, but not limited to, a sum of money representing the value of the property described above as being subject to forfeiture.

<u>Substitute Assets Provision</u>

28.       If any of the property described above as being subject to forfeiture, as a result of any act or omission of the defendants:

a.       cannot be located upon the exercise of due diligence;

b.       has been transferred or sold to, or deposited with, a third person;

c.       has been placed beyond the jurisdiction of the Court;

d.       has been substantially diminished in value; or

e.       has been commingled with other property which cannot be subdivided without difficulty;

it is the intention of the United States, pursuant to Title 18, United States Code, Section 981, Title 21, United States Code, Sections 853(p), and Title 28, United States Code, Section 2461, to

seek forfeiture of any other property of the defendants up to the value of the above forfeitable

property.

(Title 18, United States Code, Section 981(a)(1)(G) and 2332b(g)(5); Title 21, United States
Code, Section 853; and Title 28, United States Code, Section 2461.)

FOREPERSON
1-8-13

PREET BHARARA
United States Attorney

A-36

Form No. USA-33s-274 (Ed. 9-25-58)

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

### UNITED STATES OF AMERICA

- v. -

### RAFAEL ANTONIO GARAVITO-GARCIA,
### a/k/a "El Viejo," and
### GUSTAVO PEREZ-GARCIA,
### a/k/a "Gato,"

### Defendants.

## SEALED SUPERSEDING INDICTMENT

S5 12 Cr. 839

(Title 21, United States Code, Sections 960a, 963 and
Title 18, United States Code, Sections 2339B and 2339g.)

PREET BHARARA
United States Attorney.

**A TRUE BILL**

*Foreperson.*

1/8/13   Fld Superseding Indictment under seal. A/ws issued

Pitman, US MJ

(BH)

Case 15-2454, Document 20, 12/10/2015, 1661291, Page41 of 214

A-37

Case 1:12-cr-00839-JSR   Document 50   Filed 11/25/14   Page 1 of 6
Case 1:12-cr-00839-JSR   Document 48   Filed 11/13/14   Page 1 of 17

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | DECLARATION OF <br> ROBERT W. RAY |
| | : | (S5) 12 Cr. 839 (JSR) |
| -against- | : | |
| | : | |
| RAFAEL A. GARAVITO-GARCIA, et al., | : | |
| Defendants. | : | |

------------------------------------------------------------x

ROBERT W. RAY hereby declares under penalty of perjury the following:

1.     I am the attorney of record for defendant Rafael A. Garavito-Garcia ("defendant"
or "defendant Garavito-Garcia"), having been appointed under the Criminal Justice Act to
represent him on August 7, 2014 and, as such, am fully familiar with the facts and proceedings
herein.

2.     This Declaration is submitted in support of defendant's pre-trial motion for
dismissal of the Indictment for lack of jurisdiction as a consequence of a violation of the
extradition treaty between Colombia and the United States as well as other related relief in the
interests of justice.

3.     The operative charging instrument as to the remaining two defendants (including
co-defendant Gustavo Perez-Garcia) in this case currently is the fifth superseding Indictment,
filed on January 8, 2013 and unsealed on April 5, 2013 ("(S5) Indictment" or the "Indictment"),
which charges defendant Garavito-Garcia in all four counts during the period between May
2012 and the date of the filing of the Indictment, namely: (a) Count One, narcoterrorism

ACTIVE 28082072v1

Case 15-2454, Document 20, 12/10/2015, 1661291, Page42 of 214

A-38

Case 1:12-cr-00839-JSR   Document 50   Filed 11/25/14   Page 2 of 6
Case 1:12-cr-00839-JSR   Document 48   Filed 11/13/14   Page 2 of 17

conspiracy, in violation of 21 U.S.C. § 960a; Count Two, cocaine importation conspiracy from

the Republic of Guinea Bissau, located in West Africa, to the United States, in violation of 21

U.S.C. § 963; Count Three; conspiracy to provide material support to a foreign terrorist

organization (*i.e.*, FARC, or Fuerzas Armadas Revolucionarias de Colombia), in violation of 18

U.S.C. § 2339B(a)(1), (d)(1) and 3238; and Count Four, conspiracy to acquire in Guinea Bissau,

and then transfer to FARC in Colombia, anti-aircraft missiles, in violation of 18 U.S.C. §

2332g(a)(1), (b), (c) and 3238.

    4.    Upon information and belief and as reflected by records provided to me by the

defendant and his family, defendant retained an attorney in Bogota, Colombia, Jaime Javier

Valderrama Ovalle, to contest extradition from Colombia to the United States. In that regard

and among other things, Mr. Valderrama-Ovalle sent a letter, dated April 2, 2014, to the

Attorney General of Colombia documenting the various actions of the Colombian government

in response to the formal request for extradition by the United States for defendant's transfer to

the jurisdiction of this Court. That letter also describes all that transpired following defendant's

provisional arrest in Colombia on April 5, 2013. (A true copy of the April 2, 2014 Spanish

original letter to the Attorney General of Colombia is attached hereto as Exhibit A; a true copy

of the English translation of that letter is attached as Exhibit B).

    5.    Upon information and belief and as reflected by docket entries and documents

filed in the Southern District of New York in the instant case, the (S5) Indictment was returned

on or about January 8, 2013, initially under seal, and an arrest warrant was issued on the return

of that indictment for defendant Garavito-Garcia by United States Magistrate Judge Henry

Pitman.

ACTIVE 28082072v1

A-39

6.      Defendant Garavito-Garcia is a Colombian national and will be 70 years old in December.

7.      Upon information and belief and as reflected in the letter, dated April 2, 2014, of defendant's counsel in Colombia, on or about April 5, 2013, defendant Garavito-Garcia was arrested and detained in Colombia pursuant to a provisional arrest warrant [Colombia Executive Decision No. 293] arising from the initiation of extradition procedures by the United States pursuant to the extradition treaty then in effect between the Republic of Colombia and the United States. Not coincidentally, an ECF docket entry in the instant case indicates that the (S5) Indictment was unsealed on the same date, April 5, 2013. Garavito-Garcia was detained and held at the Eron Picota Penitentiary in Bogota, Colombia.

8.      The applicable treaty was signed by the respective governments of the two countries on September 14, 1979, was ratified by the United States Senate on March 4, 1982 and became the law of the land enforceable under the treaty clause provisions of Article VI to the United States Constitution.  U.S. Const. Art. VI ("This Constitution…; and all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land…."). (A true copy of the United States-Colombia Extradition Treaty [the "Extradition Treaty"] is attached hereto as Exhibit C).

9.      Upon information and belief, thereafter on December 26, 2013, Colombian authorities issued an extradition order for the transfer of defendant Garavito-Garcia from Colombia to the United States for prosecution in this case. [Colombian Executive Decision No. 374].

10.      Five days later on or about December 31, 2013, defendant Garavito-Garcia suffered a stroke while in prison in Colombia.

ACTIVE 28082072v1

11.     Upon information and belief, on or about February 14, 2014, the Office of International Affairs for the Ministry of Justice in Colombia made Garavito-Garcia "available" to the United States for extradition upon notice to the United States Embassy; but, evidently, his surrender was thereafter "suspended," on or about February 26, 2014, presumably due to his deteriorating medical condition.

12.     Upon information and belief as recounted in Colombia counsel's April 2, 2014 letter, Colombian authorities then notified the United States Embassy in Colombia, on or about February 26, 2014, that extradition would be "suspended" pending the United States Government satisfying a condition of transfer that an appropriate "medically adapted plane" be utilized to effect Garavito-Garcia's transport to the United States.

13.     On or about March 3, 2014, the Attorney General of Colombia issued a formal decision endorsing the prior action of the Office of International Affairs suspending defendant's surrender by Colombian authorities to the United States until such time as "his travel in a medically adapted plane is guaranteed by said country [the United States]." Such action purportedly was in compliance with Article 511 of the Colombian Code of Criminal Procedure and provided further that if and when the United States complied with the medical condition of transfer, Garavito-Garcia would "again be made available" for surrender and extradition. (A true copy of the March 3, 2014 Spanish original Decision of the Attorney General of Colombia is attached hereto as Exhibit D; an English translation of that letter is pending and will be supplied and filed in a separate pleading when it becomes available).

14.     On or about April 2, 2014, defendant's counsel in Colombia contested the Attorney General's action in indefinitely suspending defendant's surrender for extradition as an

ACTIVE 28082072v1

"illegal action" contrary to the provisions of Article 511 of Colombian Code of Criminal

Procedure.

      15.    As quoted in counsel's April 2, 2014 letter (Exhibits A and B), the text of Article

511 translated into English is as follows:

> ARTICLE 511. GROUNDS FOR RELEASE. The requested person will be released unconditionally by the Attorney General, if within sixty (60) days of his arrest the extradition request has not been legalized, or if after a term of thirty (30) days from the day the person was made available to the requesting State, the latter did not move forward with his transfer. In the cases considered herein, the person may be arrested again for the same reason once the requesting State has legalized the request for extradition or has complied with the conditions of transfer.

      16.    The stated basis for defendant's opposition to extradition in Colombia was that

Article 511 above provided no basis, either explicitly or implicitly, for suspending his

availability for extradition to the United States once the Office of International Affairs

communicated such availability to the United States Embassy on February 14, 2014. In other

words, the statute does not provide for any exclusions of time or contain a tolling provision to

allow for the indefinite suspension of defendant's availability for extradition. Accordingly, the

requested relief in Colombia was for defendant's immediate release pursuant to Article 511

once the thirty (30) day term expired on March 15, 2014.

      17.    Article 12 of the Extradition Treaty provides, in pertinent part:

> If ... [an] order for the extradition of a person sought has been issued by the competent authority and the person is not removed from the terrority of the Requested State **within such time as may be prescribed by its laws** or, if the laws of the Requested State do not prescribe such time, within 60 days after notification of the extradition order to the Requesting State, that person **shall be set at liberty and subsequently extradition may be refused for the same offense.**

Exhibit C (emphasis added).

ACTIVE 28082072v1

Case 15-2454, Document 20, 12/10/2015, 1661291, Page46 of 214

A-42

Case 1:12-cr-00839-JSR   Document 50   Filed 11/25/14   Page 6 of 6
Case 1:12-cr-00839-JSR   Document 48   Filed 11/13/14   Page 6 of 17

18.     Upon information and belief and notwithstanding his objection and request for immediate release under Article 511 of Colombian Code of Criminal Procedure – and by extension and incorporation, Article 12 of the Extradition Treaty – Garavito-Garcia remained in custody pending extradition and therefore was not "set at liberty," as required under the law.

19.     Upon information and belief, Garavito-Garcia remained in custody for another four months (from March 15, 2014), or a total of more than 15 months from the date of his provisional arrest on April 5, 2013, until he was finally removed from Colombia and extradited to the United States, where he arrived on or about July 22, 2014.

20.     The following day, on July 23, 2014, defendant Garavito-Garcia made his initial appearance in the Southern District of New York before United States Magistrate Judge Frank Maas, was arraigned on the Indictment, pleaded not guilty and was detained on consent pending trial.  He remains in custody.

Executed on November 13, 2014.

/s/ Robert W.Ray
_____
Robert W. Ray
*Attorney for Defendant Rafael A. Garavito-Garcia*
Fox Rothschild LLP
100 Park Avenue, 15th Floor
New York, New York 10017
Tel. No.: (212) 878-7993
rwray@foxrothschild.com (e-mail)

To:     Honorable Jed S. Rakoff
        United States District Judge
        (By ECF)

        AUSA Shane T. Stansbury
        AUSA Aimee Hector
        (By E-mail and ECF)

        Rafael A. Garavito-Garcia (71263-054)
        (By Hand Delivery to Kingsbrook Jewish Medical Center, Brooklyn, NY)

ACTIVE 28082072v1

EXHIBIT A

# CONSORCIO JURÍDICO

*Jaime Javier Valderrama Ovalle & Asociados*

*Juristas Especializados*

Carrera 69B No. 24B – 55 Int. 8 Of. 102 ~ Carrera 10 No. 16 – 18 Of. 503 Bogotá
Celulares. 313 569 00 89 – 300 380 65 77

SECCION GESTION DOCUMENTAL
DAI - No. 20146110519172
Fecha Radicado: 2014-04-02 14:26:15
Anexos: SIN / URGENTE

Señor Doctor
**EDUARDO MONTEALEGRE L.**
**FISCAL GENERAL DE LA NACIÓN**
Ciudad.

**URGENTE HAY DETENIDO**

REF: Solicitud de Libertad Incondicional Art. 511 C. de P. P.
Trámite de Extradición de Rafael Antonio Garavito García

JAIME JAVIER VALDERRAMA OVALLE, identificado civil y
profesionalmente al firmar, obrando en calidad de Protector Forense, según
poder otorgado y radicado ante la Fiscalía General de la Nación, respecto del
ciudadano colombiano **RAFAEL ANTONIO GARAVITO GARCÍA**
identificado con la **C. C. No. 19.094.230** de Bogotá, actualmente privado de la
libertad "en situación de captura" como consecuencia de una Resolución de
captura con fines de extradición, suscrita por su señoría en cumplimiento de
un deber legal.

**HECHOS**

Es preciso recordar a usted, que mi representado fue detenido el pasado 5 de
abril de 2013 y posteriormente informado sobre solicitud de extradición que
pesa en su contra.

Así mismo le informo el 13 de enero de 2014, fui notificado personalmente de
la Resolución No. 374 fechada el 26 de diciembre de 2013 y emanada del
Ministerio de Justicia y del Derecho, a través de la cual se dispuso confirmar
la Resolución Ejecutiva No. 293, **concediendo la extradición de mi**
**representado**. Contra dicho acto administrativo no procede recurso alguno,
luego se entiende que la concesión de la extradición ha quedado en firme.

En la fecha 12 de marzo de 2014, recibí por correo la Resolución de fecha 03
de marzo del en curso, firmada por Usted y como respuesta a dos Derechos
de Petición elevados por el suscrito, allí, de manera muy pedagógica se
precisan varios conceptos sobre extradición y se da cuenta de algunos

acontecimientos y la fecha de los mismos, en torno a la extradición de mi representado Sr. GARAVITO GARCIA.

Que el día **14 de febrero de 2014**, la Dirección de Asuntos Internacionales de la Fiscalía General de la Nación "... puso a disposición de la Embajada de los Estados Unidos al señor **Rafael Antonio Garavito García** y otros, a efectos de materializar su entrega según el término previsto en el artículo 511 de la Ley 906 de 2004". (Resolución sin número de fecha 3 de marzo de 2014, págs. 6 y 7).

Que "... mediante oficio DAI 20141700014201 del 26 de febrero de 2014, dirigido a la Embajada de Estados Unidos de América, se <u>suspendió la entrega</u> del señor **Rafael Antonio Garavito García**, hasta tanto no estén dadas las condiciones para su traslado a dicho País, conforme lo dictaminado por el Instituto Nacional de medicina Legal y Ciencias Forenses." (Subrayas fuera de texto). (Resolución sin número de fecha 3 de marzo de 2014, págs. 6 y 7).

En el mismo texto ya citado, en la página 8, se dice: "Así las cosas, a la fecha, <u>**se encuentra suspendida la entrega**</u> del señor **Rafael Antonio Garavito García**, hasta tanto no estén dadas las condiciones para su envío a los Estados Unidos de América. Por lo tanto, una vez se garantice su traslado en avión medicalizado por parte de ese país, nuevamente será puesto a disposición según los términos del artículo 511 de la Ley 906 de 2004." (Subrayas y negrillas fuera de texto).

## CONSIDERACIONES Y SUSTENTO LEGAL DE LA PRETENSIÓN

En primera instancia, y para mantener el carácter pedagógico propuesto en su Resolución de fecha 3 de marzo de 2014, quiero traer a colación el texto del artículo 511 del Código de Procedimiento Penal colombiano vigente y aplicable al asunto que nos ocupa, el que parece ser la piedra angular y objeto de análisis e interpretación, para llegar a adoptar una decisión legal:

"*ARTÍCULO 511. CAUSALES DE LIBERTAD. La persona reclamada será puesta en libertad incondicional por el Fiscal General de la Nación, si dentro de los sesenta (60) días siguientes a la fecha de su captura no se hubiere formalizado la petición de extradición, o si <u>transcurrido el término de treinta (30) días desde cuando fuere puesta a disposición del Estado requirente, este no procedió a su traslado.</u>*
<u>*En los casos aquí previstos, la persona podrá ser capturada nuevamente por el mismo motivo, cuando el Estado requirente formalice la petición de extradición u otorgue las condiciones para el traslado.*</u>" (Negrillas y subrayas fuera de texto).

De la norma transcrita se desprende, que hay dos momentos u oportunidades para que la persona capturada pueda acceder a su libertad incondicional:

La primera, si dentro de los 60 días siguientes a la captura no se formaliza la petición de extradición.

La segunda, cuando una vez puesto a disposición del estado requirente, éste no procede al traslado.

En el presente asunto, estamos invocando éste segundo momento o causal de libertad, esto es, EL SEÑOR RAFAEL ANTONIO GARAVITO GARCIA, FUE PUESTO A DISPOSICIÓN DE LA EMBAJADA DE LOS ESTADOS UNIDOS DE AMÉRICA, POR PARTE DE LA OFICINA DE ASUNTOS INTERNACIONALES DE LA FISCALÍA GENERAL DE LA NACIÓN, EN LA FECHA 14 DE FEBRERO DE 2014.

Es decir, que a partir de ese momento deben contarse los 30 días referidos en la norma, como el tiempo con el que cuenta el estado requirente para hacer o efectuar el traslado del ciudadano puesto a su disposición.

LA NORMA NO CONTEMPLA SUSPENSIÓN ALGUNA DE ESE TERMINO (30 días) Y CUALQUIERA INTERPRETACIÓN EN ESE SENTIDO ES CONTRARIA A LA LEY, OPUESTA AL MISMO TEXTO DE LA NORMA, PUES EL PÁRRAFO FINAL DEL ARTÍCULO 511, LO DEJA CLARO: "*En los casos aquí previstos, la persona podrá ser capturada nuevamente por el mismo motivo, cuando el Estado requirente formalice la petición de extradición u otorgue las condiciones para el traslado*" (Negrillas y subrayas fuera de texto).

Suspender la puesta a disposición, como al parecer lo hizo la Oficina de Asuntos Internacionales mediante oficio No. DAI-2014170001420 del 26 de febrero de 2014 dirigido a la Embajada de Estados Unidos de América, es una acción ILEGAL, pues esta figura de "suspensión" no está prevista en la ley, ni expresa ni tácitamente.

Ahora bien y en gracia de discusión, si lo que se quiere es hacer una interpretación de la norma, pretendiendo que la tal "suspensión" está avalada tácitamente en la ley, basta con leer para comprender que vencido el término de treinta (30) días, LA LIBERTAD PROCEDE DE INMEDIATO Y DE MANERA INCONDICIONAL Y QUE LA PERSONA PODRÁ SER CAPTURADA NUEVAMENTE POR EL MISMO MOTIVO CUANDO EL ESTADO REQUIRENTE OTORGUE LAS CONDICIONES PARA EL TRASLADO.

Pues bien señor Fiscal General de la Nación, la Oficina de Asuntos Internacionales de la Institución que Usted dirige, puso a disposición de la Embajada de Estados Unidos al ciudadano RAFAEL GARAVITO GARCIA, en la fecha 14 de febrero de 2014 y posteriormente, en la fecha 26 de febrero de 2014, la misma Oficina de Asuntos Internacionales suspendió tal acción con el argumento que "... hasta tanto no estén dadas las condiciones para su envío a los Estados Unidos (...) una vez se garantice su traslado en avión medicalizado por parte de ése país, nuevamente será puesto a disposición..." LO QUE LA NORMA ORDENA, ES QUE LA LIBERTAD PROCEDE Y EL CIUDADANO PODRÁ SER CAPTURADO NUEVAMENTE POR LOS

MISMOS MOTIVOS, CUANDO EL ESTADO REQUIRENTE OTORGUE LAS CONDICIONES PARA EL TRASLADO.

Legalmente no es posible mantener detenida o en calidad de capturada a una persona indefinidamente, y eso es lo que torpe e ilegalmente pretende la Oficina de Asuntos Internacionales cuando decide suspender indefinidamente "... hasta que estén dadas las condiciones..." y Estados Unidos "... garantice un avión medicalizado...", de manera que si en uno o dos años, el estado requirente no presenta el avión, mi prohijado debe seguir en calidad de CAPTURADO, privado de su libertad, con grave detrimento de su salud y en una infinita espera? Mi respuesta es NO.

Señor Fiscal General, lo que ha de prevalecer no es la interpretación inquisitiva de unos asesores o de un director de Oficina de Asuntos Internacionales, sino más bien, el espíritu de la norma, el querer del Legislador.  Si lo que el legislador quiere es mantener privada de su libertad de manera indefinida a una persona solicitada en extradición, no hubiere consignado los términos de 60 y 30 días como causales de libertad y mucho menos hubiere dejado de manera expresa, la posibilidad de una nueva captura, una vez saneadas las causas que llevaron a esa libertad, cuando dice: _En los casos aquí previstos, la persona podrá ser capturada nuevamente por el mismo motivo, cuando el Estado requirente formalice la petición de extradición **u otorgue las condiciones para el traslado.**_" (Negrillas y subrayas fuera de texto).

Aquí, señor Fiscal General de la Nación, se está cometiendo una arbitrariedad y un abuso en contra del ciudadano que ha depositado su confianza en el Suscrito, la Oficina de Asuntos Internacionales no tiene facultad legal ni el soporte normativo para proceder a suspender una puesta a disposición de una persona con solicitud de extradición. Tampoco le corresponde a la referida oficina la interpretación de la ley o la fijación del alcance de una norma.

Precisamente por estas razones, le estoy poniendo en conocimiento a Usted, como cabeza del Ente Acusador, los hechos relatados, para los fines legales pertinentes.

Ahora bien, el derecho a la libertad incondicional plasmado en el artículo 511 del C.P.P., debe deber otorgado de manera oficiosa por su Señoría, y ha de ser función de alguno de sus dependientes, mantener informado al señor Fiscal General, del vencimiento de tales términos, para que su "jefe" o "superior jerárquico" pueda cumplir cabalmente con la Ley y la Constitución que juró cumplir al momento de su posesión.

Como presumo que sus dependientes no han cumplido con esa obligación, lo hago yo en cumplimiento de mi deber profesional y ético.

A la fecha, han trascurrido más de treinta (30) días desde el momento en que mi representado fuera puesto a disposición de la embajada de Estados Unidos y el traslado no se ha producido. Mi prohijado, continua privado se du

libertad en las instalaciones del ERON PICOTA – PABELLON 16 y no tiene requerimiento alguno por parte de autoridades nacionales.

## PETICION

Por lo brevemente expuesto, de la manera más respetuosa solicito a Usted, se sirva dar cumplimiento al artículo 511 del código de Procedimiento Penal, en lo referido a: "... *La persona reclamada será puesta en libertad incondicional por el Fiscal General de la Nación (...) si transcurrido el término de treinta (30) días desde cuando fuere puesta a disposición del Estado requirente, este no procedió a su traslado.*
*En los casos aquí previstos, la persona podrá ser capturada nuevamente por el mismo motivo, cuando el Estado requirente formalice la petición de extradición u otorgue las condiciones para el traslado.*" (Negrillas y subrayas fuera de texto), **ordenando de manera inmediata** la **LIBERTAD INCONDICIONAL** de mi prohijado señor **RAFAEL ANTONIO GARAVITO GARCIA.**

Cordialmente,

**JAIME JAVIER VALDERRAMA OVALLE**
C. C. 79.490.849 de Bogotá
T. P. No. 90.274 del C. S. de la J.

EXHIBIT B

[Handwritten: Copy
(10)]

Legal consortium
Jaime Javier Valderrama Ovalle and Associates
Specialized Attorneys
Carrera 69B No. 24B-55, Int. 8 Of. 102 - Carrera 10 No. 16-18 Of. 503 Bogotá
Mobile numbers: 313 569 00 89 - 300 380 65 77
[Seal: Office of the Attorney General
document management section
DAI - No. 20146110519172
Date filed: 2014-04-02 14:26:15
Enclosures: NONE / URGENT]

Mister
EDUARDO MONTEALEGRE L.
ATTORNEY GENERAL
City

URGENT EXISTING DETAINEE

REF: Petition of Unconditional Release Art. 511 C of C. P.
Extradition Process of Rafael Antonio Garavito Garcia

JAIME JAVIER VALDERRAMA OVALLE, identified civilly and professionally at the moment of signing, acting in the capacity of defense attorney, according to the power of attorney given and filed before the Office of the Attorney General, regarding Colombian citizen RAFAEL ANTONIO GARAVITO GARCÍA, with ID No. 19.094.230 from Bogota, currently deprived of his freedom, "in detention" as a result of an Order of Detention for the Purpose of Extradition, signed by Your Honor in fulfillment of your legal duties.

Facts

It is necessary to remind you that my client was detained on April 5th, 2013, and was subsequently informed about a request for extradition pending against him.

I also want to let you know that on January 13th, 2014 I was personally notified about Decision No. 374, dated December 26th of 2013, and issued by the Secretary of Justice and Law, which was a confirmation of Executive Decision No. 293 **authorizing my client's extradition.** There are no remedies against such an administrative act, so it is understood that the authorization for extradition is upheld.

On March 12th, 2014, I received via mail the Decision dated March 3rd of the current year, signed by you, and as a response to the two Rights of Petition filed by the undersigned; there, in a very pedagogical manner, several concepts about extradition are clarified and there is an account of some events and their corresponding date, regarding the extradition of my client Mr. GARAVITO GARCIA.

That on **February 14th, 2014**, the Office of International Affairs of the Office of the Attorney General "... made Mr. Rafael Antonio Garavito Garcia and others available to the United States Embassy, with the purpose of surrendering them pursuant to the time limit provided by Article 511 of Law 906 of 2004." (Unnumbered Decision dated March 3rd, 2014, pages 6 and 7).

On the same text cited above, page 8, the following is stated: "In such circumstances, up to this date, Mr. **Rafael Antonio Garavito Garcia's** surrender is suspended until there is compliance with the conditions for his transfer to the United States of America. Therefore, when his travel in a medically adapted plane is guaranteed by said country, he will again be made available pursuant to the terms provided by Article 511 of Law 906 of 2004." (Underline and bold have been added).

CONSIDERATION AND LEGAL BASIS FOR THE CLAIM

First, and in order to maintain the pedagogical character present in your Decision dated March 3rd of 2014, I want to cite the text of Article 511 of the current Colombian Code of Criminal Procedure, which can be applied to the matter at hand, and which seems to be the cornerstone and the subject of analysis and interpretation needed to adopt a legal decision:

"*ARTICLE 511. GROUNDS FOR RELEASE. The requested person will be released unconditionally by the Attorney General, if within sixty (60) days of his arrest the extradition request has not been legalized, or if after a term of thirty (30) days from the day the person was made available to the requesting State, the latter did not move forward with his transfer.*
*In the cases considered herein, the person may be arrested again for the same reason once the requesting State has legalized the request for extradition or has complied with the conditions for transfer.*" (Underline and bold have been added).

From the statutory provision it can be concluded that there are two moments or opportunities for the defendant to be released unconditionally:

The first, if the request for extradition is not legalized within the next 60 days after the arrest.

The second, when after being made available to the requesting state, the latter does not move forward with the transfer.

In the present matter we invoke the second moment or basis for release, to wit, that MR. RAFAEL ANTONIO GARAVITO GARCIA WAS MADE AVAILABLE TO THE UNITED STATES EMBASSY, BY THE OFFICE OF INTERNATIONAL AFFAIRS, ON FEBRUARY 14TH, 2014.

That is to say, from that moment start running the 30 days mentioned in the statute, as the period of time the requesting state has to carry out or execute the transfer of the citizen that has been made available.

THE STATUTE DOES NOT PROVIDE FOR ANY EXCLUSIONS OF TIME FROM THIS PEROD (30 days) AND ANY SUCH INTERPRETATION IS CONTRARY TO LAW, OPPOSED TO THE WRITTEN STATUTE, AS IT IS CLEARLY EXPRESSED IN THE LAST PARAGRAPH OF ARTICLE 511: "... *In the cases considered herein, the person may be arrested again for the same reason once the requesting State has legalized the request for extradition or has complied with the conditions for transfer.*" (Underline and bold have been added).

The suspension of availability, which the Office of International Affairs seemingly carried out through official letter No. DAI 20141700014201 dated February 26th, 2014, addressed to the Embassy of the United States of America, is an **ILLEGAL action**, given that such concept of "suspension" is not provided for in the statute, neither explicitly nor implicitly.

Now then, for the sake of argument, if what is intended is an interpretation of the statute, claiming that such "suspension" is implicitly provided for in the law, one has but to read it to

understand that, once the thirty (30) day period expires, IMMEDIATE RELEASE APPLIES UNCONDITIONALLY, AND THAT THE PERSON MAY BE ARRESTED AGAIN FOR THE SAME REASON ONCE THE REQUESTING STATE COMPLIES WITH THE CONDITIONS FOR TRANSFER.

Very well, Mr. Attorney General, the Office of International Affairs of the Institution You preside, made citizen RAFAEL GARAVITIO GARCIA available to the Embassy of the United States of America, as of February 14th, 2014, and afterwards, on February 26th, 2014, the same Office of International Affairs suspended said action arguing that "…until there is compliance with the conditions for his transfer to the United States (…) when his travel in a medically adapted plane is guaranteed by said country, he will again be made available…" WHAT THE STATUTE ORDERS IS THAT IMMEDIATE RELEASE APPLIES UNCONDITIONALLY, AND THAT THE PERSON MAY BE ARRESTED AGAIN FOR THE SAME REASON ONCE THE REQUESTING STATE COMPLIES WITH THE CONDITIONS FOR TRANSFER.

It is not legally possible to keep the person detained or under arrest indefinitely, and that is what the Office of International Affairs foolishly and stupidly pretends when it decides to suspend indefinitely "… until there is compliance with the conditions…" and the United States "… guarantees a medically adapted plane…", in such a way that if in one or two years the requesting State does not provide the plane, my client must continue to be considered as CAPTURED, deprived of his freedom, to the detriment of his health, and in endless wait? My answer is NO.

Mr. Attorney General, what must prevail is not the inquisitive interpretation of some advisors or the director the Office of International Affairs, but instead, the spirit of the statute, the will of the Legislator. If what the legislator wants is to keep a person who has been requested for extradition deprived of his freedom indefinitely, he would not have established the terms of 60 and 30 days as grounds for release, let alone expressly provided for the possibility of a future arrest once the causes that led to such release have been addressed, when he says: *In the cases considered herein, the person may be arrested again for the same reason once the requesting State has legalized the extradition request or has complied with the conditions for transfer.*" (Underline and bold have been added).

Here, Mr. Attorney General, an injustice and an abuse are being committed against the citizen who has put his trust in the undersigned. The Office of International Affairs has neither legal standing nor statutory grounds to carry out a suspension when a person requested for extradition is made available. Neither is it the aforementioned office's responsibility to interpret the law or to establish the scope of a statute.

For that very reason, I am informing you, as the head of the prosecution, of the above mentioned facts, for the appropriate legal purposes.

Now, the right to unconditional release expressed in article 511 of the C.C.P. must be granted diligently by Your Honor, and it must be the duty of one of your assistants to keep the Attorney General informed of the expiration of such terms, so that his "boss" or "immediate superior" can fully comply with the law and the Constitution he swore to uphold upon his appointment.

As I presume that your clerks have not fulfilled that obligation, I do so myself, in compliance with my ethical and professional duties.

To date, more than 30 days have passed from the moment my client was made available to the Embassy of the United States and his transfer has not taken place. My client is still deprived of his freedom in the correctional facility ERON PICOTA – UNIT 16 and he is not being requested by any national authority.

PETITION

Due to what was briefly explained, with all due respect I ask You to comply with article 511 of the Code of Criminal Procedure, where it states that: "... **The requested person will be** **released unconditionally by the Attorney General (...)** _if after a term of thirty (30) days_ _from the day the person was made available to the requesting State, the latter did not_ _move forward with his transfer_. _In the cases considered herein, the person may be arrested again for the same reason once_ _the requesting State has legalized the extradition request or has complied with the_ _conditions for transfer_." (Underline and bold have been added), by **immediately ordering** the **UNCONDITIONAL RELEASE** of my client Mr. **RAFAEL ANTONIO GARAVITO GARCIA**.

Sincerely,

[Illegible signature]

JAIME JAVIER VALDERRAMA OVALLE
ID No. 79.490.849 of Bogota
T.P. No. 90.274 of the C.S. of the J.

Case 1:12-cr-00839-JSR   Document 48-1   Filed 11/13/14   Page 1 of 27

EXHIBIT C

| 97TH CONGRESS 1st Session | SENATE | TREATY DOC. No. 97-8 |
|---|---|---|

# EXTRADITION TREATY WITH THE REPUBLIC OF COLOMBIA

## MESSAGE

FROM

# THE PRESIDENT OF THE UNITED STATES

TRANSMITTING

THE TREATY OF EXTRADITION BETWEEN THE UNITED
STATES OF AMERICA AND THE REPUBLIC OF COLOMBIA,
SIGNED AT WASHINGTON ON SEPTEMBER 14, 1979



JUNE 1, 1981.—Treaty was read the first time and, together with the
accompanying papers, referred to the Committee on Foreign Relations
and ordered to be printed for the use of the Senate

U.S. GOVERNMENT PRINTING OFFICE

79-118 O                         WASHINGTON : 1981

## LETTER OF TRANSMITTAL

THE WHITE HOUSE, *May 28, 1981.*

*To the Senate of the United States:*

With a view to receiving the advice and consent of the Senate to ratification, I transmit herewith the Treaty of Extradition between the United States of America and the Republic of Colombia, signed at Washington on September 14, 1979.

I transmit also, for the information of the Senate, the report of the Department of State with respect to the treaty.

The treaty is one of a series of modern extradition treaties being negotiated by the United States. It expands the list of extraditable offenses to include narcotics violations, aircraft hijacking, bribery, and obstruction of justice, as well as many other offenses not covered by our existing extradition treaty with Colombia. Upon entry into force, it will terminate and supersede the existing Extradition Treaty and Supplementary Convention between the United States and Colombia.

This treaty will make a significant contribution to international co-operation in law enforcement. I recommend that the Senate give early and favorable consideration to the treaty and give its advice and consent to ratification.

RONALD REAGAN.

(III)

LETTER OF SUBMITTAL

DEPARTMENT OF STATE,
*Washington, May 9, 1981.*

The PRESIDENT,
*The White House.*

THE PRESIDENT: I have the honor to submit to you the Extradition Treaty between the United States of America and the Republic of Colombia, signed at Washington on September 14, 1979. I recommend that the treaty be transmitted to the Senate for its advice and consent to ratification.

This treaty follows generally the form and content of extradition treaties recently concluded by this Government. The treaty provides for the extradition of fugitives who have been charged with or convicted of any of thirty-five offenses listed in the schedule annexed to the treaty. Significant newly-listed offenses, which are not in our existing treaty with Colombia, include those relating to narcotics, aircraft hijacking, bribery, and obstruction of justice (both Colombia and the United States are Parties to multilateral conventions which in effect have amended the existing bilateral treaty to include narcotics and hijacking offenses).

Article 1 includes a jurisdictional provision which allows extradition where the offense has been committed outside the territory of the requesting State by a national of that State.

Crimes committed outside the territory of the requesting State may also provide the basis for extradition if the offense so committed would also be punishable under the law of the requested State in similar circumstances. Like provisions are contained in United States extradition treaties with the Federal Republic of Germany, Japan, and Mexico. It is anticipated that such provisions would be useful in the areas of narcotics and counterfeiting violations.

Article 2 includes as extraditable offenses those, whether listed or not, which are punishable under the Federal laws of the United States and the laws of Colombia and carry a term of imprisonment for a maximum period exceeding one year in both countries.

Article 3 also authorizes extradition under certain conditions for an attempt to commit or a conspiracy to commit any extraditable offense. This article also permits the Government of the United States to request the extradition of a person for any extraditable offense when Federal jurisdiction is based upon the use of the mails or other means of carrying out interstate commerce.

Article 3 defines the territorial application of the treaty. This article expands the normal context of that concept to include aircraft in flight. This provision also extends jurisdiction to acts of aircraft

(V)

VI

piracy, whether or not they occur over the territory of either of the Parties.

Article 4 provides that extradition shall not be granted for political or military offenses. It also prohibits extradition where the request, while involving an offense not political in nature, is made for political purposes. Article 4 grants the Executive Authority of the requested State the authority to decide on the application of the political or military offense exceptions unless it is otherwise provided by the laws of that State. This would mean that in the United States the authority rests with the Executive branch.

Article 5 contains a prior jeopardy provision. It excludes extradition in cases where the person requested has been prosecuted in the requested State for the offense for which extradition is requested.

Article 6 precludes extradition where prosecution or enforcement of the penalty for the offense for which extradition is sought has become barred by lapse of time according to the laws of the requested or requesting Party.

Article 7 permits refusal of extradition in capital cases unless satisfactory assurances are received that the death penalty will not be imposed or, if imposed, will not be executed for an offense not punishable by death in the country from which extradition is requested. A similar article has been included in most recent treaties.

Article 8 deals with the extradition of nationals. It is similar to provisions in some of our other recently signed extradition treaties. It grants the Executive the discretionary power to extradite nationals of its own country. If extradition is denied on the basis of nationality, however, the requested Party undertakes to submit the case to its competent authorities for the purpose of prosecution, provided that Party has jurisdiction over the offense. This article thus takes into account the law of Colombia which normally prohibits extradition of Colombian nationals but allows for their prosecution in Colombia for offenses committed abroad.

Article 8 also contains an innovation. It imposes an obligation on the requested State to extradite all persons, including its nationals, in cases where the offense involves punishable acts in both countries and the offense was intended to be consummated in the requesting State. This provision is especially important in prosecuting exporters of dangerous drugs and narcotics.

Articles 9-18 outline the procedures by which extradition shall be accomplished. Article 9 limits extradition to cases where there is sufficient evidence, according to the laws of the requested State, to bring the person sought to trial had the offense been committed in the requested State or where the person sought is shown to be the person convicted by the courts of the requesting State.

Article 9 also provides that the requested Party shall make all arrangements necessary for internal extradition procedures and employ all legal means to obtain from the judicial authorities the decisions necessary to perfect the extradition request. We expect to continue the present practice under which each country is represented in extradition proceedings by the other's Justice Department.

Article 19 provides that the requesting Party shall pay the costs associated with the transportation of the person sought and with the translation of extradition documents.

VII

Article 20 provides that the treaty is retroactive in effect as to extraditable offenses which were committed before the date of its entry into force if they were punishable under the laws of both Parties when committed.

Article 21 provides that the treaty will enter into force on the date of exchange of the instruments of ratification. Upon entry into force, this treaty will terminate the Treaty of Extradition between the United States and Colombia signed on May 7, 1888 and the Supplementary Convention signed on September 9, 1940.

The Department of Justice joins the Department of State in favoring approval of this treaty by the Senate at an early date.

Respectfully submitted,

WILLIAM CLARK.

EXTRADITION TREATY BETWEEN THE UNITED STATES OF AMERICA
AND THE REPUBLIC OF COLOMBIA

The Government of the United States of America and the Government of the Republic of Colombia,

Desiring to provide for more effective cooperation between the two States in the repression of crime; and

Desiring to conclude a new Treaty for the reciprocal extradition of offenders;

Have agreed as follows:

ARTICLE 1

*Obligation to Extradite*

(1) The Contracting Parties agree to extradite to each other, subject to the provisions described in this Treaty, persons found in the territory of one of the Contracting Parties who have been charged with an offense, found guilty of committing an offense, or are wanted by the other Contracting Party for the enforcement of a judicially pronounced penalty involving a deprivation of liberty for an offense, committed within the territory of the Requesting State.

(2) When the offense has been committed outside the territory of the Requesting State, the Requested State shall grant extradition, subject to the provisions of this Treaty, if:

(a) Its laws would provide for the punishment of such an offense in similar circumstances; or

(b) The person sought is a national of the Requesting State, and that State has jurisdiction to try that person.

ARTICLE 2

*Extraditable Offenses*

(1) Extraditable offenses under this Treaty are:

(a) Offenses described in the Appendix to this Treaty which are punishable under the laws of both Contracting Parties; or

(b) Offenses, whether listed in the Appendix to this Treaty or not, provided they are punishable under the Federal laws of the United States and the laws of the Republic of Colombia.

(2) For the purposes of this Article, it shall not matter whether or not the laws of the Contracting Parties place the offense within the same category of offense or denominate an offense by the same terminology.

(3) Extradition shall be granted in respect of an extraditable offense only if the offense is punishable under the laws of both Contracting Parties by deprivation of liberty for a period exceeding one

(1)

2

year. However, when the request for extradition relates to a person who
has been convicted and sentenced, extradition shall be granted only if
the duration of the penalty still to be served amounts to at least six
months.

(4) Subject to the conditions set out in paragraphs (1), (2), and (3)
extradition shall also be granted:

(a) For attempting to commit an offense or participating in the
commission of an offense. Extradition shall also be granted for
association to commit offenses as provided by the laws of Colombia
and for conspiracy to commit an offense as provided by the laws
of the United States.

(b) For any extraditable offense when, for the purpose of
granting jurisdiction to either Contracting Party, transportation
of persons or property, the use of the mails or other means of car-
rying out interstate or foreign commerce is also an element of the
specific offense.

(5) When extradition has been granted with respect to an extradit-
able offense it shall also be granted in respect to any other offense
specified in the extradition request that meets all other requisites of
extradition except that set forth in paragraph (3) of this Article.

ARTICLE 3

*Territorial Application*

For the purposes of this Treaty the territory of a Contracting Party
shall comprise all territory under the jurisdiction of that Contracting
Party, including airspace and territorial waters.

ARTICLE 4

*Political and Military Offenses*

(1) Extradition shall not be granted when the offense for which
extradition is requested is of a political character or is connected with
an offense of a political character, or when the person whose extradi-
tion is requested proves that the extradition is requested for the exclu-
sive purpose of trying or punishing that person for an offense of the
above-mentioned character.

(2) Extradition shall not be granted when the offense for which
extradition is requested is of a purely military nature.

(3) The Executive Authority of the Requested State shall decide on
the application of this Article, unless otherwise provided by the laws
of that State.

ARTICLE 5

*Prior Jeopardy for the Same Offense*

(1) Extradition shall not be granted when the person sought has
been tried and convicted or acquitted by the Requested State for the
offense for which extradition is requested.

(2) The fact that the competent authorities of the Requested State
have decided not to prosecute the person sought for the acts for which

8

extradition is requested or decided to discontinue any criminal pro-
ceedings which have been initiated shall not preclude extradition.

ARTICLE 6

*Statute of Limitations*

Extradition shall not be granted when the prosecution or the en-
forcement of the penalty for the offense for which extradition has
been sought has become barred by lapse of time according to the laws
of the Requesting State.

ARTICLE 7

*Capital Punishment*

When the offense for which extradition is requested is punishable by
death under the laws of the Requesting State and the laws of the Re-
quested State do not permit such punishment for that offense, extradi-
tion may be refused unless, before extradition is granted, the Request-
ing State furnishes such assurances as the Requested State considers
sufficient that the death penalty shall not be imposed, or, if imposed,
shall not be executed.

ARTICLE 8

*Extradition of Nationals*

(1) Neither Contracting Party shall be bound to deliver up its own
nationals, but the Executive Authority of the Requested State shall
have the power to deliver them up if, in its discretion it be deemed
proper to do so. However, extradition of nationals will be granted pur-
suant to the provisions of this Treaty in the following instances:
  (a) Where the offense involves acts taking place in the territory
  of both States with the intent that the offense be consummated in
  the Requesting State; or
  (b) Where the person for whom extradition is sought has been
  convicted in the Requesting State of the offense for which extradi-
  tion is sought.
(2) If extradition is not granted pursuant to paragraph (1) of this
Article, the Requested State shall submit the case to its competent judi-
cial authorities for the purpose of initiating the investigation or to
further the related prosecution, provided that the Requested State
has jurisdiction over the offense.

ARTICLE 9

*Extradition Procedures and Required Documents*

(1) The request for extradition shall be made through the diplo-
matic channel.
(2) The request for extradition shall be accompanied by:
  (a) Documents, statements, or other evidence which describe the
  identity and probable location of the person sought;
  (b) A statement of the facts of the case;
  (c) The texts of the laws describing the essential elements and
  the designation of the offense for which extradition is requested;

4

(d) The texts of the laws describing the punishment for the offense; and

(e) The texts of the laws describing the time limit on the prosecution or the execution of punishment for the offense.

(3) When the request for extradition relates to a person who has not been convicted, it shall be accompanied by:

(a) A copy of the indictment or its equivalent issued by a judge or other judicial authority of the Requesting State;

(b) Evidence proving that the person sought is the person to whom the indictment or its equivalent refers; and

(c) Such evidence as would provide probable cause to suspect, according to the laws of the Requested State, that the person sought has committed the offense for which extradition is requested.

(4) When the request for extradition relates to a convicted person, it shall be accompanied by:

(a) A copy of the judgment of conviction imposed by a court of the Requesting State; and

(b) Evidence proving that the person sought is the person to whom the conviction refers.

If the person has been found guilty but not sentenced, the request for extradition shall also be accompanied by evidence to that effect and by a copy of the warrant of arrest.

If the convicted person has been sentenced, the request for extradition shall also be accompanied by a copy of the sentence imposed and a statement showing to what extent the sentence has not been carried out.

(5) All the documents to be submitted by the Requesting State in accordance with Articles 9 and 10 of this Treaty shall be translated into the language of the Requested State.

(6) The documents which accompany the extradition request shall be admitted into evidence when:

(a) In the case of a request emanating from the United States, they are signed by a judge, magistrate or other judicial officer and authenticated by the official seal of the Department of State and certified by a diplomatic or consular officer of the Republic of Colombia in the United States.

(b) In the case of a request emanating from the Republic of Colombia they are signed by a judge or other judicial authority and are certified by the principal diplomatic or consular officer of the United States of America in the Republic of Colombia.

(7) The Requested State shall review for legal sufficiency documentation in support of an extradition request prior to presentation to the judicial authorities and shall provide for legal representation to protect the interest of the Requesting State before the competent authorities of the Requested State.

ARTICLE 10

*Additional Evidence*

(1) If the Executive Authority of the Requested State considers that the evidence furnished in support of the request for the extradition of a person sought is not sufficient to fulfill the requirements of

5

this Treaty, that State shall request the submission of necessary additional evidence. The Requested State may set a time limit for the submission of such evidence and may grant a reasonable extension of the time limit upon application of the Requesting State setting forth the reasons therefor.

(2) If the person sought is in custody and the additional evidence or information submitted is not sufficient, or if such evidence or information is not received within the period specified by the Requested State, that person shall be discharged from custody. However, such discharge shall not bar a subsequent request for extradition for the same offense, and the person sought may be detained again. In this connection it shall be sufficient if reference is made in the subsequent request to the supporting documents already submitted provided these documents are available at the beginning of the new extradition proceedings.

ARTICLE 11

*Provisional Detention*

(1) In case of urgency, either Contracting Party may request, through the diplomatic channel, the provisional detention of an accused or convicted person. The application shall contain a description of the person sought, a statement of intention to present the request for extradition of the person sought and a statement of the existence of a warrant of arrest or a judgment of conviction against that person.

(2) On receipt of such an application the Requested State shall take necessary steps to secure the detention of the person sought.

(3) Provisional detention shall be terminated if, within a period of 60 days after the apprehension of the person sought, the Executive Authority of the Requested State has not received the formal request for extradition and the documents mentioned in Article 9.

(4) The termination of provisional detention pursuant to paragraph (3) shall not prejudice the extradition of the person sought if the extradition request and the supporting documents mentioned in Article 9 are delivered at a later date.

ARTICLE 12

*Decision and Surrender*

(1) The Requested State shall promptly communicate to the Requesting State the decision on the request for extradition.

(2) The Requested State shall give the reasons for the complete or partial rejection of the request for extradition.

(3) If the extradition has been granted, surrender of the person sought shall take place within such time as may be prescribed by the laws of the Requested State. The competent authorities of the Contracting Parties shall agree on the time and place of the surrender of the person sought.

(4) If a warrant or order for the extradition of a person sought has been issued by the competent authority and the person is not removed from the territory of the Requested State within such time as may be prescribed by its laws or, if the laws of the Requested State do not prescribe such time, within 60 days after notification of the

6

extradition order to the Requesting State, that person shall be set at liberty and subsequently extradition may be refused for the same offense.

ARTICLE 13

*Delayed Surrender*

After the extradition request has been granted, the Requested State may defer the surrender of the requested person when that person is being proceeded against or is serving a sentence in the territory of the Requested State for an offense other than that for which extradition is sought, until the conclusion of the proceedings or the full execution of any punishment that person may be or may have been awarded.

ARTICLE 14

*Requests for Extradition Made by Several States*

The Executive Authority of the Requested State, upon receiving requests from the other Contracting Party and from a third State or States for the extradition of the same person either for the same offense or for different offenses, shall determine to which of the Requesting States it will extradite that person.

ARTICLE 15

*Rule of Speciality*

(1) A person extradited under the Treaty shall not be detained, tried or punished in the territory of the Requesting State for an offense other than that for which extradition has been granted, nor be extradited by that State to a third State, unless:

(a) That person has left the territory of the Requesting State after that person's extradition and has voluntarily returned to it; or

(b) That person has not left the territory of the Requesting State within 60 days after being free to do so; or

(c) The Executive Authority of the Requested State has consented to that person's detention, trial, or punishment for another offense, or to extradition to a third State, provided that the principles of Article 4 of this Treaty shall be observed.

These stipulations shall not apply to offenses committed after the extradition.

(2) If the offense for which the person was extradited is legally altered in the course of proceedings, that person may be prosecuted or sentenced provided:

(a) The offense under its new legal description is based on the same set of facts contained in the extradition request and its supporting documents, and

(b) The defendant is subject to be sentenced to a period of incarceration which does not exceed that provided for the offense for which that person was extradited.

7

### ARTICLE 16

*Simplified Extradition*

If the extradition of a person sought is not obviously precluded by the laws of the Requested State and provided the person sought irrevocably agrees in writing to the extradition after personally being advised by a judge or competent magistrate of that person's right to formal proceedings and the protection afforded by them, the Requested State may grant the extradition without the formal proceeding having taken place.

### ARTICLE 17

*Surrender of Articles, Instruments, Objects, and Documents*

(1) To the extent permitted under the laws of the Requested State and subject to the rights of third parties, which shall be duly respected, all articles, instruments, objects of value or documents relating to the offense, whether or not used for its execution, or which in any other manner may be material evidence for the prosecution, may be surrendered upon the granting of the extradition even when extradition cannot be effected due to the death, disappearance, or escape of the accused.

(2) The Requested State may demand from the Requesting State, as a condition for the surrender, satisfactory assurances that the articles, instruments, objects of value and documents will be returned to the Requested State, as soon as possible or upon conclusion of the criminal proceedings.

### ARTICLE 18

*Transit*

(1) The right to transport through the territory of one of the Contracting Parties a person surrendered to the other Contracting Party by a third State may be granted on request made through the diplomatic channel if reasons of public order are not opposed to the transit.

(2) The Party to which the person has been extradited shall reimburse that Party through whose territory such person is transported for any expenses incurred by the latter in connection with such transportation.

### ARTICLE 19

*Expenses*

Expenses related to the translation of documents and to the transportation of the person sought shall be paid by the Requesting State. All other expenses related to the extradition request and proceedings shall be borne by the Requested State. No pecuniary claim, arising out of the arrest, detention, examination and surrender of persons sought under the terms of this Treaty, shall be made by the Requested State against the Requesting State.

8

ARTICLE 20

*Scope of Application*

This Treaty shall apply to offenses encompassed by Article 2 committed before as well as after the date this Treaty enters into force. Extradition shall not be granted, however, for an offense committed before this Treaty enters into force which was not an offense under the laws of both Contracting Parties at the time of its commission.

ARTICLE 21

*Ratification; Entry into Force; Denunciation*

(1) This Treaty shall be subject to ratification; the instruments of ratification shall be exchanged at Washington as soon as possible.

(2) This Treaty shall enter into force on the date of the exchange of the instruments of ratification.

(3) On the entry into force of this Treaty, the Convention for the Reciprocal Extradition of Criminals of May 7, 1888, and the Supplementary Convention of Extradition of September 9, 1940, between the United States of America and the Republic of Colombia shall cease to have effect; however, any extradition proceedings pending in the Requested State at the time this Treaty enters into force shall remain subject to the previous treaties.

(4) Either Contracting Party may terminate this Treaty at any time by giving notice to the other Party and the termination shall be effective six months after the date of receipt of such notice.

In witness whereof, the undersigned, being duly authorized thereto by their respective Governments, have signed this Treaty.

Done at Washington, in duplicate, in the English and Spanish languages, each text being equally authentic, this fourteenth day of September, 1979.

FOR THE GOVERNMENT OF THE UNITED STATES OF AMERICA:

FOR THE GOVERNMENT OF THE REPUBLIC OF COLOMBIA:

APPENDIX

SCHEDULE OF OFFENSES

1. Murder; assault with intent to commit murder.

2. Manslaughter.

3. Malicious wounding; inflicting grievous bodily harm.

4. Rape; indecent assault.

5. Unlawful sexual acts with or upon children under the age specified by the laws of the Contracting Parties.

6. Willful abandonment of a minor or other dependent person when the life of that minor or that dependent person is or is likely to be injured or endangered.

7. Kidnapping; abduction; false imprisonment.

8. Extortion; blackmail.

9. Robbery; burglary; larceny.

10. Fraud, which includes obtaining property, money or valuable securities by false pretenses or by defrauding the public or any person by deceit or falsehood or other fraudulent means, whether such deceit or falsehood or any fraudulent means would or would not amount to a false pretense.

11. Embezzlement; breach of trust; graft.

12. Any offense against the laws relating to counterfeiting and forgery.

13. Receiving or transporting any money, valuable securities or other property knowing the same to have been unlawfully obtained.

14. Arson.

15. Malicious injury to property.

16. Offenses endangering public safety through explosion, flooding, or other destructive means.

17. Piracy, as defined by statute or by law of nations; mutiny or revolt on board an aircraft or vessel against the authority of the captain or commander of such aircraft or vessel.

18. Unlawful seizure of an aircraft or vessel.

19. Any malicious act done with intent to endanger the safety of any person traveling upon a railway, or in any aircraft or vessel or bus or other means of transportation.

20. Offenses against the laws relating to firearms, ammunition, explosives, incendiary devices or nuclear materials.

21. Offenses against the laws relating to the traffic in, possession, or production or manufacture of, narcotic drugs, cannabis, hallucinogenic drugs, cocaine and its derivatives, and other substances which produce physical or psychological dependence.

22. Offenses against public health, such as the illicit manufacture of or traffic in chemical products or substances injurious to health.

(9)

10

23. An offense against the laws relating to importation, exportation or transit of goods, persons, articles, or merchandise, including violations of the customs laws.

24. Offenses relating to willful evasion of taxes and duties.

25. Procuration.

26. Any offense relating to false testimony, perjury, or subornation of perjury.

27. Making a false statement to a government agency or official.

28. Offenses against the laws relating to the administration or obstruction of justice.

29. Bribery, including soliciting, offering and accepting.

30. Offenses against the laws relating to regulation of public administration or abuse of public office.

31. Offenses against the laws relating to the control of companies, corporations, or other juridical persons.

32. Offenses against the laws relating to control of private monopoly or unfair competition.

33. Offenses against the national economy, that is, offenses relating to basic commodities, or of securities and similar documents, including their issuance, registry, commercialization, trading or sale.

34. Offenses against the laws relating to bankruptcy.

35. Any offense against the laws relating to international trade and transfers of funds.

Case 1:12-cr-00839-JSR   Document 48-1   Filed 11/13/14   Page 17 of 27

# EXHIBIT D



**FISCALÍA**
GENERAL DE LA NACIÓN

Al contestar hacer referencia al Radicado No. 20141700014931
03-03-2014
Página 1 de 1

DAI

Bogotá D.C.

Doctor
**JAIME JAVIER VALDERRAMA OVALLE**
Carrera 69 B No. 24 B - 55. Int. 8. Oficina 102 -
Bogotá - D.C.

**ASUNTO:** Trámite de extradición de RAFAEL ANTONIO GARAVITO GARCIA.
Negación de detención domiciliaria y de libertad

Respetado doctor:

De manera atenta acuso recibo de sus comunicaciones del 10 y 27 de febrero de 2014, a
través de las cuales, en calidad de apoderado del señor RAFAEL ANTONIO GARAVITO
GARCIA, respectivamente, solicitó detención domiciliaria y la solicitud de libertad de su
prohijado.

Conforme a lo anterior, me permito remitir resolución de fecha 3 de marzo de 2014,
firmada por el señor Fiscal General de la Nación, mediante la cual fueron negadas dichas
peticiones.

Lo anterior para su conocimiento y fines pertinentes.

Cordialmente,

FRANCISCO JAVIER ECHEVERRI LARA
Director de Asuntos Internacionales

Anexo: 9 folios
Proyectó: JMPC

D I R E C C I O N   D E   A S U N T O S





**FISCALÍA**

**DESPACHO DEL FISCAL GENERAL DE LA NACIÓN**

*Ref: Negación solicitud de detención domiciliaria y de libertad de*
*Rafael Antonio Garavito García*

Bogotá D.C., **0 3 MAR. 2014**

### ASUNTO A TRATAR

Procede este Despacho a decidir acerca de las solicitudes presentadas por el doctor Manuel Antonio Valderrama Ovalle, identificado con la cédula de ciudadanía 79.490.849 y tarjeta profesional número 90.274, quien en calidad de apoderado judicial del señor **Rafael Antonio Garavito García**, mediante escritos del 10 y 27 de febrero de 2014, solicita detención domiciliaria y la libertad de su prohijado, respectivamente

### ANTECEDENTES

1.- El Subintendente César Augusto Cárdenas Durán, servidor de la Unidad de Investigación Criminal Narcoterrorismo de la Dirección de Antinarcóticos de la Policía Nacional, mediante informe No. 0049/DIRAN-AREIN-GRUIC-29 del 5 de abril de 2013, puso a disposición de este Despacho al señor **Rafael Antonio Garavito García**, quien fue retenido el 5 de abril de 2013, con fundamento en notificación roja de INTERPOL No. A-2118/4-2013 publicada el 5 de abril de 2013, requerida por Estados Unidos de América.

2.- La Embajada de los Estados Unidos de América, mediante nota diplomática 0443 de abril 8 de 2013, solicitó la captura con fines de extradición del señor **Rafael Antonio Garavito García.**

3.- El Fiscal General de la Nación mediante resolución de abril 11 de 2013, ordenó la captura con fines de extradición del



**FISCALÍA**
GENERAL DE LA NACIÓN

2
Negación solicitud de detención
domiciliaria y libertad del señor
*Rafael Antonio Garavito García*

señor **Rafael Antonio Garavito García**, identificado con
cédula de ciudadanía 19.094.230, la cual le fue notificada en la
misma fecha.

4.- La Embajada de Estados Unidos de América formalizó el
pedido de extradición mediante nota verbal 0945 del 31 de
mayo de 2013, conforme a los términos del artículo 511 de la
Ley 906 de 2004.

5.- La Sala de Casación Penal de la Corte Suprema de Justicia,
mediante decisión de octubre 2 de 2013, conceptúo
favorablemente al pedido de extradición formulado por los
Estados Unidos de América, respecto del señor **Rafael Antonio
Garavito García.**

6.-Mediante oficio DAI 20141700007581 del 6 de febrero de
2014, el Director de Asuntos Internacionales, solicitó al Director
General del Instituto Nacional de Medicina Legal y Ciencias
Forenses, la práctica de una valoración médico legal, para que se
determinara si en su estado actual de salud podía ser trasladado
vía aérea a los Estados Unidos de América.

7.- Mediante oficio OFI14-0002803-OAI-1100 del 10 de febrero
de 2014, la Oficina de Asuntos Internacionales del Ministerio de
Justicia y del Derecho, informó a esta institución que el Gobierno
Nacional, mediante resolución ejecutiva No. 293 del 28 de
octubre de 2013, confirmada mediante resolución ejecutiva No.
374 del 26 de diciembre de 2013, concedió la extradición a los
Estados Unidos de América del señor **Rafael Antonio Garavito
García.**

8.- Con oficio DAI 20141700010171 del 14 de febrero de 2014, la
Dirección de Asuntos Internacionales de esta institución puso a
disposición de la Embajada de los Estados Unidos al señor **Rafael
Antonio Garavito García** y otros, a efectos de materializar su
entrega según el término previsto en el Artículo 511 de la Ley
906 de 2004.





*Negación solicitud de detención
domiciliaria y libertad del señor*
**Rafael Antonio Garavito García**

**FISCALÍA**

9.- Mediante informe médico forense del 21 de febrero de 2014, allegado el 25 de febrero de 2014, por el Grupo Clínico del Instituto Nacional de Medicina Legal y Ciencias Forenses, en relación con el señor **Rafael Antonio Garavito García**, se indicó que para su traslado a los Estados Unidos de América vía aérea, se debe garantizar asistencia médica en una aeronave medicalizada.

10.- Por lo anterior, mediante oficio DAI 20141700014201, del 26 de febrero de 2014, dirigido a la Embajada de los Estados Unidos de América, se suspendió la entrega en extradición del señor **Rafael Antonio Garavito García.**

### DE LA LIBERTAD

El doctor Jaime Javier Valderrama Ovalle, apoderado judicial del señor **Rafael Antonio Garavito García**, mediante escrito del 10 de febrero de 2014, entre otras cosas, solicita la detención domiciliaria de su poderdante, o en su defecto, sea trasladado a un establecimiento público o privado, bajo vigilancia del INPEC, teniendo en cuenta el estado de salud de su poderdante.

De otra parte, mediante escrito del 27 de febrero de 2014, solicita su libertad, conforme a los términos del Artículo 511 de la Ley 906 de 2004, por cuanto según él, no se ha efectuado su entrega a los Estados Unidos de América, luego de que el Gobierno Nacional mediante resolución ejecutiva No. 293 del 28 de octubre de 2013, confirmada mediante resolución ejecutiva No. 374 del 26 de diciembre de 2013, se concedió su entrega.

### CONSIDERACIONES

1.- La competencia para resolver sobre solicitudes relacionadas con la libertad de personas privadas de la libertad con fines de extradición se deriva del artículo 509 de la Ley 906 de 2004 que faculta a este Despacho para disponer sobre la aprehensión de personas que se encuentran requeridas en extradición.

La extradición es una figura que se fundamenta en la cooperación de la comunidad internacional en la lucha contra el delito, que





Negación solicitud de detención
domiciliaria y libertad del señor
**Rafael Antonio Garavito García**

4

## FISCALÍA

tiene por finalidad la entrega de una persona a un Estado
extranjero para que comparezca ante el despacho judicial que lo
requiere o cumpla la pena que le ha sido impuesta.

Debe destacarse que el señor **Rafael Antonio Garavito García**,
no se encuentra privado de su libertad como consecuencia de una
infracción al código penal colombiano, sino con fundamento en un
procedimiento que se adelanta en los Estados Unidos de América,
circunstancia por la cual fue requerido en extradición.

Con el fin de aclarar la naturaleza del trámite de extradición
resulta pertinente citar previamente lo dicho por la Corte
Constitucional en sentencia C-460/08. M.P. Dr. Nilson Pinilla
Pinilla:

> << ...resulta claro que en el trámite de la extradición la Corte
> Suprema, Sala Penal, no valora pruebas sobre la existencia del
> hecho y sus circunstancias, ni juzga al solicitado; tampoco cuestiona
> las decisiones emitidas por la autoridad extranjera y sólo le compete
> verificar el cumplimiento de los requisitos para otorgar la
> extradición, según lo dispuesto en el tratado internacional respectivo
> o, en su defecto, en la ley interna, acatando la preceptiva superior
> (cfr. arts 12, 34 y 35 Const.) y la normatividad complementaria.
>
> Los fundamentos y la consiguiente controversia sobre la decisión
> judicial de la autoridad extranjera, con base en la cual se pide la
> extradición, tienen su escenario natural en los respectivos estrados
> judiciales, es decir, al interior del correspondiente proceso penal
> adelantado en el Estado solicitante y no ante autoridades judiciales
> colombianas, que deben cooperar, junto con el Ejecutivo, para que
> la ubicación en país distinto a donde se cometió el presunto delito,
> no sea vía para eludir la acción de la justicia, que
> internacionalmente debe permanecer aliada y diligente en la lucha
> contra la criminalidad...>>

2.- En relación con la solicitud de detención domiciliaria solicitada
a favor del señor **Rafael Antonio Garavito García**, o se
disponga su traslado a un establecimiento público o privado en
razón a su estado de salud, debe advertirse que dicha figura
resulta improcedente dentro de un trámite de extradición, pues
no puede confundirse la situación de captura con la medida de
detención propia de un proceso penal.

La resolución de captura con fines de extradición que profiere
este Despacho como consecuencia de la solicitud de un Estado
extranjero bajo los presupuestos previstos en un determinado
tratado internacional, o en su defecto, en el artículo 509 de la Ley





5

Negación solicitud de detención
domiciliaria y libertad del señor
**Rafael Antonio Garavito García**

**FISCALÍA**

906 de 2004, se rige por el Capítulo II Libro V de la Ley 906 de 2004 que establece un trámite autónomo e independiente del procedimiento penal común.

Según se desprende del ordenamiento procesal penal y los tratados internacionales sobre la materia, la captura con fines de extradición tiene su razón de ser en el interés del Estado extranjero así expresado por conducto diplomático, en obtener la privación de la libertad de la persona requerida, mientras el Gobierno Nacional, previo concepto de la Sala de Casación Penal de la Corte Suprema de Justicia, profiere la respectiva resolución ejecutiva mediante la cual se concede o niega la solicitud.

Si bien es cierto que el trámite de extradición se encuentra regulado por el Código de Procedimiento Penal colombiano, también lo es, que su naturaleza es totalmente distinta al proceso penal doméstico propiamente dicho. La persona que se encuentra capturada con fines de extradición no es objeto de las instituciones procesales contenidas en el Capítulo III del Título IV - Libro II de la Ley 906 de 2004.

Adicionalmente debe tenerse en cuenta, que el sentido de los términos de detención preventiva y captura, usados en la normatividad procesal penal interna, tienen un alcance jurídico diferente.

En lo que se refiere a la captura, se trata de un hecho físico perceptible por los sentidos, que constituye un medio para la realización de los fines de la administración de justicia y consiste en la aprehensión física de la persona requerida.

Por su parte, la detención preventiva se fundamenta en la existencia de dos indicios graves de responsabilidad (art. 356 de la ley 600 de 2000) dentro de una determinada actuación penal. En la ley 906 de 2004, el juez de control de garantías la decreta cuando de los elementos materiales probatorios y evidencia física recogidos y asegurados, o de la información obtenida, se pueda inferir razonablemente que el imputado puede ser autor o partícipe de la conducta delictiva, siempre y cuando se cumplan los requisitos previstos en el artículo 308.

En este orden de ideas, la denominada detención domiciliaria que se solicita resulta improcedente frente a una persona sujeta a un trámite de extradición, teniendo en cuenta que esta privación de la libertad sólo puede cesar con fundamento en el retiro de la





*Negación solicitud de detención*
*domiciliaria y libertad del señor*
**Rafael Antonio Garavito García**

solicitud de captura que haga el país requirente, en el concepto desfavorable de la Corte Suprema de Justicia, lo cual no ocurrió en el presente caso, o en la decisión negativa del Gobierno Nacional frente al pedido de extradición conforme a la facultad discrecional que le asiste.

De otro lado, teniendo en cuenta que las causales de libertad en materia de extradición, no consagran el estado de salud, resulta igualmente improcedente acceder a la petición de libertad domiciliaria planteada.

3.- Ahora bien, es importante indicar que el día 11 de febrero de 2014, la Fiscalía General de la Nación fue informada que el Gobierno Nacional mediante resolución ejecutiva No. 293 del 28 de octubre de 2013, confirmada mediante resolución ejecutiva No. 374 del 26 de diciembre de 2013, condicionó la entrega en extradición del señor **Rafael Antonio Garavito García**, teniendo en cuenta lo siguiente:

> <<...*Con el fin de establecer el estado de salud del ciudadano requerido en extradición y de garantizar el derecho fundamental a la salud del que es titular, el Gobierno Nacional dentro del marco de sus competencias constitucionales y legales considera necesario solicitar a la Fiscalía General de la Nación que no lleve a cabo su entrega hasta tanto no obtenga un dictamen médico legal en el que se determine que el traslado no pone en riesgo su integridad personal, en atención a lo establecido por el artículo 49 de la Constitución Política...*>>

Con anterioridad, la Dirección de Asuntos Internacionales de esta institución mediante comunicación DAI 20141700007581 del 6 de febrero de 2014, en aras de garantizar derechos fundamentales a favor del señor **Rafael Antonio Garavito García**, había solicitado al Director General del Instituto Nacional de Medicina Legal y Ciencias Forenses la práctica de una valoración médico legal, para que se determinara si en su estado actual de salud podía ser trasladado vía aérea a los Estados Unidos de América, ante una eventual autorización de entrega por parte del Gobierno Nacional.

Mientras tanto, a través de oficio DAI 20141700010171 del 14 de febrero de 2014, la Dirección de Asuntos Internacionales de esta institución puso a disposición de la Embajada de los Estados Unidos al señor **Rafael Antonio Garavito García** y otros, a





*Negación solicitud de detención*
*domiciliaria y libertad del señor*
*Rafael Antonio Garavito García*

**FISCALÍA**
GENERAL DE LA NACIÓN

efectos de materializar su entrega según el término previsto en el
Artículo 511 de la Ley 906 de 2004.

Posteriormente, mediante informe médico forense Caso BOG-
2014-002610 del 21 de febrero de 2014, allegado el 25 de
febrero de 2014, por el Grupo Clínico del Instituto Nacional de
Medicina Legal y Ciencias Forenses, en relación con el señor
**Rafael Antonio Garavito García**, se concluyó entre otras cosas
lo siguiente:

> <<...Con respecto a la pregunta sobre la conveniencia o no de de
> (sic) su viaje a los estados unidos (sic), si bien sus condiciones
> hemodinámicas son estables, por su estado neurológico y de
> postración **debe garantizarse asistencia medica** (sic) **durante el
> traslado, el cual debe realizarse en aeronave
> medicalizada**...>> Subrayado y negrilla fuera de texto.

Por lo expuesto, mediante oficio DAI 20141700014201 del 26 de
febrero de 2014, dirigido a la Embajada de los Estados Unidos de
América, se suspendió la entrega del señor **Rafael Antonio
Garavito García**, hasta tanto no estén dadas las condiciones
para su traslado a dicho país, conforme a lo dictaminado por el
Instituto Nacional de Medicina Legal y Ciencias Forenses.

Mientras tanto, mediante oficio 20141700014221 del 26 de
febrero de 2014, se solicitó al Director del Instituto Nacional
Penitenciario y Carcelario, se adopten las medidas que resulten
pertinentes para garantizar el acceso eficaz y oportuno a los
servicios médicos para la salvaguarda de los derechos
fundamentales del señor **Rafael Antonio Garavito García**, de
conformidad con lo establecido para este tipo de asuntos según la
normatividad penitenciaria.

Con base en lo anterior y contrario a lo argumentado por el
apoderado del señor **Rafael Antonio Garavito García**, en
solicitud del 27 de febrero de 2014, resulta improcedente la
solicitud de libertad presentada por su poderdante.

Pues como se ha señalado, si bien es cierto el Gobierno Nacional
autorizó su extradición mediante resolución del 26 de diciembre
de 2013, también lo es, que el 10 de febrero de 2014, el
Ministerio de Justicia y del Derecho, informó a esta institución
acerca de dicha decisión, circunstancia por la cual el 14 de
febrero de 2014, fue puesto a disposición de la Embajada de los



*Negación solicitud de detención*
*domiciliaria y libertad del señor*
***Rafael Antonio Garavito García***

Estados Unidos el señor **Rafael Antonio Garavito García,** para su entrega, misma que fue suspendida el día 26 de febrero de 2014, habida cuenta del dictamen de medicina allegado el 25 de febrero de 2014, por el Grupo Clínico del Instituto Nacional de Medicina Legal y Ciencias Forenses, el cual condicionó su traslado en avión medicalizado.

Así las cosas, a la fecha, se encuentra suspendida la entrega del señor **Rafael Antonio Garavito García,** hasta tanto no estén dadas las condiciones para su envío a los Estados Unidos de América. Por lo tanto, una vez se garantice su traslado en avión medicalizado por parte de ese país, nuevamente será puesto a disposición según los términos del artículo 511 de la Ley 906 de 2004.

4.- Finalmente, respecto de la petición presentada por el doctor Valderrama Ovalle, a través de la cual solicita se ordene al Hospital El Tunal, la expedición de copias de la historia clínica del señor **Rafael Antonio Garavito García,** es pertinente indicar que en el caso particular, el paciente mediante autorización a un tercero, puede solicitarlas a la respectiva institución médica.

En mérito de lo expuesto, el Fiscal General de la Nación,

## RESUELVE

**PRIMERO.-** Negar por improcedente la solicitud de libertad presentada a nombre del señor **Rafael Antonio Garavito García,** identificado con cédula de ciudadanía 19.094.230.

**SEGUNDO.-** Negar por improcedente la detención domiciliaria, presentada a nombre del señor **Rafael Antonio Garavito García,** identificado con cédula de ciudadanía 19.094.230.

**TERCERO.-** Solicitar al Director del Instituto Nacional Penitenciario y Carcelario, mientras se efectúa la entrega en extradición del señor **Rafael Antonio Garavito García,** se garantice el acceso eficaz y oportuno a todos los servicios





9

*Negación solicitud de detención
domiciliaria y libertad del señor*
***Rafael Antonio Garavito García***

**FISCALÍA**

médicos y el ejercicio de sus derechos fundamentales, de conformidad con lo establecido para este tipo de asuntos en el Código Nacional Penitenciario y Carcelario.

**CUARTO.-** *Comisionar al Instituto Nacional Penitenciario y Carcelario con el fin de que se notifique personalmente el contenido de esta providencia al señor* **Rafael Antonio Garavito García.**

Notifíquese, comuníquese y cúmplase.

**EDUARDO MONTEALEGRE LYNETT**
Fiscal General de la Nación

EXHIBIT E

[Emblem:
OFFICE OF THE ATTORNEY GENERAL]
[Barcode]
[To respond, make reference to File No. 20141700014931
03-03-2014
Page 1 of 1]

DAI[1]

Bogota, D.C.

Mister
**JAIME JAVIER VALDERRAMA OVALLE**
Carrera 69 B No. 24 B – 55. Int. 8, Suite 102 –
Bogota – D.C.

> **MATTER:** Extradition process of RAFAEL ANTONIO GARAVITO GARCIA. Denial of home detention and release

Dear Sir:

I courteously acknowledge receipt of your submissions dated February 10th and 14th, 2014, through which you, in your capacity as defense attorney for Mr. RAFAEL ANTONIO GARAVITO GARCIA, requested for your client home detention and release, respectively.

Pursuant to the foregoing, I am sending you the Decision dated March 3rd, 2014, signed by the Attorney General, where said requests were denied.

The foregoing is for your information and relevant purposes.

Sincerely,
[Signature illegible]
**FRANCISCO JAVIER ECHEVERRY LARA**
Director of International Affairs

Enclosures: 9 folios
Drafted by: JMPC

DIRECTION OF AFFAIRS[2]

---

[1] Spanish acronym for the Direction of International Affairs.
[2] It is assumed that this is the emblem of the Direction of International Affairs, but the bottom of the page is cut in the image file.

A-83

[Emblem: OFFICE OF THE ATTORNEY GENERAL]
Denial of petition for home detention and release of **Rafael Antonio Garavito Garcia**

Bogota, D.C. [Stamp: 03 MAR. 2014]

## MATTER AT HAND

This office hereby makes a decision regarding the requests made by Mr. Manuel Antonio Valderrama Ovalle, ID card No. 79.490.849 and professional card No. 90.274, who, as legal counsel to Mr. **Rafael Antonio Garavito Garcia**, through written submissions on February the 10th and the 27th, 2014, respectively, requests for his client to be released and placed in home detention.

## CASE BACKGROUND

1.- Second Lieutenant Cesar Augusto Cardenas Duran, a member of the Narcoterrorism Investigative Unit of the Direction of Antinarcotics of the National Police, through report No. 0049/DIRAN-AREIN-GRUIC-29, dated April 5th, 2013, brought before this office Mr. **Rafael Antonio Garavito Garcia,** who was detained on April 5th, 2013, pursuant to Red Notice No. A-2118/4-2013 from INTERPOL, published on April 5th, 2013, requested by the United States of America.

2.- The Embassy of the United States of America, through Diplomatic Note 0443, dated April 8th, 2013, requested the capture of Mr. **Rafael Antonio Garavito Garcia** for the purpose of extradition.

3.- The Attorney General, through a Decision dated Aprill 11th, 2013, ordered the capture for the purpose of extradition of Mr. **Rafael Antonio Garavito Garcia,** ID card No. 19.094.230, of which he was notified on that same date.

4.- The Embassy of the United States of America formalized the request for extradition through Verbal Note 0945, dated May 31st, 2013, pursuant to Article 511 of Law 906 of 2004.

5.- The Criminal Appeals Part of the Supreme Court of Justice, in its ruling dated October 2nd, 2013, decided in favor of the extradition request made by the United States of America in regards to Mr. **Rafael Antonio Garavito Garcia.**

6.- The Director of International Affairs, through document  DAI 20141700007581, dated February 6th, 2014, made a request to the General Director of the National Institute of Legal Medicine and Forensic Sciences, for the performance of a medical and legal evaluation, in order to determine if in his current state of health he could be transported by plane to the United States of America.

7.- Through document  OFI14-0002803-OAI-1100, dated February 10th, 2014, the Office of International Affairs of the Secretary of Justice and Law informed this institution that the National Government granted the extradition of Mr. **Rafael Antonio Garavito Garcia** to the United States of America through Executive Resolution No. 293, dated October 28th, 2013, confirmed through Executive Resolution No. 374, dated December 26th, 2013.

[Emblem: OFFICE OF THE ATTORNEY GENERAL]
Denial of petition for home detention and release of **Rafael Antonio Garavito Garcia**

8.- Through document  DAI 20141700010171, dated February 14th, 2014, the Direction of International Affairs of this institution made Mr. **Rafael Antonio Garavito Garcia** and others available to the United States Embassy, with the purpose of surrendering them pursuant to the time limit provided by Article 511 of Law 906 of 2004.

9.- A medical forensic report from the Clinical Group of the National Institute of Legal Medicine and Forensic Sciences , dated February 21st, 2014, received on February 25th, of 2014, regarding Mr. **Rafael Antonio Garavito Garcia,** indicated that in order to transport him in a flight to the United States of America, it was necessary to secure medical assistance in a medically adapted plane.

10.- Due to the foregoing, through document DAI 20141700014201, dated February 26th, 2014, addressed to the Embassy of the United States of America, the surrender for extradition of Mr. **Rafael Antonio Garavito Garcia** was suspended.

## REGARDING RELEASE

Mr. Jaime Javier Valderrama Ovalle, defense attorney of Mr. **Rafael Antonio Garavito Garcia,** by means of a written submission dated February 10th, 2014, requests, among other things, home detention for his client, or otherwise, for him to be transferred to a public or private facility, under the custody of INPEC[3], given the poor health of his client.

On the other hand, by means of a written submission dated February 27th, 2014, he requests his release, pursuant to the terms of Article 511 of Law 906 of 2004, given that, according to him, he has not been surrendered to the United States of America, after the National Government granted his surrender through Executive Resolution No. 293, dated October 28th, 2013, confirmed through Executive Resolution No. 374, dated December 26th, 2013.

## CONSIDERATIONS

1.- The authority to decide on matters regarding the release of individuals deprived of their freedom with the purpose of extradition is provided for on Article 509 of Law 906 of 2004, which gives this office the power to decide upon the detention of individuals who are requested for extradition.

Extradition is a legal concept based on the cooperation of the international community in the fight against crime, were the final aim is the surrender of an individual to a foreign State so that he or she can either appear before the judicial entity that made the request, or serve the sentence already imposed.

It should be noted that Mr. **Rafael Antonio Garavito Garcia** has not been deprived of his freedom due to a violation of the Colombian Criminal Code, but based on legal proceedings currently taking place in the United States of America, due to which he was requested for extradition.

---

[3] Spanish acronym for "Instituto Nacional Penitenciario y Carcelario" (National Penitentiary and Detention Institute).

[Emblem: OFFICE OF THE ATTORNEY GENERAL]
Denial of petition for home detention and release of **Rafael Antonio Garavito Garcia**

To clarify the nature of the extradition process it is appropriate to first cite what the Constitutional Court said in Sentence C-460/08. M.P. Dr. Nilson Pinilla Pinilla:

> *"... it is clear that during the extradition process, the Criminal Part of the Supreme Court does not evaluate the evidence of the occurrence of the fact and its circumstances, nor does it try the requested individual; in addition, it does not call into question the decisions issued by foreign authorities and it is only responsible for verifying compliance with the requirements to authorize extradition, pursuant to the specific international treaty, or, otherwise, in the domestic statute, abiding by the higher mandate (see Articles 12, 34 and 35 of the Constitution) and supplemental norms.*
>
> *The grounds and ensuing controversy about the judicial decision of a foreign authority, on the basis of which extradition is sought, have their natural setting in the corresponding judicial instances, namely, within the particular criminal process taking place in the requesting State and not before Colombian judicial authorities, which must cooperate, together with the Government, so that location in a country other than the one where the crime is committed, does not allow for an evasion of justice, as internationally it should remain allied and diligent in the fight against crime...."*

2.- Regarding the request for home detention for Mr. **Rafael Antonio Garavito Garcia,** or for ordering his transfer to a public or private facility due to poor health, it should be observed that such a measure is not provided for within the extradition process, because being <u>captured</u> should not be confused with being under an <u>measure of detention</u>, which is characteristic of a criminal case.

The order to capture for the purpose of extradition issued by this office as a result of the request made by a foreign State under the provisions of a particular international treaty or, otherwise, in Article 509 of Law 906 of 2004, is governed by Chapter II Book V of Law 906 of 2004, which provides for a process autonomous and independent from common criminal procedure.

As can be deduced from criminal procedure legislation and from international treaties on the subject, the capture for the purpose of extradition derives its reason to exist from the interest of the foreign State, as expressed through diplomatic channels, in securing the detention of the requested individual, while the National Government, abreast of the ruling of the Criminal Appeals Part of the Supreme Court of Justice, issues the respective Executive Resolution through which it approves or denies the request.

Although it is true that the extradition process is regulated by the Colombian Code of Criminal Procedure, it is also true that it has a completely different nature from that of the domestic criminal process per se. The individual who has been captured for the purpose of extradition is not the object of the procedural institutions provided for in Chapter III of Title IV – Book II of Law 906 of 2004.

In addition, it should be taken into account that the meaning of the terms preventive detention and capture, as used in the normative of domestic criminal procedure, have a different juridical scope.

[Emblem: OFFICE OF THE ATTORNEY GENERAL]
Denial of petition for home detention and release of **Rafael Antonio Garavito Garcia**

In regards to capture, it is a material event that can be perceived by the senses, which constitutes the means to achieve the ends of the administration of justice and which entails the material apprehension of the requested individual.

On the other hand, preventive detention is based on the existence of two serious signs of responsibility (Article 356 of Law 600 of 2000) within particular criminal proceedings. In law 906 of 2004 the supervisory judge orders it when, through the material evidentiary elements and physical evidence gathered and secured, or through the information obtained, it can be reasonably inferred that the defendant can be an author or participant in criminal conduct, provided that the requirements of Article 308 have been satisfied.

Along these lines, the aforementioned home detention that is requested is inappropriate in the case of an individual subject to an extradition process, keeping in mind that such deprivation of freedom can only cease based on the withdrawal of the request for capture by the requesting State, on an unfavorable decision by the Supreme Court of Justice, which did not occur in this case, or on a denial of the request for extradition by the National Government according to its discretionary powers.

On the other hand, considering that the grounds for release in the case of extradition do not contemplate health status, it is also inappropriate to approve the request for release into home detention.

3.- Now, it is important to point out that on February 11th, 2014, the Office of the Attorney General was informed that the National Government, through Executive Resolution No. 293, dated October 28th, 2013, confirmed through Executive Resolution No. 374, dated December 26th, 2013, made the surrender for extradition of Mr. **Rafael Antonio Garavito Garcia** contingent upon the following:

> *"... In order to determine the health status of the citizen requested for extradition and to guarantee the fundamental right to health to which he is entitled, the National Government, within the framework of its constitutional and legal responsibilities, deems necessary to request the Office of the Attorney General not to carry out the surrender until it has obtained a legal medical opinion where it is established that the transfer does not pose a threat to his personal integrity, in regard to what is provided in Article 49 of the Political Constitution...."*

Beforehand, the Director of International Affairs, through document  DAI 20141700007581, dated February 6th, 2014, in the interest of safeguarding the fundamental rights of Mr. **Rafael Antonio Garavito Garcia,** made a request to the General Director of the National Institute of Legal Medicine and Forensic Sciences, for the performance of a medical and legal evaluation, in order to determine if in his current state of health he could be transported by plane to the United States of America, given the possibility that the National Government would authorize the surrender.

In the meantime, through document DAI 20141700010171, dated February 14th, 2014, the Direction of International Affairs of this institution made Mr. **Rafael Antonio Garavito Garcia** and others available

[Emblem: OFFICE OF THE ATTORNEY GENERAL]
Denial of petition for home detention and release of **Rafael Antonio Garavito Garcia**

to the United States Embassy, with the purpose of surrendering them pursuant to the time limit provided by Article 511 of Law 906 of 2004.

Subsequently, through medical forensic report Case BOG-2014-002610, dated February 21st, 2014, received on February 25th, of 2014, from the Clinical Group of the National Institute of Legal Medicine and Forensic Sciences, regarding Mr. **Rafael Antonio Garavito Garcia,** concluded, among other things, the following:

> *"In regards to the question of whether it is convenient or not, his trip to the United States[4], even though his hemodynamics are stable, due to his neurological status and prostration, **medical assistance must be guaranteed during his transport, which needs to be done in a medically adapted plane**."* Underlines and bold have been added.

Due to the foregoing, through document DAI 20141700014201, dated February 26th, 2014, addressed to the Embassy of the United States of America, the surrender for extradition of Mr. **Rafael Antonio Garavito Garcia** was suspended until all the conditions for his transport to said country are met, in accordance with the decision of the National Institute of Legal Medicine and Forensic Sciences.

In the meantime, through document DAI 20141700014221, dated February 26th, 2014, a request was made to the Director of the National Penitentiary and Detention Institute to take all pertinent measures to secure efficient and timely access to the medical services needed to safeguard the fundamental rights of Mr. **Rafael Antonio Garavito Garcia,** pursuant to the provisions of penitentiary rules for this kind of matters.

Based on the foregoing, and contrary to the arguments of the attorney for Mr. **Rafael Antonio Garavito Garcia** in his request dated February 27th, 2014, the request for release filed by counsel is inadmissible.

Then, as has been indicated, although it is true that the National Government authorized his extradition through the resolution dated December 26th, 2013, it is also true that on February 10th, 2014, the Secretary of Justice and Law informed this institution about said decision, due to which on February 14th, 2014, Mr. **Rafael Antonio Garavito Garcia** was made available to the Embassy of the United States for his surrender, which was suspended on February 26th, 2014, after taking into account the medical opinion received on February 25th, 2014 from the Clinical Group of the National Institute of Legal Medicine and Forensic Sciences, where the condition for his transport was the use of a medically adapted plane.

This being the case, to date, the surrender of Mr. **Rafael Antonio Garavito Garcia** is suspended until all the conditions for his travel to the United States of America are fulfilled. Consequently, once his transport in a medically adapted plane is secured by that country, he will be made available again, pursuant to the terms of Article 511 of Law 906 of 2004.

4.- Finally, regarding Mr. Valderrama Ovalle's petition, through which he requests that Hospital El Tunal be ordered to provide copies of Mr. **Rafael Antonio Garavito Garcia's** medical records, it is necessary

---

[4] The spelling mistakes in this quote, marked in the original, have been corrected in the English translation.

[Emblem: OFFICE OF THE ATTORNEY GENERAL]
Denial of petition for home detention and release of **Rafael Antonio Garavito Garcia**

to point out that in this particular case the patient, by authorizing a third party, can request them to that medical institution.

Based on the foregoing, the Attorney General,

**DECIDES**

**First.-** To deny as inadmissible the request for release made on behalf of Mr. **Rafael Antonio Garavito Garcia**, ID No. 19.094.230.

**Second.-** To deny home detention as inadmissible, as requested on behalf of Mr. **Rafael Antonio Garavito Garcia**, ID No. 19.094.230.

**Third.-** To request that, while the surrender for extradition of Mr. **Rafael Antonio Garavito Garcia** is completed, the Director of the National Penitentiary and Detention Institute guarantees efficient and timely access to medical services and the exercise of his fundamental rights, pursuant to the provisions for this kind of matters in the National Penitentiary and Detention Code.

**Fourth.-** To commission the National Penitentiary and Detention Institute so that the contents of this decision are personally notified to Mr. **Rafael Antonio Garavito Garcia.**

To be notified, published and executed.

[Illegible signature]
**EDUARDO MONTEALEGRE LYNETT**
Attorney General

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA     x
      :

      :

     -against-      :    (S5) 12 Cr. 839 (JSR)

RAFAEL A. GARAVITO-GARCIA,    :

     Defendant.     :

      x

---

### MEMORANDUM OF LAW IN SUPPORT OF PRE-TRIAL MOTION TO DISMISS INDICTMENT ON BEHALF OF DEFENDANT RAFAEL A. GARAVITO-GARCIA

---

Robert W. Ray
*Attorney for Defendant Rafael A. Garavito-Garcia*

Fox Rothschild LLP
100 Park Avenue, 15th Floor
New York, New York 10017
Tel. No.: (212) 878-7993
rwray@foxrothschild.com (e-mail)

## PRELIMINARY STATEMENT

Defendant Rafael A. Garavito-Garcia submits this Memorandum of Law in support of his motion to dismiss the Indictment, pursuant to Fed. R. Crim. P. 12(b)(3)(A),  for lack of jurisdiction and to repatriate him back to Colombia as a consequence of a violation of the extradition treaty then in effect between the United States and Colombia (the "Extradition Treaty" or "Treaty").  That Treaty required that Garavito-Garcia be transferred to the United States within thirty (30) days from the date he was "made available to the requesting State." Furthermore, defendant Garavito-Garcia submits this Memorandum of Law in support of his motion, pursuant to Fed. R. Crim. P. 12(b)(3)(E) and 16(a)(1)(E)(i), to compel further discovery from the Government of all extradition documents within the Government's possession, custody or control relevant to defendant's extradition on July 22, 2014 that are material to the preparation of his defense and the disposition of the instant motion.  Finally, Mr. Garavito-Garcia also seeks leave to submit additional pre-trial motions in the interests of justice, as well as any further relief that this Court deems just and proper.

## PROCEDURAL HISTORY

On January 8, 2013, the fifth superseding indictment in this case was filed under seal naming two defendants, including Garavito-Garcia and his alleged associate and co-conspirator Gustavo Perez-Garcia.  (S5) Indictment, 12 Cr. 839 (JSR).  Thereafter and presumably following defendant's provisional arrest in Colombia on April 5, 2013, the (S5) Indictment was unsealed. That Indictment charges defendant Garavito-Garcia in all four counts during the period between May 2012 and the filing of the Indictment, as follows:

*Count One* − Narcoterrorism conspiracy, in violation of 21 U.S.C. § 960a.

*Count Two* − Cocaine importation conspiracy, in violation of 21 U.S.C. § 963.

ACTIVE 28084075v1

*Count Three* – Conspiracy to provide material support to a foreign terrorist organization, namely, FARC, in violation of 18 U.S.C. § 2239B(a)(1), (d)(1) and 3238.

*Count Four* – Conspiracy to acquire in Guinea Bissau, and then transfer to FARC in Colombia, anti-aircraft missiles, in violation of 18 U.S.C. § 2332g(a)(1), (b), (c) and 3238.

On July 22, 2014, more than fifteen months following his provisional arrest in Colombia, Garavito-Garcia was finally extradited to the United States and presented before a United States Magistrate Judge the following day, arraigned on the Indictment and detained on consent pending trial.  He remains in custody under pre-trial detention.

## STATEMENT OF FACTS

A statement of the relevant facts in considering Garavito-Garcia's pre-trial motion is incorporated by reference from that contained in the Declaration of Robert W. Ray, CJA counsel, filed contemporaneously herewith, and will not be repeated here.

Between Colombia and the United States, defendant Garavito-Garcia now has been in custody over 19 months.  This case arises as a result of the return of the Indictment by a grand jury in the Southern District of New York and the Government's efforts to secure defendant's presence for prosecution before this Court by invoking the extradition treaty between Colombia and the United States.  The Indictment alleges conduct by the defendant while in Guinea Bissau and also in Colombia.  There is no allegation among the four conspiracies charged in the Indictment that defendant ever entered the United States in furtherance of any of these alleged illegal activities.  Instead, the Government contends that Guinea Bissau has become a "major transshipment point" for narcotics produced in Colombia and exported to "Europe and elsewhere" and that one of the many objects of the charged conspiracies was Garavito-Garcia's

ACTIVE 28084075v1

alleged involvement in planning for the importation of large quantities of cocaine into the United States.  (S5) Indictment ¶¶ 1-2, 10, 14, 19.

Additionally, a further alleged purpose of the charged conspiracies was purportedly for defendant and others to ship "FARC-owned cocaine" to Guinea Bissau in exchange for surface-to-air missiles, grenade launchers and machine guns in order to combat the counter-narcotics forces of the United States, including those of the Drug Enforcement Administration (DEA), and provide the means to shoot down U.S. helicopters engaged in those efforts in Colombia.  How exactly that was to be done is not explained in any detail in the Indictment, except that it was to involve corrupt government and military officials in Guinea Bissau providing weapons to FARC in Colombia funded by the receipt of "ton-quantities" of cocaine supplied by, among others, defendant and his alleged co-conspirators.  And, naturally of course for purposes of establishing jurisdiction, the plan advanced by the Government's confidential sources was for some of that cocaine somehow to end up back again across the Atlantic Ocean for sale in the United States as well.  (S5) Indictment ¶¶ 4, 6-7, 11.

The Government's investigation was spearheaded by two confidential sources working for the DEA, who together with five unnamed co-conspirators and two unnamed Guinea Bissau military officials, orchestrated the activities that ultimately led to the return of the (S5) Indictment against defendant Garavito-Garcia and his named alleged co-conspirator, co-defendant and associate Gustavo Perez-Garcia.  (S5) Indictment ¶¶ 4-5, 6-7, 11.  Discovery materials supplied to date by the Government in this case reveal only a single cryptic recorded conversation (and a brief related reference in a follow up conversation three days later), out of the numerous surreptitiously tape-recorded meetings during the investigation dating back to the

spring of 2012, where the jurisdictionally relevant exportation of cocaine to the United States is

even discussed.  On June 30, 2012, CS-1 explains the ruse:

> CS-1:  [S]o the idea is [to] install a fish processing factory [in Guinea Bissau]
> and produce fish in a way [as a cover] that we can also utilize for our work
> [cocaine trafficking], for our national [Colombian] product, which you already
> know what is the national product [cocaine].  To[,] for example[,] be able to
> send to Canada, [the] United States, Portugal and Spain utilizing … the
> infrastructure [cover factory].  You understand me?  At the same time, we can
> provide jobs [−] people make money and everyone is happy.
>
> GARAVITO-GARCIA:  Many things that can be done in a country[,] and in a
> country that is growing[,] and … [i]t is okay.  It is fine.

With that evidence and not much more, the Government proceeded on an eighteen-month

quest – from the filing of the Indictment in January 2013 until defendant's extradition pursuant

to the Extradition Treaty and transfer to the United States in July 2014 – to secure his presence

for prosecution in the Southern District of New York.

That transfer, however, was delayed in Colombia and then complicated by defendant

Garavito-Garcia suffering a serious stroke after nearly nine months in custody following his

provisional arrest.  Declaration of Robert W. Ray, with attached exhibits, filed herewith

(hereinafter, the "Ray Declaration").

And then, significantly, the Attorney General of Colombia, by his own acknowledgment,

made defendant available, on or about February 14, 2014, to the United States Embassy in

Colombia for extradition pursuant to the Treaty.  It was not until over five months later,

however, that defendant's extradition was effected.  All the while, defendant Garavito-Garcia

remained in custody with complications from the stroke he suffered months before in late

December 2013.

ACTIVE 28084075v1

Since his arrival in the United States in July 2014, defendant has been under the care of a hospital/assisted living/rehabilitation facility and under 24-hour armed guard by the Bureau of Prisons in Brooklyn, New York.

## DISCUSSION AND RELEVANT LAW

The problem for the Government in this case, and thus the basis for the instant motion, is this: the Court simply lacks jurisdiction over the defendant because Colombia violated its own law and thereby (and more importantly) the Extradition Treaty by refusing to "set [him] at liberty" once he was "made available" to the United States and his extradition was not accomplished within the 30-day time limit prescribed by Article 511 of the Colombian Code of Criminal Justice and, by extension, Article 12 of the Extradition Treaty.  Article 511, quoted in Ray Declaration ¶ 15; Colombia-U.S. Extradition Treaty, attached as Exhibit C to Ray Declaration.

First, there can be little question that Article 511 was triggered as the result of the Colombian Attorney General's express written acknowledgment that on February 14, 2014, his office "made Mr. Rafael Antonio Garavito Garcia … available to the United States Embassy, with the purpose of surrendering [him] pursuant to the time limit provided by Article 511…."  *See* Exhibit B to Ray Declaration (quoting Attorney General of Colombia Eduardo Montealegre Lynett's Decision, dated March 4, 2014).

Second, the significance of that acknowledgment is that once the 30-day time period elapsed under Colombian law, the **TREATY mandates** that the "surrender of the person sought **shall** take place within such time as may be prescribed by the laws of the Requested State" and that if so prescribed and "the person is not removed from the territory of the Requested State

ACTIVE 28084075v1

within such time," then "that person **shall** be set at liberty."  Extradition Treaty [Exhibit C to Ray Declaration], Art. 12 ¶¶ 3 and 4 (emphasis added); *see also* 1979 U.S.T. LEXIS 199.

The only exception provided for in the Treaty to delay surrender occurs when the "Requested State," here Colombia, defers surrender because the affected person is either serving a sentence for an offense other than the extradition offense or proceedings are pending against that person for such an offense, until such time as all proceedings are concluded and any punishment imposed has been fully satisfied.  *Id.*, Art. 13.

Simply stated, a medical or other related deferral does not excuse compliance with Article 511 or the Treaty.  Garavito-Garcia had the right under Colombian law and the Treaty to be released unconditionally on or after March 15, 2014.  His extradition after that date (and while still in custody) thus was in violation of law, depriving this Court of jurisdiction over him.

For more than one hundred years, the Supreme Court has recognized the right of an individual delivered up to the United States under an extradition treaty "to enforce in any appropriate proceeding the rights of persons growing out of that treaty."  *United States v. Rauscher*, 119 U.S. 407, 419 (1886).  That is because, under our Constitution, a treaty, like an ordinary act of Congress, is the "law of the land" and, as such, is enforceable by the judicial branch in this country to preserve and protect the rights conferred by treaty on the party arrested and extradited under its provisions.  *See Id.*  Or, as Chief Justice John Marshall put it, "a treaty… is … to be regarded in courts of justice as equivalent to an act of the legislature whenever it operates of itself … and … it …become[s] a rule for the court."  *Foster v. Neilson*, 27 U.S. 253, 254 (1829).

This is to be distinguished from the extraordinary rendition cases where the Supreme Court has recognized – when the United States acts either without the benefit of an extradition

ACTIVE 28084075v1

treaty or intentionally declines to invoke its provisions – that no judicial inquiry into the circumstances as to how the defendant came to be before the court is jurisdictionally relevant absent shocking and outrageous governmental misconduct.  *Cf. United States v. Alvarez-Machain*, 504 U.S. 655 (1992); *Ker v. Illinois*, 119 U.S. 436, 444 (1886) (decided the same day as *United States v. Rauscher, supra*); *Frisbie v. Collins*, 342 U.S. 519, 522 (1952) (since referred to as the "*Ker-Frisbie*" doctrine).  Or, stated another way, where the *Ker-Frisbie* doctrine does not apply, "a court is deprived of jurisdiction over an extradited defendant, if either: (1) the transfer of the defendant violated the applicable extradition treaty, or (2) the United States government engaged in 'misconduct of the most shocking and outrageous kind' to obtain his presence." *United States v. Anderson*, 472 F.3d 662, 666 (9th Cir. 2006) (quoting *United States v. Matta-Ballesteros*, 71 F.3d 754, 762-64 (9th Cir. 1995)).  *Accord United States v. Toscanino*, 500 F.2d 267, 278 (2d Cir. 1974) ("*Ker* does not apply where a defendant has been brought into the district court's jurisdiction … in violation of a treaty").

Thus, it is for this Court to decide once the Treaty had been invoked – and clearly based on everything presently known here, it surely was in this case – only whether there has been a violation of the treaty and whether that violation implicates a personal right of the defendant secured by the Treaty to defeat jurisdiction to prosecute.  *See United States v. Rauscher*, 119 U.S. at 426, 429-30 & 433 (finding that trial court "did not have jurisdiction of the person at that time so as to subject him to trial" which should have resulted in dismissal of indictment).  In *Rauscher* (and as confirmed a century later by *Alvarez-Machain*) which concerned the doctrine of specialty, that is, the prohibition against prosecution for a crime other than the one for which the defendant is extradited, the Supreme Court has made clear that when an individual is brought to the United States by way proceedings under an extradition treaty, that person:

Page **8** of **14**

> can only be tried for one of the offences [sic] described in that treaty, and for the offence with which he is charged in the proceedings for his extradition, until a reasonable time and opportunity have been given him, after his release or trial upon such charge, to return to the country from whose asylum he had been forcibly taken under those proceedings.

119 U.S. at 430; *accord Alvarez-Machain*, 504 U.S. at 659-60.

Similarly here, Garavito-Garcia was entitled under the law to be released unconditionally after March 15, 2014 for failure to comply with the extradition treaty and Colombia's Code of Criminal procedure.  That failure and his further detention constitutes sufficient grounds for this Court to decline jurisdiction and return him to Colombia.  Otherwise, the treaty provisions are meaningless and a person subjected to its reach may be detained indefinitely merely by "suspending," whenever expedient, that person's availability for extradition.  That cannot be the law.

Or, so you would think.  However, in *United States v. Salinas Doria*, 2008 WL 4684229 (S.D.N.Y.) (Lynch, D.J.), then District Judge Gerard E. Lynch considered a similar issue involving the U.S.-Mexico extradition treaty.  In that case, an extradition order was issued by the foreign ministry in Mexico that, in part and among other things, granted extradition to the United States but also invoked a treaty provision deferring that extradition until such time as all open cases against the defendant in Mexico had been "definitively resolved."  In a pre-trial motion before Judge Lynch, following extradition but while certain legal proceedings were apparently still pending against him in Mexico, the defendant argued consistent with *Rauscher* and *Alvarez-Machain* that entertaining jurisdiction "would undermine the purpose and integrity of [the] Extradition Treaty."  *Id.* at *6 (quoting defendant's Reply Mem.).  Judge Lynch disagreed and noted that the relevant language from the U.S.-Mexico extradition treaty – that "'[t]he requested party, after granting the extradition, *may* defer the surrender of the person sought'" until

Page **9** of **14**

proceedings against him are concluded in the extraditing country – was "permissive and discretionary" and therefore "confer[red] no rights or obligations of any kind on the extraditing country, let alone on the courts of the requesting country." *Id.* (quoting Art. 15, U.S.-Mexico extradition treaty, May 4, 1978, 31 U.S.T. 5059) (emphasis in district court's opinion). Accordingly, the district court denied the motion to dismiss the indictment for lack of jurisdiction. *Id.*

Nevertheless, Judge Lynch went on to note in *dicta* that even if the treaty language were "mandatory," as is the case here, rather than "permissive" the general comity-based rule between sovereign nations would apply that "foreign decisions regarding extradition are not within the purview of American courts." *Id.* Moreover, Judge Lynch went on to explain that U.S. treaty obligations:

> do not require the United States Government or an American court to re-evaluate whether the foreign government properly complied with the terms of the relevant treaty in deciding to surrender the defendant. American courts take personal jurisdiction of extradited defendants subject to the limitations of the treaty and the extradition orders of the surrendering state; however, such jurisdiction may not be defeated by a claim that the *surrendering state* violated the treaty by turning the defendant over to American authorities.

*Id.* (emphasis in original).

This *dicta*, though, would appear to be directly contrary to the rule in *Rauscher* and the Supremacy Clause in Article VI of the Constitution, at least to the extent that the treaty language is clear and self-executing. *Accord Antwi v. United States*, 349 F.Supp.2d 663, 671 (S.D.N.Y. 2004) (Cote, J.) (citing *Rauscher* and quoting *Alvarez-Machain,* 504 U.S. at 667, to the effect that since extradition treaty "has the force of law, … it would appear that a court must enforce it on behalf of an individual"); *see also Mora v. New York*, 524 F.3d 183, 202-03 (2d Cir. 2008) (treaty creates individual rights and is self-executing where it is clear that "intent of the treaty

ACTIVE 28084075v1

drafters was to confer rights that could be vindicated in the manner sought by the affected individuals") (citing *Rauscher*, 119 U.S. at 410-11, for authority to allow criminal defendant to raise in his defense certain alleged violations of extradition treaty).

Thus, while it is generally true, as the Second Circuit has recognized, that "our courts cannot second-guess another country's grant of extradition to the United States," *United States v. Campbell*, 300 F.3d 202, 209 (2d Cir. 2004) (Newman and *Kearse*, C.J.s, Rakoff, D.J., by designation), the rule in *Rauscher* still remains in effect.  In *Campbell*, the Second Circuit sought to distinguish *Rauscher* by limiting the decision to the now well-established international principle of specialty that an extradited defendant may not be tried in the United States, for example, for a crime not numerated in the applicable extradition treaty.  *Id.*  However, the Court went on to find that "the question of whether an extradition treaty allows prosecution for a particular crime that is specified in the extradition request is a matter for the extraditing country to determine."  *Id.* (citing *Johnson v. Browne*, 205 U.S. 309, 316 (1907)); *see Johnson*, 205 U.S. at 316 ("[w]hether the crime came within the provision of the treaty was a matter for the decision of the Dominican authorities, and such decision was final by the express terms of the treaty itself").  And, to the Second Circuit in *Campbell*, it made no difference whether any express terms in a treaty existed to make the extraditing country's decision final because:

> deference to that country's decision seems essential to the maintenance of cordial international relations.  It could hardly promote harmony to request a grant of extradition and then, after extradition is granted, have the requesting nation take the stance that the extraditing nation was wrong to grant the request.

300 F.3d at 209.

The import of all of this is apparent, if not readily apparent:  when a treaty calls for the exercise of discretion by the extraditing country in deciding whether to extradite by interpreting that treaty, its decision in that regard is not to be second-guessed by a court in the United States,

Page **11** of **14**

lest we offend well-recognized principles of international comity.  *Accord Antwi v. United States*, 349 F.Supp.2d at 672 n.6.  Those principles fall by the wayside, however, when the treaty language is clear, self-executing and mandatory (rather than permissive), as is the case here.  *See generally Lopez v. Davis*, 531 U.S. 230, 241 (2001) ("Congress' use of the permissive 'may' … contrasts with the legislators' use of a mandatory 'shall' in the very same section"); *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 35 (1998) ("[t]he mandatory 'shall' … normally creates an obligation impervious to judicial discretion"); *United States ex rel. Siegel v. Thoman*, 156 U.S. 353, 359-60 (1895) ("in the law to be construed here it is evident that the word 'may' is used in special contradistinction to the word 'shall'").  That is so because, as the Supreme Court in *Alvarez-Machain* reaffirmed the rule in *Rauscher*, an extradition treaty – carrying with it the "force of law" – must be enforced "on behalf of an individual regardless of the offensiveness of the practice of one nation to the other nation."  *Alvarez-Machain*, 504 U.S. at 667.

Defendant Garavito-Garcia respectfully submits, therefore, that the failure to release him after the expiration of the 30-day term once he was "made available" to the United States was in direct violation of the explicit terms of the Treaty, depriving this Court of jurisdiction and warranting the dismissal of the Indictment and the repatriation of this 70-year-old defendant in deteriorating health back to the Republic of Colombia.

Mr. Garavito-Garcia also requests that the Court order the Government to provide additional discovery as may be relevant to the disposition of the instant motion and which is material to the matter of his extradition, as required by Fed. R. Crim. P. 16(a)(1)(E)(i), and further to allow the defendant to reserve his right to make further motions on receipt of additional discovery, as the interests of justice so require.

ACTIVE 28084075v1

A-101

**CONCLUSION**

For the reasons stated herein, defendant Rafael A. Garavito-Garcia respectfully requests

that the relief sought be granted.

Dated: New York, New York
            November 13, 2014

                                        Respectfully submitted,

                                        s/ Robert W. Ray

                                        _____

                                        Robert W. Ray
                                        *Attorney for Defendant Rafael A. Garavito-Garcia*
                                        Fox Rothschild LLP
                                        100 Park Avenue, 15th Floor
                                        New York, New York 10017
                                        Tel. No.: (212) 878-7993
                                        rwray@foxrothschild.com (e-mail)

cc:       Honorable Jed S. Rakoff
          United States District Judge
          (By ECF)

          AUSA Shane T. Stansbury
          AUSA Aimee Hector
          (By E-mail and ECF)

          Rafael A. Garavito-Garcia (71263-054)
          (By Hand Delivery to Kingsbrook Jewish Medical Center Brooklyn, NY)

                              Page **13** of **14**

ACTIVE 28084075v1

A-103

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x

UNITED STATES OF AMERICA                         :

   -v.-                                                          :           S5 12 Cr. 839 (JSR)

RAFAEL ANTONIO GARAVITO-GARCIA,       :
     a/k/a "El Viejo,"
                                      :

                       Defendant.

                                          :
-------------------------------------------------------------------x

## <u>DECLARATION OF SHANE T. STANSBURY</u>

      Shane T. Stansbury declares pursuant to Title 28, United States Code, Section 1746 as
follows:

      1.     I am an Assistant United States Attorney in the Southern District of New York.  I
am familiar with the above-captioned matter and the statements made herein are based on my
review of pertinent records and on own personal knowledge.

      2.     Attached hereto as <u>Exhibit A</u> is a true and correct copy of Diplomatic Note No.
0945, dated May 31, 2013, in English, issued by the United States Embassy in Bogotá,
Colombia.

      3.     Attached hereto as <u>Exhibit B</u> is a true and correct copy of Diplomatic Note No.
0945, dated May 31, 2013, in Spanish, issued by the United States Embassy in Bogotá,
Colombia.

      4.     Attached hereto as <u>Exhibit C</u> is a true and correct copy of a an English translation
of Republic of Colombia Executive Resolution No. 293, dated October 28, 2013.  The translation
was prepared by a court-certified interpreter.

A-104

5.      Attached hereto as <u>Exhibit D</u> is a  is a true and correct copy of Republic of Colombia, Executive Resolution No. 293, in Spanish, dated October 28, 2013.

6.      Attached hereto as <u>Exhibit E</u> is a  is a true and correct copy of an English translation of Republic of Colombia, Executive Resolution No. 374, dated December 26, 2013. The translation was prepared by a court-certified interpreter.

7.      Attached hereto as <u>Exhibit F</u> is a  is a true and correct copy of Republic of Colombia, Executive Resolution No. 374, in Spanish, dated December 26, 2013.

8.      Attached hereto as <u>Exhibit G</u> is a true and correct copy of an English translation of a February 26, 2014 letter to Benjamin G. Ziff, at the United States Embassy in Bogotá, Colombia.  The translation was prepared by a court-certified interpreter.

9.      Attached hereto as <u>Exhibit H</u> is a true and correct copy of a February 26, 2014 letter, in Spanish, to Benjamin G. Ziff, at the United States Embassy in Bogotá, Colombia.

10.      Attached hereto as <u>Exhibit I</u> is a true and correct copy of an English translation of a June 25, 2014 letter to Kevin Whitaker, at the United States Embassy in Bogotá, Colombia. The translation was prepared by a court-certified interpreter.

11.      Attached hereto as <u>Exhibit J</u> is a true and correct copy of a June 25, 2014 letter, in Spanish, to Kevin Whitaker, at the United States Embassy in Bogotá, Colombia.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: December 11, 2014
       New York, New York


_____/s/_____
Shane T. Stansbury
Assistant United States Attorney
(212) 637-2641

2

A-105

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x

UNITED STATES OF AMERICA                 :

   -v.-                                    :         S5 12 Cr. 839 (JSR)

RAFAEL ANTONIO GARAVITO-GARCIA,          :
     a/k/a "El Viejo,"

                              :

               Defendant.

                              :

---------------------------------------------------------------x


**MEMORANDUM OF LAW OF THE UNITED STATES OF
AMERICA IN OPPOSITION TO THE DEFENDANT'S
<u>MOTION TO DISMISS THE INDICTMENT</u>**


                                      PREET BHARARA
                                      United States Attorney
                                      Southern District of New York
                                      Attorney for the United States of America


Shane T. Stansbury
Assistant United States Attorney
- Of Counsel -

## **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................ 1

BACKGROUND ................................................................................................................... 1

ARGUMENT ........................................................................................................................ 4

    A.  The Defendant Lacks Standing To Assert The Alleged Procedural Violation ................... 4

        1.  Applicable Law ................................................................................................ 4

        2.  The Defendant Has Not Established That The Treaty Applies To His Extradition ......... 6

        3.  The Defendant Has No Standing To Object To A Procedural Violation Where
            There Is No Objection By A Party To The Extradition Treaty ..................................... 11

    B.  The Rule Of Comity And The *Ker-Frisbie* Doctrine Foreclose The Defendant's
        Effort To Dismiss The Indictment Based On An Alleged Treaty Violation ..................... 12

        1.  The Rule of Comity ........................................................................................ 12

        2.  The *Ker-Frisbie* Doctrine .............................................................................. 18

CONCLUSION .................................................................................................................... 21

## TABLE OF AUTHORITIES

**Cases**

*Antwi* v. *United States* 349 F. Supp. 2d 663 (S.D.N.Y. 2004)........................................................ 5

*Casey* v. *Dep't of State*, 980 F.2d 1472 (D.C. Cir. 1992) ........................................................ 15

*Demjanjuk* v. *Petrovsky,* 776 F.2d 571 (6th Cir. 1985) ........................................................ 5

*Frisbie* v. *Collins*, 342 U.S. 519 (1952)........................................................................................ 18

*Gerstein* v. *Pugh*, 420 U.S. 103 (1975)........................................................................................ 19

*INS* v. *Lopez-Mendoza*, 468 U.S. 1032 (1984) ............................................................................ 19

*Johnson* v. *Browne*, 205 U.S. 309 (1907) .................................................................................... 12

*Ker* v. *Illinois*, 119 U.S. 436 (1886) ............................................................................................ 18

*Matta–Ballesteros* v. *Henman*, 896 F.2d 255 (7th Cir.) ............................................................ 5

*Oetjen* v. *Central Leather Co.,* 246 U.S. 297 (1918) .................................................................. 15

*Stone* v. *Powell*, 428 U.S. 465, 485 (1976) .................................................................................. 19

*United States ex. rel. Cabrera* v. *Warden, Metropolitan Correctional Center,*
     629 F. Supp. 699, 701 (S.D.N.Y. 1986)................................................................................ 6

*United States* v. *Alvarez-Machain*, 504 U.S. 655 (1992)........................................................ 9, 10

*United States* v. *Bout*, 731 F.3d 233 (2d Cir. 2013)...................................................................... 11

*United States* v. *Campbell*, 300 F.3d 202 (2d Cir. 2002)........................................................ 12, 13

*United States* v. *Crews*, 445 U.S. 463 (1980) .............................................................................. 19

*United States* v. *Herbert*, 313 F. Supp.2d 324 (S.D.N.Y. 2004) .................................................. 6

*United States* v. *Kaufman*, 874 F.2d 242 (5th Cir. 1989) ............................................................ 5

*United States* v. *Lira,* 515 F.2d 68 (2d Cir. 1975) ...................................................................... 18

*United States* v. *Lujan*, 510 F.2d 62 (2d Cir. 1975)...................................................................... 4

*United States* v. *Matta-Ballesteros*, 71 F.3d 754 (9th Cir. 1996) .............................................. 19

*United States* v. *Medina*, 985 F. Supp. 397 (S.D.N.Y. 1997)........................................... 5, 13, 18

*United States* v. *Mitchell*, 957 F.2d 465, 470 (7th Cir. 1992)...................................................... 19

*United States* v. *Nosov,* 153 F. Supp.2d 477, 480 (S.D.N.Y. 2001) .............................................. 5

*United States* v. *Rauscher*, 119 U.S. 407 (1886) ........................................................................ 10

*United States* v. *Reed*, 639 F.2d 896 (2d Cir. 1981) ...................................................................... 4

*United States* v. *Rommy*, 506 .3d 108 (2d Cir. 2007) .................................................................. 11

*United States* v. *Salinas Doria*, No. 01 Cr. 21 (GEL), 2008 WL 4684229
     (S.D.N.Y. Oct. 21, 2008) ........................................................................................ 13, 15, 16

*United States* v. *Toscanino*, 500 F.2d 267 (2d Cir. 1974) ............................................................ 18

*United States* v. *Umeh*, 762 F. Supp.2d 658 (S.D.N.Y. 2011)................................................. 13, 19

*United States* v. *Valencia-Trujillo*, 573 F.3d 1171 (11th Cir. 2009) ......................................... 7, 8

*United States* v. *Valot*, 625 F.2d 308 (9th Cir. 1980) ................................................................... 5

**<u>Other Authorities</u>**

Extradition Treaty with Republic of Colombia, Sept. 14, 1979, U.S.-Colom., art. 12(4),
  S. Treaty Doc. No. 97-8  (entered into force Mar. 4, 1982) ..................................................... 11

U.S. Dep't of State, Report on International Extradition Submitted to the Congress Pursuant to
  Section 211 of the Admiral James W. Nance and Meg Donovan Foreign Relations
  Authorization Act, Fiscal Years 2000 and 2001 (Public Law 106-113) 9 & n.10 ................... 11

**PRELIMINARY STATEMENT**

The Government respectfully submits this memorandum of law in opposition to the motion of defendant Rafael Antonio Garavito-Garcia, a/k/a "El Viejo" (the "defendant") to dismiss the indictment.  The defendant, who was extradited to the United States from Colombia, seeks this extraordinary relief on the ground that his extradition purportedly violated the extradition treaty between the United States and Colombia (the "Extradition Treaty") and Colombian law.  For the reasons set forth below, the defendant's motion should be denied.

**BACKGROUND**

On January 8, 2014, a grand jury in this District returned indictment S5 12 Cr. 839 (JSR) (the "Indictment"), charging the defendant and co-defendant Gustavo Perez-Garcia, a/k/a "Gato," in four counts.  Count One charges the defendant with conspiring to engage in narcoterrorism, in violation of Title 21, United States Code, Section 960a.  Count Two charges the defendant with conspiring to distribute a controlled substance, cocaine, intending and knowing that the controlled substance would be imported into the United States, in violation of Title 21, United States Code, Section 963.  Count Three charges the defendant with conspiring to provide material support and resources to a foreign terrorist organization, the Fuerzas Armadas Revolucionarias de Colombia (the "FARC"), in violation of Title 18, United States Code, Sections 2339B(a)(1), (d)(1), and 3238.  Count Four charges the defendant with conspiring to acquire and transfer anti-aircraft missiles, in violation of Title 18, United States Code, Sections 2332g(a)(1), (b), (c), and 3238.  The Indictment, originally filed under seal, was unsealed on April 5, 2013, upon the defendant's arrest in Colombia.

The United States Government submitted a request for the defendant's extradition, which was formalized through a diplomatic note dated May 31, 2013.  (*See* Diplomatic Note No. 0945,

A-110

dated May 31, 2013 (attached as Exhibit A to Declaration of Shane T. Stansbury ("Stansbury Decl.")).[1]  On or about October 28, 2013, the Colombian Government issued Executive Resolution No. 293, which granted the extradition of the defendant so that he could be transferred to the United States to face the charges set forth in all four counts of the Indictment. (*See* Republic of Colombia Executive Resolution No. 293, dated October 28, 2013 (Stansbury Decl., Ex. C)).[2]

The defendant appealed the order granting his extradition.  On or about December 26, 2013, the Colombian Government issued Executive Resolution No. 374, "confirming" Executive No. 293.  (*See* Republic of Colombia Executive Resolution No. 374, dated December 26, 2013 (Stansbury Decl., Ex. E)).[3]  In confirming the grant of extradition, Executive Resolution No. 374 addressed potential health risks associated with the defendant's transfer, stating:

> [I]n order to establish the health status of the citizen requested on extradition and to guarantee his fundamental right to health to which he is entitled to, the National Government, from the framework of its constitutional and legal competencies, deems appropriate to request to the Office of the Attorney General of the Nation to not surrender him until it obtains a legal medical report that determines that the transfer will not risk his personal integrity, as per Article 49 of the Political Constitution.

(*Id*. at 9).

On or about February 14, 2014, the United States Embassy in Bogota, Colombia (the "United States Embassy") received a notice from the Colombian Government authorizing the defendant's extradition.  On or about February 25, 2014, the National Institute of Legal Medicine and Forensic Science in Colombia (the "National Institute of Legal Medicine") issued an

---

[1] The Spanish language version of Exhibit A is attached as Exhibit B.

[2] The original Spanish language version of Exhibit C is attached as Exhibit D.

[3] The original Spanish language version of Exhibit E is attached as Exhibit F.

2

opinion, in which it indicated that in order to transport the defendant to the United States, it was necessary to guarantee medical care during transport in a medical aircraft.  (*See* February 26, 2014 Letter to Benjamin G. Ziff, United States Embassy (Stansbury Decl., Ex. G)).[4]  On or about the following day, the Colombian Government suspended the surrender of the defendant to the United States due to the aforementioned health concerns.  (*Id.*).  In the months that followed, the defendant's extradition was postponed pending resolution of his health status and travel requirements.[5]

On or about June 26, 2014, the Colombian Government informed the United States Embassy that the National Institute of Legal Medicine, by way of an opinion dated June 13, 2014, had advised that the defendant may travel to the United States by air in a medical airplane, and with the assistance of trained personnel.  (*See* June 25, 2014 Letter to Kevin Whitaker, United States Embassy (Stansbury Decl., Ex. I)).[6]  The Colombian Government also informed the United States Embassy that it was making the defendant available for transfer to the United States.  (*Id.*).

On or about July 22, 2014, the defendant was transported from Colombia to this District by means of a medical aircraft.  The defendant was presented and arraigned the next day.  On November 13, 2014, the defendant filed the instant motion.

---

[4] The original Spanish language version of Exhibit G is attached as Exhibit H.

[5] Following the suspension of the extradition on or about February 26, 2014 and through the defendant's actual extradition in July 2014, the United States Government remained in contact with the Colombian Government to inquire about the defendant's availability and fitness for travel, and also ensured that a medical plane, with proper medical care, would be available in the event the Colombian Government surrendered the defendant for extradition.  Both sides took extensive steps to ensure the defendant could safely be transported.  In fact, at one point in June 2014, the United States sent a medically equipped plane to Colombia with the expectation that the defendant would be available, only to have it return because the defendant had recently been hospitalized.

[6] The original Spanish language version of Exhibit I is attached as Exhibit J.

## ARGUMENT

The defendant seeks the extraordinary remedy of dismissing the Indictment based not on any alleged illegalities by the United States Government or its agents -- but instead based on an alleged violation of foreign procedural law by foreign authorities in the course of processing a formal extradition.  The defendant's effort fails as a matter of law.  First, the defendant has no standing to seek dismissal of the Indictment based on a purported violation of the Extradition Treaty.  Second, even if the defendant had standing raise his objection, his request to dismiss the Indictment is foreclosed by two well-established doctrines:  the rule of comity, which compels courts not to second-guess another country's grant of extradition, and the *Ker-Frisbie* doctrine, which holds that illegalities in the manner by which a defendant arrived in the United States do not constitute a basis for dismissing an indictment.

### A.      The Defendant Lacks Standing To Assert The Alleged Procedural Violation

#### 1.      Applicable Law

In general, an individual's rights under a treaty are derivative of the sovereigns that are parties to the treaty. Those rights can be asserted by the individual only to the extent the signatory could assert them.  Thus, "absent protest or objection by the offended sovereign, [a defendant] has no standing to raise violation of [an extradition treaty] as an issue." *United States* v. *Reed*, 639 F.2d 896, 903 (2d Cir. 1981).  *See also United States* v. *Lujan*, 510 F.2d 62, 66-67 (2d Cir. 1975) (rejecting Argentinian citizen's habeas corpus claim that the circumstances of his "abduction" from Bolivia violated certain international charters where defendant failed to allege that either Argentina or Bolivia protested or objected to his abduction, and noting that "it is plainly the offended states which must in the first instance determine whether a violation of sovereignty occurred, or requires redress").

4

Consistent with these principles, courts have routinely rejected defendants' attempts to seek relief based on a treaty violation where a contracting party state has not objected to the alleged violation. *See, e.g.*, *Matta–Ballesteros* v. *Henman*, 896 F.2d 255, 259 (7th Cir.), *cert. denied*, 498 U.S. 878 (1990) ("It is well established that individuals have no standing to challenge violations of international treaties in the absence of a protest by the sovereign involved"); *United States* v. *Valot*, 625 F.2d 308 (9th Cir. 1980) (holding, where defendant alleged that abduction violated extradition treaty, that individuals' rights are only derivative through states, even when a treaty provides certain benefits for nationals); *United States* v. *Kaufman*, 874 F.2d 242, 243 (5th Cir. 1989) (holding that "only an offended nation can complain about the purported violation of an extradition treaty"); *Demjanjuk* v. *Petrovsky,* 776 F.2d 571, 584 (6th Cir. 1985) (same), *vacated on other grounds,* 10 F.3d 338 (6th Cir. 1993).

To be sure, some courts have recognized an extradited defendant's standing to challenge his or her prosecution in the United States based on an alleged violation of the rule of specialty -- a limited context not implicated here.  The rule of specialty "requires that an extradited defendant be tried for the crimes on which extradition was granted, and none other."  *United States* v. *Medina*, 985 F. Supp. 397, 400 (S.D.N.Y. 1997) (citations and internal quotation marks omitted). This doctrine allows a defendant to raise objections to the substantive counts of an indictment that were not disclosed in the extradition request.  But even in this limited context, the law is not settled across circuits, *see Antwi* v. *United States* 349 F. Supp. 2d 663, 669-70 (S.D.N.Y. 2004) (noting the Second Circuit has not ruled on the issue and comparing cases across circuits), and several courts in this District have suggested that defendants do not have standing even to raise a rule of specialty objection.  *See e.g., United States* v. *Nosov,* 153 F. Supp.2d 477, 480 (S.D.N.Y. 2001) (observing that the rights created by an extradition treaty based on the rule of specialty

belong only to the state parties to the treaty, and consequently, "a defendant would not have standing to invoke the rule of specialty . . . absent protest or objection by the offended sovereign."); *United States ex. rel. Cabrera* v. *Warden, Metropolitan Correctional Center,* 629 F. Supp. 699, 701 (S.D.N.Y. 1986) (concluding defendant does not have standing to invoke the rule of specialty).[7]   Moreover, even courts that have recognized a defendant's standing in the rule of specialty context have held that a defendant has no standing to allege a purely procedural violation of the extradition treaty.   *See United States* v. *Herbert*, 313 F. Supp.2d 324, 329 (S.D.N.Y. 2004) (holding that a defendant had no standing to allege "mere procedural violations" of the extradition treaty, which could be raised only by the contracting states, and noting that the defendant had "fail[ed] to recognize the difference between violations of the 'rule of speciality,' which can be raised by defendants to defeat a court's jurisdiction, and mere procedural violations—such as those alleged in this case—which cannot be raised to defeat an indictment").

### 2. The Defendant Has Not Established That The Treaty Applies To His Extradition

The defendant seeks to challenge his prosecution in the United States based solely on the ground that the Colombian Government violated its own procedures that set forth the time period for transferring a defendant subject to extradition.   The defendant reasons that the Colombian Government violated Article 511 of the Colombia Code of Criminal Justice when Colombian authorities failed to release the defendant on March 15, 2014, thirty days after he was "made available" to the United States.  (Def. Mem. at 6).  Although that decision was made pursuant to

---

[7] Even some courts that have recognized an individual right to raise a rule of specialty objection have noted limitations on the defendant's standing in that context.  For example, in *Antwi*, Judge Cote concluded that such a right does not exist where the state from which the defendant is extradited explicitly waives any objection based on the rule of specialty.  349 F. Supp. 2d at 671 (noting that such a waiver "abrogates that portion of the treaty with respect to the defendant").

A-115

Colombian law, the defendant reasons that this alleged violation of local law constituted a violation of Article 12 of the Extradition Treaty (*id.*), which states that "[i]f . . . [an] order for the extradition of a person sought has issued by the competent authority and the person is not removed from the territory of the Requested State within such time as may be prescribed by its laws . . . that person shall be set at liberty . . . ."  Extradition Treaty with Republic of Colombia, Sept. 14, 1979, U.S.-Colom., art. 12(4), S. Treaty Doc. No. 97-8  (entered into force Mar. 4, 1982).

The defendant lacks standing to invoke the Extradition Treaty in the first instance because he has not established that he was actually extradited pursuant to the Extradition Treaty such that he could invoke its provisions.  Although the United States and Colombia signed the Extradition Treaty in 1979 and it was entered into force for the United States in 1982, the Colombian Government, as a matter of practice, generally does not consider and approve extradition requests from the United States pursuant to that treaty.  *See* U.S. Dep't of State, Report on International Extradition Submitted to the Congress Pursuant to Section 211 of the Admiral James W. Nance and Meg Donovan Foreign Relations Authorization Act, Fiscal Years 2000 and 2001 (Public Law 106-113) 9 & n.10 (available at http://www.state.gov/ documents/organization/6545.doc) (explaining that although the United States recognizes the U.S.-Colombia extradition treaty, Colombia has been "unable to rely on the provisions of the treaty to arrest and extradite fugitives at the request of the United States" and instead "has used its domestic extradition law to extradite persons to the United States").

The Eleventh Circuit recently explained Colombia's procedures in *United States* v. *Valencia-Trujillo*, 573 F.3d 1171 (11th Cir. 2009), when it concluded that the defendant did not have standing to invoke the rule of specialty under the Extradition Treaty even though he was

7

extradited pursuant to a formal extradition request by the United States.[8]  The Court reasoned

that the mere fact that the defendant was extradited through "procedures consistent with those

used under the treaty" did not mean that the defendant was "actually extradited under the treaty."

*Id*. at 1178.  The Court pointed out that the diplomatic note that was sent by the U.S. Embassy to

Colombia requesting extradition did not "invoke or even mention the 1979 Colombia-United

States treaty," and also found it significant that the defendant had not pointed to any extradition

document that mentioned the treaty.  *Id*.

Similarly, here, although the defendant bases his motion on a purported violation of

Article 12 of the Extradition Treaty, the defendant alleges no facts suggesting that he was

actually extradited pursuant to the Extradition Treaty.  The Diplomatic Note formalizing the

extradition request also shows that the United States did not specifically request the defendant's

extradition pursuant to the Extradition Treaty, but rather pursuant to "relevant treaties" generally,

as well as "Article 35 of the Constitution of Colombia of 1991 . . [and] the applicable procedural

criminal legislation regarding extradition."  (Stansbury Decl., Ex. A, at 1).  Executive Resolution

---

[8] As the Eleventh Circuit explained, Colombia's practice of not extraditing pursuant to the
Extradition Treaty is rooted in the history of the enactment of the treaty in Colombia:

> The United States and Colombia signed an extradition treaty in
> 1979, *see* Extradition Treaty with the Republic of Colombia, U.S.-
> Colom., Sept. 14, 1979, S. Treaty Doc. No. 97-8, which became
> effective three years later. In 1986, the Colombian Supreme Court
> declared the law ratifying the treaty invalid. *See* Judgment No. 41,
> 14 Jurisprudencia y Doctrina 1064 (1986). Colombia's president
> briefly revived extraditions by executive decree, but in 1991 the
> Colombian legislature amended the Colombian constitution to
> prohibit extradition entirely.

*Valencia-Trujillo*, 573 F.3d at 1174 n.1.  Following this prohibition, the Colombian Constitution
was amended in response, providing, in part, that "'[e]xtradition can be . . . granted or offered in
accordance with the public treaties or in their absence with the law.'" *Id*. at 1174 & n.1 (quoting
Constitucion Politica de Colombia tit. 1, art. 35 (1997)).

293, which authorized the defendant's extradition, also does not reference the Extradition Treaty, mentioning only the United Nations Convention Against Illicit Traffic in Narcotic Drugs and Psychotropic Substances and provisions of local Colombian extradition law.  (*Id*., Ex. C). Likewise, Executive Resolution No. 374, which confirmed the extradition, does not mention the Extradition Treaty or suggest that the defendant was extradited pursuant to that treaty.  (*See id*., Ex. E).  Having failed to show that he was actually extradited pursuant to the Extradition Treaty, the defendant has no standing to invoke its provisions.  *See Valencia-Trujillo*, 573 F.3d at 1181.

     The defendant seeks to overcome the fact that his claim is, in essence, a claim under Colombian domestic law by calling Article 12 of the Extradition Treaty a "mandatory" and "self-executing" provision that must be imposed on his behalf.  (Def. Mem. at 12).  The defendant seizes on the word "shall" in Article 12, as if that language in itself makes the provision self-executing and enforceable on behalf of individuals.  (*Id*. at 6, 12).  But that language cannot be viewed in a vacuum.  The Extradition Treaty itself, of which Article 12 is a part, is generally discretionary; it does not specify that it shall be the only means by which a defendant is extradited.  *See Herbert*, 313 F. Supp.2d at 330 ("In order for the mechanism for extradition established in the treaty to be the only method by which a person can be transferred from one country to another, the treaty must explicitly state that no other method for transferring custody shall be used.") (citing *United States* v. *Alvarez-Machain*, 504 U.S. 655 664-65 (1992)).  Given that Colombia can (and does) extradite individuals by means other than the Extradition Treaty, there is no basis for concluding that Article 12, as a procedural provision relating to the timing of

the extradition, establishes a freestanding, actionable right enforceable by individuals, regardless of the mechanism by which they were extradited.[9]

The defendant's reliance on *United States* v. *Rauscher*, 119 U.S. 407 (1886), also is not helpful. In that case, Supreme Court addressed a defendant's claim that the rule of specialty had been violated following his extradition from Great Britain, stated that "[a] person who has been brought within the jurisdiction of the court, by virtue of proceedings under an extradition treaty, can only be tried for one of the offenses described in that treaty, and for the offenses with which he is charged in the proceedings for his extradition . . . ." *Id*. at 430. But in *Rauscher*, the defendant had been extradited pursuant to a treaty -- which the defendant has not established here. Moreover, in that case, the Court simply applied the rule of specialty, which some (albeit not all) courts have concluded is a narrow exception to the general principle that individuals do not have standing to invoke violations of an extradition treaty. *See Antwi*, 349 F. Supp. 2d at 669-70. Because the defendant has not (and cannot) invoke the rule of specialty, *Rauscher* is inapposite.[10]

---

[9] Moreover, Article 13 of the Extradition Treaty, entitled "Delayed Surrender," shows that the Extradition Treaty explicitly contemplates situations where surrender may be delayed. It states that "[a]fter the extradition request has been granted, the Requested State *may* defer the surrender of the requested person when that person is being proceeded against or is serving a sentence in the territory of the Requested State for an offense other than that for which extradition is sought." Extradition Treaty, Art. 13. Although the defendant claims that the two exceptions provided constitute the only exceptions for delays, the provision does not exclude other exceptions that the contracting parties may wish to invoke. Moreover, the provision's use of the word "may" shows that the provision is permissive, not mandatory. It is therefore reasonable to assume that, even to the extent the Extradition Treaty applies, the signatories have the discretion to agree upon delayed surrender in other contexts, such as medical emergencies or to ensure the safety of the individual during travel, as they did in this case.

[10] The defendant quotes the Supreme Court's statement in *United States* v. *Alvarez-Machain* that treaties must be enforced "on behalf of an individual regardless of the offensiveness of the practice of one nation to the other nation." (Def. Mem. at 12 (quoting 504 U.S. at 667)). But as another court in this District has noted, "[t]his dicta in *Alvarez-Machain*, and couched in hypothetical language, has not led other courts to find that defendants have standing to raise an

3.      **The Defendant Has No Standing To Object To A Procedural Violation Where There Is No Objection By A Party To The Extradition Treaty**

This Court need not dwell on whether the defendant was extradited pursuant to the Extradition Treaty because even if, as the defendant claims, Article 12 of the Extradition Treaty is applicable to his extradition, the defendant cannot assert a violation of that provision before this Court, particularly where there has been no protest by a contracting party.

"Absent protest or objection by the offended sovereign, [a defendant] has no standing to raise violation of [an extradition treaty] as an issue." *Reed*, 639 F.2d at 903. *See also Lujan*, 510 at 66-67. There is no dispute here that the Colombian Government has not objected to the circumstances of the defendant's extradition; to the contrary, the Colombian Government approved and helped carry out the extradition, thereby waiving any objection that might exist as to its timing. Thus, whatever rights the defendant may have had under Colombian law to challenge the extradition procedure prior to being transferred to the United States, he has no standing before this Court to invoke the Extradition Treaty as a basis for dismissing the Indictment. *See Reed*, 639 F.2d at 903; *see also United States* v. *Bout*, 731 F.3d 233, 240 n.6 (2d Cir. 2013) (to the extent defendant claimed a violation of the extradition treaty, the claim failed because the sending country had not claimed any violation of the treaty).

The defendant's position is even further weakened by the fact that he does not allege any violation, such as the rule of specialty, that would even arguably fall into an exception to this rule. Rather, he has raised a procedural violation, which cannot be relied upon to defeat an

---

objection to an extradition outside the rule of specialty." *Herbert*, 313 F. Supp.2d at 329. Moreover, as the Second Circuit has observed, "[f]or any number of reasons, sovereigns may elect to overlook non-compliance with particular treaty requirements in given cases," and therefore a "proper respect for the diplomatic choices of sovereign nations prompts courts generally to apply a strong presumption against inferring individual rights from international treaties." *United States* v. *Rommy*, 506 .3d 108, 129-30 (2d Cir. 2007).

11

indictment.  *See Herbert*, 313 F. Supp.2d at 331 (holding the defendant had no standing to allege

"mere procedural violations" of the extradition treaty, which could be raised only by the

contracting states, and observing that the defendant had "fail[ed] to recognize the difference

between violations of the 'rule of speciality,' which can be raised by defendants to defeat a

court's jurisdiction, and mere procedural violations—such as those alleged in this case—which

cannot be raised to defeat an indictment").

**B.      The Rule Of Comity And The *Ker-Frisbie* Doctrine Foreclose The Defendant's Effort To Dismiss The Indictment Based On An Alleged Treaty Violation**

The defendant's motion to dismiss the Indictment on the basis of an alleged violation of

Colombian law and the Extradition Treaty also must be denied under principles of international

comity and the *Ker-Frisbie* doctrine.

**1.      The Rule of Comity**

It is settled in this Circuit that "although courts of the United States have authority to

determine whether an offense is an extraditable crime when deciding whether an accused should

be extradited from the United States, . . . our courts cannot second-guess another country's grant

of extradition to the United States."  *United States* v. *Campbell*, 300 F.3d 202, 209 (2d Cir. 2002)

(interpreting *Johnson* v. *Browne*, 205 U.S. 309, 316 (1907)).  This deference, grounded in

principles of international comity, is "essential to the maintenance of cordial international

relations."  *Id.*  As the Second Circuit reasoned in *Campbell*, "[i]t could hardly promote harmony

to request a grant of extradition and then, after extradition is granted, have the requesting nation

take the stance that the extraditing nation was wrong to grant the request."  *Id.; see also Bout*,

731 F.3d at 239-40 (rejecting defendant's claim that he was improperly extradited from Thailand

as a result of political pressure as well as the prospect of U.S. courts taking on the "responsibility

of evaluating the legality of the extradition of a defendant by a foreign government to the United States").

Because the Colombian authorities granted the defendant's extradition and released the defendant to the United States without protest, it would be inappropriate for this Court to second-guess the Colombian Government's actions. *See Campbell*, 300 F.3d at 209; *accord United States* v. *Salinas Doria*, No. 01 Cr. 21 (GEL), 2008 WL 4684229, at *2 (S.D.N.Y. Oct. 21, 2008); *United States* v. *Medina*, 985 F. Supp. 397, 400-02 (S.D.N.Y. 1997).  Although the defendant contends that the timing of his release violated a procedural provision of Colombian law governing extraditions, the Colombian authorities concluded otherwise when they approved his transfer to the United States.  That is the end of the inquiry.  *See United States* v. *Umeh*, 762 F. Supp.2d 658, 664 (S.D.N.Y. 2011), *aff'd* 527 Fed. Appx. 57 (2d Cir. 2013) ("[T]he United States is not responsible for ensuring that a foreign sovereign complies with its internal laws in issuing an extradition or expulsion.")

Indeed, the conditions and timing of the defendant's release were given special consideration at the highest levels of the Colombian Government, which sought to ensure that the defendant's health and rights would not be compromised as a result of his transfer.  Specifically, Executive Resolution No. 374, which affirmed the original order of extradition, noted that "in order to establish the health status of the citizen requested on extradition and to guarantee his fundamental right to health to which he is entitled to," the Colombian Government "deems appropriate to request to the Office of the Attorney General . . . to not surrender him until it obtains a legal medical report that determines that the transfer will not risk his personal integrity, as per Article 49 of the Political Constitution."  (Stansbury Decl., Ex. E, at 10).

13

Consistent with Executive Resolution No. 374, on or about February 26, 2014, the Colombian Government, after having previously made the defendant available for surrender to the United States, suspended the defendant's extradition.  (*Id.*, Ex. G).  The decision to suspend the extradition followed a determination by the National Institute of Legal Medicine in Colombia that it was necessary to secure medical assistance in a medically adapted plane during the course of the defendant's transfer to the United States.  (*Id.*).  On or about June 25, 2014, following assurances by the United States that such a plane would be made available for the defendant's transfer and a June 13, 2014 report by the National Institute of Legal Medicine confirming the defendant's fitness for transfer, the Colombian Government again made the defendant available for surrender to the United States.  (*See id.*, Ex. I).

The defendant seeks to have this Court unravel the Colombian Government's careful deliberations leading up to his extradition, thereby sending a message to Colombian authorities that they were wrong in granting the extradition and in carrying it out in a manner consistent with the December 26, 2013 extradition order, which specifically requested the Attorney General to obtain medical confirmation of the defendant's fitness for travel.  Even worse, the defendant would have this Court signal to Colombian authorities that they are incapable of properly interpreting their own laws.   As the defendant concedes, the purported deadline for the defendant's release that the defendant cites (*i.e.*, 30 days from the day the defendant was made available to the requesting State) is found not in the Extradition Treaty itself, but in Article 511 of the Colombian Code of Criminal Justice.  (Def. Br. at 6).  Even if the defendant were able to show that his reading of Article 511 is correct (and he has not),[11] having this Court engage in an

---

[11] The language of Article 511 shows precisely why it is perilous for a U.S. Court, unfamiliar with Colombian law, to weigh in on the meaning of such a provision, particularly when foreign authorities have already done so.  According to the defendant's translation, Article 511 states that

14

interpretation of Colombian law and procedure for the purpose of potentially revisiting an issue already considered and resolved by the Colombian Government would not serve the goals of international comity.  *See Campbell*, 300 F.3d at 209; *cf. Oetjen* v. *Central Leather Co.,* 246 U.S. 297, 304 (1918) ("To permit the validity of the acts of one sovereign state to be reexamined and perhaps condemned by the courts of another would very certainly imperil the amicable relations between governments and vex the peace of nations.") (internal citation omitted); *Casey* v. *Dep't of State*, 980 F.2d 1472, 1475-77 (D.C. Cir. 1992) ("A foreign court's holding as to what that country's criminal law provides should not lightly be second-guessed by an American court -- if it is ever reviewable.").

Judge Lynch's decision in *United States* v. *Salinas Doria*, No. 01 Cr. 21 (GEL), 2008 WL 4684229 (S.D.N.Y. Oct. 21, 2008), is instructive.  In that case, the defendant, who had been extradited from Mexico, moved to dismiss the indictment on the ground that certain provisions of the U.S.-Mexico extradition treaty had been violated, including Article 6, which precluded the extraditing state from granting extradition when the person sought had already been prosecuted for the same offense for which extradition was requested. [12]  In denying the motion on

---

"the requested person will be released unconditionally by the Attorney General, if . . . after a term of thirty (30) days from the day the person was made available to the requesting State, the *latter* [*i.e.,* here, the United States]  did not *move forward* with his transfer."  (Ray Decl., ¶ 15). By requiring the requested person's release if the requesting State has not "move[d] forward" with the transfer within the 30-day time period, this language suggests that the transfer does not have to be fully completed; rather, the requesting state must have taken steps to execute the transfer.  Because the United States engaged with the Colombian Government well before March 15, 2014 to determine whether the defendant could be surrendered in a manner consistent with the concerns for his health, and in fact sought on multiple occasions to effect the defendant's transfer through the time of his actual extradition, the United States did in fact "move forward" with the transfer during the requisite time period.

[12] Specifically, the defendant in *Salinas Doria* alleged violations of (i) Article 6, which precluded the extraditing state from granting extradition when the person sought had already been prosecuted for the same offense for which extradition was requested, and (ii) Article 15, providing that the extraditing state may defer the surrender of the person sought until after the

international comity (and other) grounds, Judge Lynch cited the Second Circuit's instruction not to "'second-guess another country's grant of extradition to the United States,'" *id*. at *2 (quoting *Campbell*, 300 F.3d at 209), and added that no countervailing interest would be served by such review. *Id*. at *3 (noting that "no . . . deterrent purpose could be served by an American court's attempt to enforce legal provisions allegedly violated by foreign authorities").

Judge Lynch also observed that "[t]he case against American judicial monitoring is even stronger where a defendant alleges not extra-legal action by foreign police agents, but *mere legal error* by the foreign government, after that government has fully considered the defendant's legal arguments and provided judicial review in accordance with the processes established by its laws." *Id*. (emphasis added). Thus, in addressing the defendant's argument that Article 6 had been violated, Judge Lynch found it notable that the Mexican government had the information necessary to evaluate the issue raised by defendant prior to extraditing him (*i.e.*, details about the U.S. charges that would allow Mexico to determine whether those charges constituted the same offenses as those for which he was convicted in Mexico). That fact in itself was sufficient to preclude review of the decision to extradite. *Id*. at *4 ("That the Mexican Government was *capable* of assessing whether the extradition request complied with Article 6 . . . is itself sufficient to preclude review of the decision to extradite." ) (emphasis in original).

Like Salinas Doria, this defendant does not allege any extralegal or improper action by law enforcement agents, but rather a "mere legal error" by Colombian authorities in implementing Colombian law, further weakening any conceivable argument in favor of second-guessing Colombian authorities. Moreover, as in *Salinas Doria*, the Colombian Government was in a position to assess the issue he raises now. When the Colombian Government issued a

---

conclusion of any proceedings pending against him in the extraditing country. 2008 WL 4684229, at *2, *6.

decision to suspend the defendant's extradition in light of the defendant's health, in accordance with the December 26, 2013 extradition order, Colombian officials were fully capable of assessing whether any delays caused by the suspension would violate any provision of the Colombian Code of Criminal Justice or any other applicable laws.

Indeed, the documents offered by the defendant in support of his motion demonstrate that the Colombian Government was not only *capable* of considering the issue, but in fact *did* consider it. The March 3, 2014 decision by the Attorney General denying a request for release by the defendant's Colombian attorney explained the reasons it would not be proper to release the defendant under Colombian law or the terms of the December 26, 2014 extradition order. The decision recounted the requirement in Executive Resolution No. 374 for a legal medical report establishing his fitness for transfer. In doing so, the Attorney General explained that the Colombian Government sought to abide by the requirements of Article 511:

> [A]lthough it is true that the National Government authorized his extradition through the resolution dated December 26, 2013, it is also true that on February 10th, 2014, the Secretary of Justice and Law informed this institution about said decision, due to which on February 14th, 2014, Mr. Rafael Antonio Garavito Garcia was made available to the Embassy of the United States for his surrender, which was suspended on February 26, 2014, after taking into account the medical opinion received on February 25, 2014 from the Clinical Group of the National Institute of Legal Medicine and Forensic Sciences, where the condition for his transport was the use of a medially adapted plane.
>
> This being the case, to date, the surrender of Mr. Rafael Antonio Garavito Garcia is suspended until all the conditions for his travel to the United States of America are fulfilled. Consequently, once his transport in a medically adapted plane is secured by that country, *he will be made available again, pursuant to the terms of Article 511 of Law 905 of 2004.*

(Declaration of Robert W. Ray in Support of Defendant's Motion ("Ray Decl."), Ex. E, at 6) (emphasis added).

In sum, the Colombian Government, in an effort to protect the defendant's health, made a careful and deliberate decision to carry out the defendant's extradition in the manner that it did, and in doing so ensured that it would comply with applicable law. It is not for this Court to revisit this process. *Salinas Doria*, 2008 WL 4684229, at *3 (concluding Mexico's extradition decision could not be reviewed in part because Mexico had considered the issue raised by the defendant and "assess[ed]the provisions of its own criminal law"). *See also United States* v. *Lira,* 515 F.2d 68, 71-72 (2d Cir. 1975) *(*rejecting argument that Chilean law was violated where an expulsion decree was issued, where Chile was "aware of the alleged violations on the part of its own officials and did not object or take remedial action," and adding that the "United States Government did not owe appellant any obligation to enforce his asserted right under Chilean law"); *United States* v. *Medina*, 985 F. Supp. 397, 402 (S.D.N.Y. 1997) ("[T]he Dominican Republic was fully informed of the 58–counts of the pending Indictment and made a considered judgment to grant extradition, a judgment that should not be reviewed by a United States court.").

### 2.  The *Ker-Frisbie* Doctrine

The defendant's request to dismiss the indictment as a result of alleged illegalities in his extradition is also precluded under the longstanding *Ker-Frisbie* doctrine.  Under that doctrine, the manner in which a defendant is brought within a court's jurisdiction for prosecution does not deprive a court of the power to try the defendant or require dismissal of the charges. *See United States* v. *Toscanino*, 500 F.2d 267, 271 (2d Cir. 1974) (explaining that the *Ker-Frisbie* rule provides that "the government's power to prosecute a defendant is not impaired by the illegality of the method by which it acquires control over him"); *see Ker* v. *Illinois*, 119 U.S. 436 (1886); *Frisbie* v. *Collins*, 342 U.S. 519 (1952).  In the decades since *Ker* and *Frisbie* were decided, the

Supreme Court has repeatedly reaffirmed the doctrine.  *See*, *e.g.*, *Alvarez-Machain*, 504 U.S. at 660-62; *INS* v. *Lopez-Mendoza*, 468 U.S. 1032, 1039-40 (1984); *United States* v. *Crews*, 445 U.S. 463, 474 & n.20 (1980); *Stone* v. *Powell*, 428 U.S. 465, 485 (1976); *Gerstein* v. *Pugh*, 420 U.S. 103, 119 (1975).

Courts have frequently applied the *Ker-Frisbie* doctrine to situations where the claimed illegality involves conduct far more egregious than violation claimed here -- such as where a defendant claims he was forcibly removed from a foreign country.  *See*, *e.g.*, *Alvarez-Machain*, 504 U.S. at 660-62; *United States* v. *Matta-Ballesteros*, 71 F.3d 754, 762-63 n.3 (9th Cir. 1996); *United States* v. *Mitchell*, 957 F.2d 465, 470 (7th Cir. 1992); *Reed*, 639 F.2d at 901-02.  Not long ago, this Court considered a defendant's pretrial arguments that he was arrested/kidnapped in Liberia, tortured for approximately two consecutive days by individuals supposedly associated with the DEA, later handed over to agents with the DEA, immediately flown to the United States, beat up by DEA agents after he landed in the United States, and then presented in court. *Umeh*, 762 F. Supp.2d at 661-62.  This Court relied on the *Ker-Frisbie* doctrine in denying the defendant's motion without a hearing, concluding that the defendant's allegations that the United States violated international law in effectuating the defendant's transfer, even if true, were "irrelevant" and did not warrant dismissal of an indictment.  *Id*. at 662-64.  The Court also noted that, in any event, the defendant had been "extradited to the United States pursuant to a facially valid Expulsion Order issued by the Liberian Government," and that "the United States is not responsible for ensuring that a foreign sovereign complies with its internal laws." *Id*. at 664.

Turning the logic of the *Ker-Frisbie* doctrine on its head, the defendant -- who was not forcibly removed, but instead arrived via normal diplomatic channels and was delayed in arriving to the United States solely due to efforts to protect the defendant's health -- claims that

Colombia's alleged violation of its procedures in providing this assistance should result in dismissal of the Indictment  The defendant argues that the *Ker-Frisbie* doctrine's application is limited to cases involving "extraordinary rendition," as opposed to pursuant to a formal extradition.  (Def. Mem. at 7).  In his view, if a defendant has been extradited pursuant to a treaty, any violation of the treaty -- even a procedural error by the surrendering state, as alleged by the defendant -- can deprive this Court of jurisdiction and warrant dismissal of the Indictment. (Def. Mem. at 7- 12).  But that is not the law.

Even to the extent the Extradition Treaty applies (and, as described above, the defendant has not established that it does), as Judge Lynch explained when presented with a similar argument in *Salinas Doria,* it follows from the *Ker-Frisbie* line of cases that "charges against a defendant in an American court should not be dismissed solely because of an alleged defect in the judicial or diplomatic processes leading to that defendant's extradition." *Salinas Doria*, 2008 WL 4684229, at *4.  While it is true a limited exception to the *Ker-Frisbie* doctrine may exist where the United States took a defendant into custody in an egregious manner that constituted a demonstrable violation of an extradition treaty, *Alvarez-Machain*, 504 U.S. at 669, it is not the case that the *Ker-Frisbie* doctrine has no applicability where a defendant has been formally extradited; nor is dismissal of an indictment warranted as a remedy as a result of a purported error in another country's extradition proceedings.  *See Salinas Doria*, 2008 WL 4684229, at *6 (explaining that, although the United States is "bound by its obligations under the terms of the relevant treaty" after it has invoked the treaty to have the defendant extradited, "these obligations do not require the United States Government or an American court to re-evaluate whether the foreign government properly complied with the terms of the relevant treaty in deciding to surrender the defendant.").  *See also Bout*, 731 F.3d at 240 (applying *Ker-Frisbie* doctrine where

defendant had been formally extradited and where defendant alleged that his extradition was the consequence of political pressure by the United States).

In the end, the defendant seeks to transform a claim under local Colombian law into a jurisdictional claim before this Court.   The defendant attempted, and failed, to obtain release pursuant to Article 511 while he was pending extradition.   To the extent he had a remedy available to him, that remedy had to be obtained by the Colombian Government prior to his arrival in the United States.   Now that he has been validly extradited, he is properly before his Court and cannot resurrect his claim in the form of a motion to dismiss.[13]

## CONCLUSION

Because the defendant's motion fails as a matter of law, the defendant's motion should be denied without a hearing.

Dated:  New York, New York
        December 11, 2014

                                            Respectfully submitted,

                                            PREET BHARARA
                                            United States Attorney for the
                                            Southern District of New York

                                    By:     ____/s/_____
                                            Shane T. Stansbury
                                            Assistant United States Attorney
                                            Tel.: (212) 637-2641

---

[13] The defendant included with his motion a request for an order compelling further discovery of additional documents relating to his extradition.   The Government has complied with its discovery obligations under Rule 16 and will continue to do so.  To the extent the Government obtains additional documents relating to the defendant's extradition that fall within the requirements of Rule 16, the Government will produce those.  The defendant's request should therefore be denied as moot.

21

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

_____ x

UNITED STATES OF AMERICA      :

      :

      -against-      :     (S5) 12 Cr. 839 (JSR)

RAFAEL A. GARAVITO-GARCIA,      :

      Defendant.      :

_____ x

---

**REPLY MEMORANDUM OF LAW IN SUPPORT OF PRE-TRIAL MOTION TO DISMISS INDICTMENT ON BEHALF OF DEFENDANT RAFAEL A. GARAVITO-GARCIA**

---

Robert W. Ray
*Attorney for Defendant Rafael A. Garavito-Garcia*

Fox Rothschild LLP
100 Park Avenue, 15th Floor
New York, New York 10017
Tel. No.: (212) 878-7993
rwray@foxrothschild.com (e-mail)

The Government's opposition characterizes the all-but-acknowledged illegality presented here by the instant motion as involving solely one of "foreign procedural law." (Government's Opposition at 4). As was clear from our motion papers, however, "foreign procedural law" was expressly incorporated by reference into the applicable extradition treaty. And, the Government's argument that the treaty was never "invoked" in this case is just plain wrong, because the Diplomatic Note formalizing the Government's extradition request specifically invoked "relevant treaties" as well as Colombia's "applicable procedural criminal legislation regarding extradition." (AUSA Stansbury Decl., Ex. A, at 1).

The reason why the Government desperately seeks to avoid application of the treaty is because it is clear that it was violated in this case. Defendant Garavito-Garcia was entitled to be released **under the treaty** 30 days after Colombia made him available to the United States for extradition if his transfer did not occur. It is undisputed that this transfer did not occur within the requisite time period.

The Government incredibly seeks to avoid this procedural default by erroneously claiming that the extradition treaty was never invoked and therefore does not apply. The only case cited for that remarkable proposition is the Eleventh Circuit's decision in *United States v. Valencia-Trujillo*, 573 F.3d 1171 (11th Cir. 2009). The Government attempts to persuade this Court to adopt the Eleventh Circuit's reasoning that just because a defendant was extradited by means of "procedures consistent with those used under the treaty" does not mean that the defendant was "actually extradited under the treaty." *Id.* at 1178; *see* Government's Opp. at 8. What the Government completely fails to acknowledge, however, is that the U.S. Embassy Diplomatic Note in *Valencia-Trujillo* involving a similar U.S.-Colombia extradition request invoked only "Article 35 of the Constitution of Colombia of 1991 as amended by the extradition

reform act which entered into force on December 17, 1997, the appropriate sections of the 2000 Colombian Criminal Procedure Code, entered into force on July 24, 2001, and applicable principles of international law." 573 F.3d at 1174. There was no mention of any treaties, extradition or otherwise. In contrast here, the Diplomatic Note pertaining to Garavito-Garcia's extradition additionally and unequivocally invoked "relevant treaties to which both Colombia and the United States are party." (AUSA Stansbury Decl., Ex. A, at 1, ¶ 1).

Thus, *Valencia-Trujillo* is easily distinguishable, as the Eleventh Circuit explicitly relied on the fact that the Diplomatic Note in that case "conspicuously does not invoke or even mention" the extradition treaty and that the defendant could "point[ ] to no part of his extradition documents that does." 573 F.3d at 1178. Not so here. The Government's dismissive acknowledgement now of the reference to "'relevant treaties' generally" does not alter the inescapable conclusion that, at least insofar as the U.S. State Department was concerned, the extradition treaty obviously was "invoked." (Government's Opp. at 8). Any further argument that specific mention of the 1979 U.S.-Colombia extradition treaty, upon which defendant relies, is required should accordingly be rejected. In any event, the Eleventh Circuit's decision is of course not binding on this Court.

Whatever authority Colombia thought it was exercising in granting defendant's extradition is of no moment. While Colombia is free to violate the treaty or even not to invoke it at all under recognized principles of international comity, neither the United States nor this Court is free to ignore or sidestep applicable treaty provisions that carry with them the force of binding federal law enforceable under the Supremacy Clause to the U.S. Constitution. U.S. Const. art. VI, cl. 2.

ACTIVE 28429447v1

A-133

The Government's related contention that Article 12 of the Extradition Treaty, concerning the timing of the extradition, establishes no "freestanding, actionable right enforceable by individuals" (Government's Opp. at 10) is belied by the plain language of that section.  Moreover, the Government's attempt to avoid the rule in *United States v. Rauscher*, 119 U.S. 407 (1886) misses the mark.  Two years earlier in the *Head Money Cases*, the Supreme Court clearly articulated the standing principle as it pertains to individuals in extradition cases:

> A treaty is primarily a compact between independent nations.  It depends for the enforcement of its provisions on the interest and honor of the governments which are parties to it.  If these fail, its infraction becomes the subject of international negotiations and reclamations…. It is obvious that, with all this, the judicial courts have nothing to do, and can give no redress.  **But a treaty may also contain provisions which confer certain rights upon the citizens or subjects of one nation, residing in the territorial limits of the other, which partake of the nature of municipal law and which are capable of enforcement as between private parties in the courts of the country**…. A treaty then, is a law of the land, as an act of congress is whenever its provisions prescribe a rule by which the rights of the private citizen or subject may be determined.  And when such rights are of a nature to be enforced in a court of justice, that court resorts to the treaty for a rule of decision for the case before it as it would to a statute.

112 U.S. 580, 599-600 (1884) (emphasis added); *accord Medellin v. Texas,* 552 U.S. 491, 128 S.Ct. 1346,1357 & n.3 (2008); *United States v. Alvarez-Machain*, 504 U.S. 655, 659-66 (1992).

In short, if this treaty applies – and it does – its provisions relative to surrender, transfer and release are demonstrably self-executing.  Any argument that *Rauscher* is inapposite because that case involved only the rule of specialty is unavailing.  As the Supreme Court's later decision in *Alvarez-Machain*, cited above, also makes clear, if an extradition treaty applies and has been invoked, *Rausher* is controlling and the *Ker-Frisbie* doctrine is avoided. 504 U.S. at 660-62.

Thus, this case fits comfortably within the *Alvarez-Machain* recognized narrow exception to the *Ker-Frisbie* rule that self-executing provisions of an extradition treaty are binding,

Page **4** of **7**

enforceable in courts of the United States, and provide standing for redress by defendants contesting jurisdiction over their extradition. *See United States v. Cournoyer*, 2012 U.S. Dist. LEXIS 177497, at *13 (E.D.N.Y. 2012) ("[i]n *Alvarez-Machain* the Supreme Court reaffirmed both the *Ker-Frisbie* rule and a narrow exception to that rule for defendants brought within the jurisdiction of a court by procedures that violate the terms of an extradition treaty").

It is undoubtedly true, as the Government argues and this Court itself has recognized, that principles of comity under international law do not ordinarily countenance or look with favor on courts in this country, for example, being "responsible for ensuring that a foreign sovereign complies with its internal laws in issuing an extradition or expulsion." *United States v. Umeh*, 762 F.Supp. 2d 658, 664 (S.D.N.Y. 2011), *aff'd*, 527 Fed. Appx. 57 (2d Cir. 2013). That principle does not apply, however, when the procedural rule applicable in Colombia is incorporated into the treaty. In that event, *Rauscher* governs, and the same principles that guide application of the rule of specialty apply here.

This is so irrespective of whether or not Colombia raised any objection to the procedural violation.[1] Just as in *Rauscher*, courts in the United States are not free to ignore a self-executing provision of a governing extradition treaty that has been invoked just because the other party to the treaty has ignored it, declined to invoke it, or otherwise failed to register any objection to its self-executing provisions. Thus, this case stands as an exception to the "strong presumption

---

[1] The Government also far too cavalierly dismisses what occurred here as a "mere legal error" or, alternatively, as "mere procedural violations" by Colombian authorities not worthy of recognition as grounds to defeat an indictment. But, of course and as argued above, the acknowledged error was not "merely" a violation of Colombian law but also a violation of the treaty. More importantly though, procedural error—if it arises from a statute, rule or (in this case) treaty enacted by Congress—may constitute grounds for dismissal of an indictment. *See generally* Fed. R. Crim. P. 12. Thus, for example, "procedural" errors such as a violation of the Speedy Trial Act, the applicable statute of limitations and the like are cognizable for redress and enforceable by courts under penalty of dismissal of the indictment with or without prejudice. Here, the treaty **itself** suggests that the remedy for such a "procedural" error is release ("shall be set at liberty") with prejudice ("subsequently extradition may be refused for the same offense"). Extradition Treaty, Art. 12, ¶ 4.

ACTIVE 28429447v1

against inferring individual rights from international treaties." *Cf. United States v. Rommy*, 506 F.3d 108, 129-30 (2d Cir. 2007). This is so because the treaty and thus the Treaty Clause to the U.S. Constitution make it so.

Finally, in obvious recognition of the defect[2] presented by this extradition under the treaty, the Government seeks to avoid dismissal of the indictment against Garavito-Garcia by arguing that Colombia presented an expedient alternative to circumvent this result simply by withdrawing its prior decision to make the defendant available to the U.S. Embassy for extradition and then re-submitting it at a later time. The problem for the Government is that no such delayed surrender procedure for medical necessity exists in the language of the treaty and none can be fairly implied given the explicit, limited and inapplicable exceptions to delayed surrender already specified (Article 13) in the treaty. In any event, were this Court to read such a medically necessary delay of surrender term into the treaty it would effectively render the procedural protections afforded by Article 12 of the treaty a dead letter.

Mr. Garavito-Garcia was entitled to be released in March 2014 under the provisions of Article 12 and, as incorporated by reference, Article 511 of the Colombian Code of Criminal Procedure. Because his right to release was denied and the extradition and transfer proceeded in contravention of that right under the treaty, his extradition was contrary to law and the indictment against him is thus rendered invalid.

---

[2] The Government also makes much of the English translation of Article 511 of ther Colombian Code of Criminal Procedure and the indefinite words "did not move forward with his transfer." (Government's Opposition at 14 n.11). Actually, upon further review, those words ("este no procedió a su traslado") in Spanish are more accurately translated as "did not carry out the transfer." The Government's attempt to glean an "out" from the treaty and compliance with the requisite time period in this respect thus plainly fails.

Page **6** of 7

<u>**Conclusion**</u>

For all of the foregoing reasons, the indictment against defendant Garavito-Garcia must

be dismissed.

Dated: New York, New York
          December 15, 2014

                                                    Respectfully submitted,

                                                    s/ Robert W. Ray

                                                    _____

                                                    Robert W. Ray
                                                    *Attorney for Defendant Rafael A. Garavito-Garcia*
                                                    Fox Rothschild LLP
                                                    100 Park Avenue, 15th Floor
                                                    New York, New York 10017
                                                    Tel. No.: (212) 878-7993
                                                    rwray@foxrothschild.com (e-mail)

cc:      Honorable Jed S. Rakoff
         United States District Judge
         (By ECF)

         AUSA Shane T. Stansbury
         AUSA Aimee Hector
         (By E-mail and ECF)

         Rafael A. Garavito-Garcia (71263-054)
         (By Hand Delivery to Kingsbrook Jewish Medical Center, Brooklyn, NY)

**A-137**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
UNITED STATES OF AMERICA,                      :

                            :        12-cr-839 (JSR)

       -v-                    :

                               ORDER

RAFAEL ANTONIO GARAVITO-GARCIA,

    Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - -

JED S. RAKOFF, U.S.D.J.

      Pending before the Court is defendant Rafael Antonio Garavito-Garcia's motion to dismiss the indictment for lack of jurisdiction. Upon consideration, the Court hereby denies the motion. A memorandum explaining the reasons for this ruling will issue in due course.

      The Clerk of the Court is directed to close document number 47 on the docket of this case.

      SO ORDERED.

Dated:    New York, NY
          December 29, 2014

                                     JED S. RAKOFF, U.S.D.J.



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - -
UNITED STATES OF AMERICA,

     -v-

RAFAEL ANTONIO GARAVITO-GARCIA,

    Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

:     12-cr-839 (JSR)
:
:     MEMORANDUM
:
:
:
:

JED S. RAKOFF, U.S.D.J.

Defendant Rafael Antonio Garavito-Garcia was extradited to the

United States from Colombia on July 22, 2014 to face charges that he

conspired to commit narcoterrorism, to distribute cocaine intending

and knowing that it would be imported into the United States, to

provide support to a foreign terrorist organization, and to acquire

and transfer anti-aircraft missiles. On November 13, 2014, Garavito-

Garcia moved pursuant to Federal Rule of Criminal Procedure

12(b)(3)(A) to dismiss the indictment for lack of subject matter

jurisdiction, asserting that his removal to the United States

violated the extradition treaty between the United States and

Colombia and that the treaty required he be set free. In a December

30, 2014 Order, this Court denied the motion. This Memorandum

explains the reasons for that ruling.

The United States requested Garavito-Garcia's extradition

through a May 31, 2013 diplomatic note. Declaration of Shane Thomas

Stansbury ("Stansbury Decl."), Ex. A, Diplomatic Note No. 0945. The

Colombian authorities apprehended Garavito-Garcia on April 5, 2013,

and an extradition order issued on October 28, 2013. See Declaration

1

of Robert W. Ray ("Ray Decl.") ¶ 5; Stansbury Decl., Ex. C, Ministry

of Justice and the Law, Resolution No. 293 (Oct. 28, 2013), at 7.

Garavito-Garcia, who was at the time 68 years old, appealed the

order, arguing, among other things, that he should not be extradited

because he was in poor health. See Stansbury Decl., Ex. E, Ministry

of Justice and the Law, Resolution No. 374 (Dec. 26, 2013), at 2. On

December 26, 2013, the Colombian Ministry of Justice and the Law

issued Resolution No. 374 to confirm the extradition order; but the

Resolution, crediting Garavito-Garcia's health concerns, also

instructed the Colombian Attorney General to obtain a medical report

on the feasibility of transferring Garavito-Garcia before the

Colombian authorities surrendered him to the United States. Id. at

10. Five days later, Garavito-Garcia suffered a stroke. Ray Decl. ¶

10.

On February 14, 2014, notwithstanding that a medical report had

yet to issue, the Colombia Government authorized the United States

to remove Garavito-Garcia. Id. ¶ 11. Less than two weeks later, the

National Institute of Legal Medicine and Forensic Science in

Colombia (the "National Institute") provided its opinion that

Garavito-Garcia had to be transported in a "medical aircraft" to

ensure his safety during travel to the United States. See Stansbury

Decl., Ex. G, Letter from the Director of International Management

to Benjamin Ziff, Chargé d'Affaires, U.S. Embassy (Feb. 26, 2014).

After receiving this report, the Colombian government "suspended"

the "availability" of Garavito-Garcia "until the necessary and

2

indispensable conditions designed to safeguard [his] life and health" could be met. Id.

Notwithstanding the fact that the delay was designed to accommodate his health issues, Garavito-Garcia then challenged his continued detention in Colombia on the ground that he should have been extradited sooner. Specifically, Garavito-Garcia invoked Article 511 of the Colombian Criminal Code, which requires that the subject of an extradition request be transferred to the requesting state within thirty days of when "the person was made available to the requesting state." Ray Decl. ¶ 15. In an initial response to Garavito-Garcia's counsel, before the thirty-day time limit had expired, the Colombian Attorney General explained that the time limit imposed by Article 511 had been suspended in accordance with the National Institute's opinion and Resolution No. 374. See Ray Decl., Ex. E, Office of the Attorney General, Denial of Petition for Home Detention and Release of Rafael Antonio Garavito-Garcia ("Petition Denial"), at 5-6. Nonetheless, Garavito-Garcia, through counsel, continued to press his purported rights under Article 511, asserting in an April 2, 2014 letter that Article 511 admits no exceptions "neither explicitly nor implicitly" and mandated that he be released. See Ray Decl., Ex. B, Letter from Jaime Javier Valderrama Ovalle to L. Eduardo Montealegre, Attorney General, at 2. The Colombian Attorney General was unpersuaded, and Garavito-Garcia remained in detention. See Ray Decl. ¶ 18.

A-141

On June 26, 2014, the United States was informed that the National Institute had issued a second opinion on June 13. See Stansbury Decl., Ex. I, Letter from the Director of International Management to Kevin Whitaker, Ambassador, U.S. Embassy (June 26, 2014). As a result of this opinion, which stated that "the risk of complications [would be] reasonably low" if Garavito-Garcia travelled on a medical airplane with trained personnel, the Colombian Government once again made the defendant available to the United States. Id. On July 22, 2014, Garavito-Garcia was transported to the Southern District of New York.

Now, in his motion to dismiss, Garavito-Garcia seeks to relitigate his claim that he should have been set free as a result of the Colombian authorities' alleged failure to timely comply with Article 511. This time, however, Garavito-Garcia relies not only on Article 511, but also on the extradition treaty between the United States and Colombia. See Ray Decl., Ex. C., Extradition Treaty with Republic of Colombia, Sept. 14, 1979 (the "1979 Treaty"). Article 12 of the 1979 Treaty provides that, once an extradition order issues, if the subject of the extradition request "is not removed from the territory of the Requested State within such time as may be prescribed by its laws . . . , that person shall be set free." Id. at 5-6. In other words, the 1979 Treaty incorporates Article 511. Accordingly, Garavito-Garcia contends that, because Article 511 was allegedly violated, the Treaty requires that he "shall be set free."

4

A-142

In response, the Government, among other things, challenges Garavito-Garcia's assertion that he was extradited pursuant to the 1979 Treaty, that the Treaty creates judicially enforceable rights, and that he has "standing" to raise a violation of the Treaty; but even if the Court assumes each premise of Garavito-Garcia's argument arguendo, his claim fails nonetheless.[1] This is because it is settled that "courts cannot second-guess another country's grant of extradition to the United States." United States v. Campbell, 300 F.3d 202, 209 (2d Cir. 2002). In Campbell, the defendant sought reversal of his conviction on the ground that the extradition treaty between the United States and Costa Rica did not include among the list of extraditable offenses the firearms charges for which he was convicted. Id. The Second Circuit, after noting that the firearms offenses that the defendant took issue with had been presented to the Costa Rican authorities in the extradition request, rejected the his argument: "Giving the required deference, we will presume that if the extraditing country does not indicate that an offense specified in the request is excluded from the extradition grant, the extraditing country considers the offense to be a crime for which extradition is permissible." Id. This approach, the court explained, promotes "the maintenance of cordial international relations." Id.

---

[1] The Court does not view the Government's standing argument as presenting an Article III question that requires resolution before the Court reaches the merits of Garavito-Garcia's motion. See United States v. Day, 700 F.3d 713, 721 (4th Cir. 2012).

This case presents even more compelling reasons to defer to the foreign government's determination of the lawfulness of the extradition. Unlike in Campbell, where the Second Circuit "presume[d]" that the Costa Rican authorities had considered the defendant's concerns, Garavito-Garcia explicitly raised his arguments under Article 511 to the Colombian Attorney General and received an explicit response. Although Garavito-Garcia did not reference Article 12 of the 1979 Treaty, nonetheless, because Article 12 merely incorporates Colombian law, the difference, as Garavito-Garcia recognizes, is immaterial. See Memorandum of Law in Support of Pre-Trial Motion to Dismiss Indictment at 6 ("[Garavito-Garcia's] extradition was not accomplished within the 30-day time limit prescribed by Article 511 of the Colombian Code of Criminal Justice and, by extension, Article 12 of the Extradition Treaty.") (emphasis added). The Colombian Attorney General heard and rejected Garavito-Garcia's arguments regarding Article 511, and deference in the context of matters involving international extradition requires this Court to follow suit. "It could hardly promote harmony to request a grant of extradition and then, after extradition is granted, . . . take the stance that the extraditing nation was wrong to grant the request." See Campbell, 300 F.2d at 209

Garavito-Garcia fails to meaningfully distinguish Campbell. He argues that Campbell's rule of deference applies only to a foreign government's determination of a discretionary matter, whereas Article 12 of the 1979 Treaty mandates that Garavito-Garcia "shall"

6

be set free if Colombia failed to comply with the relevant time limits. To begin with, the relevant portion of Campbell makes no mention of discretion. But even accepting Garavito-Garcia's framing of that case, the declaratory language of Article 12 comes into play only once a person "is not removed from the territory of the Requested State within such time as may be prescribed by its laws." 1979 Treaty at 5-6. Here, the Colombian Attorney General determined that the time limit "prescribed by" Article 511 could be, and in this case was, suspended. Petition Denial at 5-6. Accordingly, Garavito-Garcia was removed from Colombia within the relevant time limit and no violation of Article 511 of Colombian law or Article 12 of the 1979 Treaty occurred. To conclude otherwise, this Court would have to disagree with the Colombian Attorney General on his interpretation of Colombian law. Doing so would be in direct contravention of the Second Circuit's instructions in Campbell and of common sense in the arena of international relations.

    For the foregoing reasons, the Court reaffirms its denial of Garavito-Garcia's motion to dismiss the indictment.

    Dated:    New York, NY
              March 11, 2015                    JED S. RAKOFF, U.S.D.J.

F3h0gar1                          Trial

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4            v.                                12 CR 839 (JSR)

5    RAFAEL GARAVITO-GARCIA,

6                    Defendant.

7    ------------------------------x

8                                         New York, N.Y.
                                          March 17, 2015
9                                         10:00 A.M.

10

     Before:
11
                        HON. JED S. RAKOFF,
12
                                          District Judge
13

14                      APPEARANCES

15   PREET BHARARA,

16       United States Attorney for the
         Southern District of New York
17   SHANE STANSBURY
     ILAN GRAFF
18       Assistant United States Attorney

19   ROBERT RAY
         Attorney for Defendant
20
     ALSO PRESENT:
21   MIRTA HESS, Spanish Interpreter
     CRISTINA WEISZ, Spanish Interpreter
22   ANNA MARIA RISO, Spanish Interpreter
     ELIZABETH CARUSO, Spanish Interpreter
23   JASON STAAB-PETERS, DEA Special Agent

24   JOSEPH ROSENBERG, USAO Paralegal

25

F3h0gar3                        Jardinero – direct

1   Q.  And what happened after you arrived at the hotel?

2   A.  We scheduled a meeting with the people that Rafael Garavito

3   was going to introduce us to.

4   Q.  And for when was that meeting scheduled?

5   A.  The morning.  The morning of the day we arrived.

6   Q.  Did that meeting occur?

7   A.  Yes, sir.

8   Q.  Who participated in that meeting?

9   A.  Juancho, Mario, Serifo, Rafael, and me.

10  Q.  You mentioned Mario and Serifo.  Had you met either of

11  those men before that day?

12  A.  No, sir.

13  Q.  Who introduced you to them?

14  A.  Rafael Garavito.

15          MR. GRAFF:  Please display government exhibit 3C,

16  which is in evidence.

17  Q.  Who is this?

18  A.  Mario.

19          MR. GRAFF:  Please display government exhibit 3D.

20  Q.  Who is this?

21  A.  Serifo.

22  Q.  What did you do after you met Mario and Serifo.

23  A.  We had a meeting in Juancho's room.

24  Q.  Approximately how long was the meeting?

25  A.  An hour, 45 minutes.

F3h0gar3                         Jardinero - direct

1   Q.  And now I direct your and the jury's attention to

2   government exhibit 100TC.  That's the C tab in the transcript

3   binder.

4           Is this a transcript of the meetings to which you just

5   referred?

6   A.  Parts of it.

7   Q.  And on what date did that meeting happen?

8   A.  June 30, 2012.

9   Q.  Now, I'll ask you and the jury to please turn to page 17,

10  box 10.  And read from 17, boxes 10 to 20, box 6.

11          With reference to the portion of the transcript that

12  you have just read, what in general do you understand to be

13  happening at this point in the meeting?

14  A.  What I'm trying to justify here is the reason we're

15  trafficking drugs.  And then I say, you know, things that are

16  illegal today might become legal tomorrow, for example, tobacco

17  and alcohol.

18          And I am also telling them that, as of this moment

19  onward, we are not going to be talking about cocaine, but

20  rather our national product.

21  Q.  Why were you -- why did you say that?

22  A.  Because I didn't want us to use the word "cocaine" any time

23  we spoke on the telephone or in our e-mails, because that could

24  put the operation in danger.

25  Q.  And now focusing your attention to page 20, box 7, and

```
        F3h0gar3                    Jardinero - direct
```

 1    continuing onto the next page, do you see where you say:  We

 2    have formed an alliance.  The gentleman knows it.  We have an

 3    alliance with which the gentleman wants to continue with.

 4    Let's no longer say the word "boss."  That word is no longer

 5    used.  Now we say the manager.  The manager has an alliance

 6    with those who are the major producers of our national product.

 7    Who are they?  The guerilla.

 8                And then Serifo says:  The guerilla.

 9                And then you say:  The FARC,

10    A.  Yes, sir.

11    Q.  When you refer to the major producers of our national

12    products, what do you mean.

13    A.  That the FARC produces a large amount -- sorry, the

14    majority of cocaine in our country.

15    Q.  And you see in box 4, on the same page where you say:  They

16    are the ones who produce it, and we're the ones who sell it.

17    A.  Yes, sir.

18    Q.  To whom were you referring when you said "they are?"

19    A.  Juancho.

20    Q.  And to whom were you referring when you say we're?

21    A.  To Juancho and me.

22    Q.  So to be fair, who were the ones who produce it?

23    A.  The FARC.

24    Q.  And who were the ones who sell it?

25    A.  Juancho and I.

F3h0gar3                         Jardinero - direct

 1   Q.  Let's go to the next page, page 22, box one.  And if you

 2   could please read the portions attributed to you, and I'll read

 3   the portions attributed to Serifo.

 4   A.  Okay.  "We sell it, and they, at the same time, we do

 5   favors for them.  Within the negotiations that we had with

 6   them, we have to provide them with certain things, as you all

 7   very well know.  What does the FARC need.

 8   Q.  "Right.

 9   A.  "Yeah.  Weapons.  So then what we have thought about,

10   because we see there is a chance to do it, as we say in

11   Colombia, an unbelievable opportunity.  For what?  If the prime

12   minister of this country helps us in that regard, it is very,

13   very easy.  We ourselves, not even, not even the FARC can go to

14   the national market, to the international market and say sell

15   me three assault rifles, sell me four assault rifles.  They

16   can't do that, especially not us.  Do you understand?

17   Q.  "Yes.

18   A.  "But if there were a country, if there were a country that

19   would say I want the buy them from me.  I want to buy from me a

20   thousand assault rifles or 2,000 assault rifles, they won't

21   hassle them.  Why?  Because they are a state, a country.

22   Q.  "A country.

23   A.  "So then what we would propose, is that if the government

24   here will help us, we'll make the money available.

25   Q.  "So that they can buy it on their own behalf?

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

Case 15-2454, Document 20, 12/10/2015, 1661291, Page154 of 214

F3h0gar3                          Jardinero - direct

1   A.   "So that they can buy armament.  What's more, we can tell

2   them from whom they can buy it, because they won't sell it to

3   us because we're not a country.  And that's what they say.  Get

4   us a country to come and buy from us.  We'll sell them whatever

5   they want.  What's more, we'll give them a chance that we'll go

6   and tell them on the invoice that there are 500 assault rifles.

7   They are really delivering 500 to us.  Sorry, I meant they are

8   really giving us 5,000, you know what I mean?  We'll say sell

9   us a hundreds guns.  So they invoice 100 guns, but in reality,

10  under the table, we're paying them for 2,000 or 3,000 thousand,

11  do you understand?

12  Q.   "Got it.

13  A.   "With everything that we, or what they really need is

14  really need is light infantry armaments.  I don't know if you

15  guys know about armaments, rifles and assault rifles.

16  Q.   "Right.

17  A.   "Portable antiaircraft weapons, antiaircraft missiles.  I

18  wish and I hope if they could do us that favor, which would be

19  fabulous.  Do you understand?

20  Q.   "Yes.

21  A.   "I don't know if they can do it."

22  Q.   So stopping there.  Mr. Jardinero, what did you understand

23  to be happening at this point in the meeting?

24  A.   What I'm telling them here is that part of the arrangement

25  we have with the FARC is to get them weapons.  And in order to

F3h0gar3                           Jardinero - direct

1    be able to do that, we could do it through the Guinea Bissau

2    government.  If the government makes a request, as a

3    government, it's a lot easier to get them then.

4    Q.  Where, relative to you, was the defendant at this point in

5    the meeting?

6    A.  To my left.  He was next to me.

7    Q.  Do you see, on the next page, 25, boxes 1 and 3?

8    A.  Twenty-five, did you say?

9    Q.  Yes, boxes 1 and 3, where the defendant says: Forgive me

10   for interrupting you.  For now, I'm thinking that we should

11   start to organize this work.

12   A.  Yes, sir.

13   Q.  What did you understand that to mean?

14   A.  My understanding is that he wanted for us to first finalize

15   the drug part, and then start with the weapons thing.

16   Q.  So, if you could please now read from page 25, box 4 to

17   page 27, box 7.  And in deference to everybody's vocal chords,

18   this can be read to yourself.

19   A.  Okay.

20   Q.  Do you see on page 26, box 1 where the defendant says: I'm

21   talking about the -- the percentage going to be charged for --

22   for that right of arriving here and selling it.  The people who

23   buy the material for us, to have the money ready and not have

24   to compromise the government that the president is going to

25   some conference somewhere, and he can't leave because

F3h0gar3                          Jardinero - direct

 1    underneath his desk he has got 200 kilos.  It can't be they

 2    want their money and we'll take care of that.

 3              What do you understand that to mean?

 4    A.  What I understood, because I had previously said that all

 5    the drug deal, the drug deal or the 4,000 kilos was a chain.

 6    Because the money from that negotiation was going to be used to

 7    purchase weapons.  And that my understanding is that he could

 8    sell drugs in Guinea Bissau to facilitate that in order to stop

 9    the president or somebody in the government.  Because if you

10    pay the president with drugs, he would have to put 200 kilos

11    under the table.  And that wouldn't have been possible.  What

12    they wanted was money.

13    Q.  And just if you could, please, clarify.  When you said that

14    he, the defendant, could sell drugs in Guinea Bissau in order

15    to facilitate the deal, in what way would the defendant,

16    selling drugs in Guinea Bissau, facilitate the weapons deal?

17    A.  Because we had money there in Guinea Bissau.  He had told

18    us that he had some Nigerian customers that could buy large

19    amount of drugs there.

20    Q.  And what would be done with that money?

21    A.  The weapons would be paid for.

22    Q.  Now, if you could please read from page 27, box 7, just a

23    couple of boxes, to page 28, box 2.

24              What did you understand to be happening during this

25    exchange?

Case 15-2454, Document 20, 12/10/2015, 1661291, Page157 of 214

F3h0gar3                          Jardinero - direct

1    A.   Juancho was distributing roles in the investigation -- I'm

2    sorry, in the operation.  He was designating me as his

3    representative.  And the person being the person who would

4    handle his things in Guinea Bissau.  And was designating Rafael

5    to take charge of things with Mario and Serifo in Guinea

6    Bissau.  And he was the one in charge of distributing the

7    percentages of the deal with them.  So that everybody will get

8    paid, and they would look good with everybody.

9    Q.   Now, do you see on page 28, box 2, when the defendant

10   replies to Juancho and says everyone is going to work?

11   A.   Yes, sir.

12   Q.   What did you understand the defendant to be saying?

13   A.   That anybody that participated in the deal had to be well

14   paid.

15   Q.   Now, if you could please turn to -- if you move forward to

16   page 44, box 5, and read from page 44, box 5 to page 45, box 9.

17          Do you see on page 44, box 9 where Mario says: They --

18   unintelligible -- they pretend that they are bringing them some

19   uniforms, whatever it is.  The boots.  The boots.

20   A.   Yes.

21   Q.   What did you understand him to be saying?

22   A.   At that moment, Mario is telling us that the plane in which

23   we're going to put in the 4,000 kilos of cocaine, uniforms,

24   boots, need to be put inside.  Or similar things.  To justify

25   that the flight arrives to Guinea Bissau, meaning disguising

F3h0gar3                          Jardinero - direct

1    the drugs with this kind of things.

2    Q.  Do you see, on page 45, boxes 6 and 7 where you say:  Now I

3    understand.  You can't bring it in sloppily.

4          And then the defendant says:  That's why you have to

5    come.

6          What did you understand that exchange to mean?

7    A.  After having heard Mario saying that we needed to do things

8    inside the plane to disguise the drugs, I said, you cannot

9    bring it in sloppily with an expression that means just

10   facelessly, just up front like that.  And Rafael says that's

11   why you have to come.

12   Q.  And who did you understand Rafael to mean by "you?"

13   A.  The drugs.

14   Q.  Now, if you could take a moment and focus on pages 45, box

15   8 and 9.  Do you see where you say: Viejo, so then we can't

16   bring it in haphazardly.  So that it has to be a bigger plane,

17   because if we're bringing in 4,000 kilos.

18         And then the defendant says: Antonov.

19         What did you understand Antonov to be?

20   A.  It's a Russian-made plane.

21   Q.  And what did you understand the defendant to be saying

22   here?

23   A.  That we couldn't use a small plane, otherwise we wouldn't

24   be able to fit in 4,000 kilos, if that were the weight of the

25   uniforms.

F3h0gar3                          Jardinero - direct

1    Q.  And just to be clear 4,000 kilos of what?

2    A.  Of cocaine.

3    Q.  Now, if you could please take a moment and read from

4    page 48, box 9, just a few boxes to page 50, box 5.

5            Please continue with page 50, box 5.

6    A.  Yes.

7    Q.  What did you understand to be happening at this point in

8    the meeting?

9    A.  Mario is saying that the Guinea Bissau government has all

10   the necessary means, all the resources to do the deal.  And

11   that's why they need to get paid.  And that could be done in

12   the city, because it's way more, way safer.

13   Q.  And do you see, on page 50, box 5, where the defendant

14   says: That's it.  Done.

15   A.  Yes, sir.

16   Q.  What did you understand that to mean?

17   A.  My understanding is that he wanted to give his approval to

18   the operation to where it was being done to use the city

19   airport.

20   Q.  Let's move forward a few pages.  And I'll ask you and the

21   jury to please read from page 56, box 2, to page 60, box 11.

22   Please stop at 60, box 11.

23           What, in general, did you understand to be happening

24   at this point in the meeting?

25   A.  I was explaining to them that we had other needs, to open

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

F3h0gar3                        Jardinero - direct

1    up new routes to bring drugs to the U.S. and Canada.  And I was

2    telling them that, taking advantage of the fact that the

3    government of Guinea Bissau was giving us access to all of the

4    things that they were providing, that it was very easy then to

5    use, to take use of a fish factory, and a cashew factory to

6    export from there to the U.S.

7    Q.  To export what to the U.S.?

8    A.  Cocaine.

9    Q.  Let's go back to page 56, box 2.

10        MR. GRAFF:  Please display government exhibit 2B in

11   evidence.

12   Q.  Please explain what you meant on page 56, box 2, when you

13   said:  We are having a lot of problems to get from our country

14   to Canada, and to the United States, because of the Mexicans.

15        And then continuing in box 4:  The Mexicans have

16   ongoing wars where they are killing each other.

17        Could you please explain what you mean in boxes 2

18   through 4.  And you should feel free to refer to government

19   exhibit 2B to the extent that that would be helpful to you.

20   A.  When what I was saying to everyone here is justifying the

21   reason why we wanted to use Guinea Bissau as a jumping-off

22   point to send containers of fish or cashews to the United

23   States so that -- and I knew, in their eyes, they didn't think

24   that this was very normal that we go to Africa and then to the

25   United States.  What had been done, forever, for trafficking

F3h0gar3                          Jardinero - direct

 1   from Colombia, was to use the Pacific and the Atlantic, to also

 2   drive the stuff up through Mexico.

 3            I am trying to justify why we're trying to find a new

 4   route, which I attribute to the trouble we're having in Mexico

 5   with the Mexicans.  And I'm saying they are mixed up in their

 6   own silly, stupid wars among themselves over, really, nothing.

 7   Over stupid things.  And I'm saying that we don't want the

 8   United States government to start looking at us because we're

 9   involving ourselves with the Mexicans in their problems, in

10   their mess.

11   Q.  To be clear, is that on page 58, box 3?

12   A.  Yes, sir.

13   Q.  Taking you back to page 56, box 5.  Do you see, after you

14   describe where -- after you say:  The Mexicans have ongoing

15   warrants.

16            And continuing, the defendant then says:  They are

17   killing each other every day.

18   A.  Yes, sir.

19   Q.  What did you understand that to mean?

20   A.  I understand him to be corroborating what I have just said.

21   He says, yeah, they kill each other every day.

22   Q.  And then do you see on page 59 where the defendant says:

23   Get the Mexicans out of the way.

24            Do you see that?

25   A.  Yes, sir.

F3h0gar3                         Jardinero - direct

1   Q.  Can you please read your reply?

2   A.  Can I please read my reply?

3   Q.  On page 59, box 2, if you could please read that out loud.

4   A.  Okay.  Go to another border, go somewhere else.  So, then

5   El Viejo, who is offering us that here, with the way you guys

6   manage things, it's possible that we can get a license to open

7   up a fish factory.

8   Q.  What did you mean when you said that?

9   A.  According to what Rafael had told us, was that he had the

10  means of getting a license to export fish to the United States

11  and to hide the drugs in there.

12  Q.  Focusing your attention on the bottom of on the next page,

13  boxes 9, 10, and 11 -- I apologize.  Boxes 7 through 11 where

14  were you say:  So, then, what if what we can't -- what we want

15  to change, if we can get a license -- if we could get a

16  license -- I -- we could get a license.

17          And Serifo says:  Right.

18          And you say:  And we open up a factory here to package

19  fish.

20          And Serifo says:  Yes.

21          And you say:  We can export it from here to Canada or

22  to the United States.

23  A.  Yes, sir.

24  Q.  What did you understand that exchange to mean?

25  A.  What I am explaining here is corroborating what I had just

F3h0gar3                         Jardinero – direct

1   said before.  If we're able to set up a fish processing plant

2   in Guinea Bissau, we would be able to use it to hide the

3   cocaine in the fish that we would then export to the United

4   States and Canada.

5   Q.  And Mr. Juardinero, you mentioned a few times, Rafael or El

6   Viejo.  To whom were you referring when you used those names?

7   A.  Mr. Rafael Garavito.

8            MR. GRAFF:  Your Honor, the next block we are about to

9   read is a number of pages.  So now might be an opportune time

10  to break for lunch.

11           THE COURT:  Okay, ladies and gentlemen, we'll take our

12  lunch break now and we'll reconvene at 2:00.

13           (Jury excused)

14

15

16

17

18

19

20

21

22

23

24

25

F3HKGAR4                          Jardinero - direct

1     the conversation?

2              MR. RAY:  Objection, your Honor, to the form of the

3     question.

4              THE COURT:  Sustained as the question is phrased.

5     Q.  How did the defendant react to this portion of the

6     conversation?

7              THE COURT:  No, no, no.  That's the same question.

8              MR. GRAFF:  Okay.  I'll move on, your Honor.

9     Q.  Did there come a time when you met with General Indjai?

10    A.  Yes, sir.

11    Q.  When was that?

12    A.  Two days later, Monday, in the morning.  I don't remember

13    the date, July 1st or 2nd.

14    Q.  What did you do in the meantime?

15    A.  We stayed at the hotel.

16    Q.  Directing your attention to the day that you met with

17    Indjai, what did you do that morning?

18    A.  I had breakfast, I met with Juancho, and then we went off

19    to meet with Mario, Rafael, and Serifo, I think.

20    Q.  Where did that meeting happen?

21    A.  In Juancho's room.

22    Q.  Now, directing your attention to tab E, 100T, is this a

23    transcript of the meeting that you just described?

24    A.  Yes, sir.

25    Q.  Looking at page 1 of the transcript, on what date did that

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

F3HKGAR4                          Jardinero - direct

1    meeting happen?

2    A.  According to what this transcript says, July 12th.

3              THE INTERPRETER:  Interpreter correction:  July 2nd,

4    2012.

5    Q.  Now, if you could turn the page to what is page 29 of this

6    transcript and take a moment and read from page 29, box 23, at

7    the bottom of the page and continue to page 32, box 2.

8    A.  Okay.

9    Q.  Do you see on page 29, box 23, when you say, "Not

10   everything.  Remember something, gentlemen, not everything"?

11   And then it continues a few words later, "We won't be able to

12   give you everything that comes in for you to sell because

13   remember that we -- what we had in mind and what we're going to

14   try to do is to set up the company with the old guy"?

15   A.  Yes, sir.

16   Q.  What did you mean when you said that?

17   A.  I was repeating here what I had said before, that some of

18   the merchandise, the cocaine, that was going to arrive in

19   Guinea-Bissau, we were going to use for other purposes, we

20   would not be able to give it all to them to sell.

21   Q.  On the top of page 30, do you see where you continue

22   speaking, and you say, "Could sell in Canada and send product

23   to the United States because we do not want to continue

24   battling with those Mexicans" and so forth?

25   A.  Yes.

F3j0gar1                        Trial

1  | UNITED STATES DISTRICT COURT
   | SOUTHERN DISTRICT OF NEW YORK
2  | ------------------------------x
3  | UNITED STATES OF AMERICA,
4  |           v.                          12 CR 839 (JSR)
5  | RAFAEL GARAVITO-GARCIA,
6  |                 Defendant.
7  | ------------------------------x
8  |                                    New York, N.Y.
   |                                    March 19, 2015
9  |                                    9:30 A.M.
10 |
   | Before:
11 |
   |                       HON. JED S. RAKOFF,
12 |
13 |                                    District Judge
   |                       APPEARANCES
14 | PREET BHARARA,
   |       United States Attorney for the
15 |       Southern District of New York
   | SHANE STANSBURY
16 | ILAN GRAFF
   |       Assistant United States Attorney
17 |
   | ROBERT RAY
18 |       Attorney for Defendant
19 | ALSO PRESENT:
20 | MIRTA HESS, Spanish Interpreter
   | CRISTINA WEISZ, Spanish Interpreter
21 | ANNA MARIA RISO, Spanish Interpreter
   | ELIZABETH CARUSO, Spanish Interpreter
22 | Alicia Cugliari, Portuguese Interpreter
   | Connie Raicovich, Portuguese Interpreter
23 |
   | JASON STAAB-PETERS, DEA Special Agent
24 | JOSEPH ROSENBERG, USAO Paralegal
25 |

F3j0gar1                          Juardinero - cross

1                (In open court)

2                THE COURT:  What I just told you is, of course, just

3       one small part of the more detailed instruction, that I will be

4       giving you at the close of the case.  And it's those

5       instructions that, of course, will govern your deliberations.

6       So in singling out this one aspect, in order to clarify the

7       questions that are being put, now, I don't want you to suppose

8       that is the whole story.  There will be full written

9       instructions that I will give you at the close of all of the

10      evidence.

11               Okay, counsel, go ahead.

12               MR. RAY:  Thank you, your Honor.

13      BY MR. RAY:

14      Q.  I don't know whether I had a pending question or not, but

15      let's start over, okay.

16               On page 32, 100T-A, box number 1, Mr. Juardinero, you

17      do see and recall your testimony regarding mention of the words

18      United States in that portion of the transcript?

19      A.  Yes, sir.

20      Q.  And your use of those words during this conversation from

21      June 25th, 2012, were preceded by instructions that you

22      received, and conversations that you had, with agents of the

23      Drug Enforcement Administration; correct?

24      A.  Yes, sir.

25      Q.  In other words, they gave you instructions about the plan

F3j0gar1                          Juardinero - cross

1    that they wanted you to implement in connection with this

2    meeting; right?

3    A.   Yes, sir.

4    Q.   And is it not also true that the agents told you that it

5    was important for you to address the issue of importation into

6    the United States?

7    A.   Yes, sir.

8    Q.   And you followed that instruction?

9    A.   Yes, sir.

10   Q.   Now, this idea originated with the DEA, correct?

11   A.   Yes, sir.

12   Q.   It was passed on to you?

13   A.   They transmitted it to me.  I imagine it was their idea.

14   Q.   Okay, understood.  And then, as a result of their idea and

15   what was transmitted to you, you then implemented it during the

16   course of your conversations, including this first one on

17   June 25th, 2012, that is recorded?

18   A.   Yes, sir.

19   Q.   Now, in response to that, Mr. Garcia, in turn, indicates

20   over on page 34, box number 3, in the first and second sentence

21   that, among other things, he has, quote:  Sources over there

22   with the Nigerians.

23            Do you see that?

24   A.   Yes, sir.

25   Q.   And you recall that's what he said?

F3j0gar1                        Juardinero - cross

1    A.  Yes, sir.

2    Q.  And during the course of this conversation, Mr. Garcia

3    never indicates his agreement; does he?

4             MR. GRAFF:  Objection, your Honor.

5             THE COURT:  Sustained.

6    Q.  It is true, is it not, that Mr. Garcia never says anything

7    about the United States in this conversation?

8             MR. GRAFF:  Objection, your Honor.  The exhibit speaks

9    for itself.

10            THE COURT:  Well, that's true.  And, technically, a

11   valid objection.  But I think rather than put the jury to

12   having to go through the entire exhibit, if there is no

13   disagreement on that point, I will allow the question.

14   A.  Could you repeat it, please?

15   Q.  Mr. Garcia never says anything about the United States,

16   does he?

17            THE COURT:  During this conversation.

18   Q.  During this conversation.

19   A.  I don't remember him saying the United States, to be exact,

20   if that's what you are asking.

21   Q.  That's what I'm asking.

22   A.  Then, yes.

23   Q.  Now, let's go over to the second conversation on that day,

24   which is 11T-B, so it is the next tab.  In this conversation,

25   focusing your attention to box number 4, on page 12, and his

F3j0gar1                          Juardinero - cross

 1    reference to the quote/unquote "big job" which you have

 2    testified about, do you see that first sentence?

 3    A.  Yes, sir.

 4    Q.  Mr. Garcia says nothing about that big job in the context

 5    of anything involving the United States, does he, in this

 6    conversation?

 7    A.  No, sir.

 8    Q.  Let's go over to 100T-C, which is five days later.  It is

 9    the third transcript in the binder.  And I'm specifically

10    inviting your attention to, over to page 25.  This is the third

11    exhibit, which is 100T-C from June 30th, 2012.  And remind us

12    where you are there, where are you, by June 30th 2012.  We're

13    no longer in Brazil, right?

14    A.  Sorry, what date did you say?

15    Q.  June 30.  It appears on the cover page of 100T-C?

16    A.  We were in Guinea Bissau, sir.

17    Q.  So we're now into the third conversation.  The first two

18    were in Brazil, now we're in Guinea Bissau?

19    A.  Yes, sir.

20    Q.  And I think we established, but let me just be clear, that

21    there were other people present during this conversation

22    besides Mr. Garcia, yourself, Juancho.  Now, there are two

23    individuals present who are from Guinea Bissau; correct?

24    A.  Yes, sir.

25    Q.  And those two individuals you have identified as Mario and

F3j0gar1                    Juardinero - cross

1   the other one was Serifo; correct?

2   A.  Yes, sir.

3   Q.  And now, okay, so now I'm ready to go over to, I'm sorry,

4   page 25 again.  Now, the government focused your attention on I

5   believe the pages that preceded it, from 22 to 24.  And that

6   discussion, between 22 and 24, involved mention of armaments;

7   did it not?

8   A.  Yes, sir.

9   Q.  Weapons, assault rifles, armaments, infantry armaments,

10  portable antiaircraft weapons, antiaircraft missiles; all of

11  that, right?

12  A.  Yes, sir.

13  Q.  And over on to page 25, the first thing Mr. Garcia says is

14  the following: Forgive me for interrupting you.

15          Do you see that?

16  A.  Yes, sir.

17  Q.  Box one?

18  A.  Yes, sir.

19  Q.  So on this portion of the conversation, didn't you

20  understand Mr. Garcia to be cutting you off?

21  A.  Yes, sir.

22  Q.  You wanted to talk about weapons, and he wanted to talk

23  about the work; right?

24  A.  Yes, sir.

25  Q.  And the work that he was referring to, by your testimony,

F3j0gar1                          Juardinero - cross

1   was narcotics trafficking; right?

2   A.  Yes, sir.

3   Q.  He says in box number 3:  Organize this work.

4           Right?

5   A.  Yes, sir.

6   Q.  And you say, in response, box four:  You haven't given me a

7   chance to connect all of the dots.

8           Right?

9   A.  Yes, sir.

10  Q.  So what you wanted to talk about was weapons, and

11  armaments, and surface-to-air-missiles; right?

12  A.  It was the whole thing.

13  Q.  I'm asking about this part of the conversation, though.

14  You just testified that Mr. Garcia cut you off, right?

15  A.  Yes, sir.

16  Q.  And your response is:  Well, let me tell you about the

17  whole.

18          Plan box two; right?

19  A.  Yes, sir.

20  Q.  You say, quote:  You have not allowed me to link everything

21  together for you.

22          Right?

23  A.  Yes, sir.

24  Q.  And over on to page 32, box number 5, you see where Juancho

25  says:  Are we are we in agreement?

F3j0gar1                    Juardinero - cross

1    A.  Yes, sir.

2    Q.  And Serifo indicates his response:  That's it, that's the

3    way it goes.

4    A.  Yes, sir.

5    Q.  And there is no indication in this recorded conversation

6    similarly indicating Mr. Garcia's agreement to quote/unquote

7    that agreement; right?

8    A.  Yes, sir.

9    Q.  Now, over to page 35, in box number 8, the bottom, this is

10   the first occasion in which a proposed transaction involving

11   4,000 kilos is discussed; right?

12   A.  Yes, sir.

13   Q.  And then you talk about various means, ways in which

14   4,000 kilos could be transported.  Take a look at page 38 in

15   that regard.  Do you see that?

16   A.  Could I just read this, please?

17   Q.  I'm sorry?

18   A.  Could I just read this, please.

19   Q.  Of course, of course.  Boxes 2 through 4.

20   A.  Yes, sir.  You're right.

21   Q.  And this is where you discuss alternatives, right?

22   A.  Yes, sir.

23              (Continued on next page)

24

25

F3JKGAR2                          Jardinero - cross

1   BY MR. RAY:

2   Q.  One of which is, you can bring it by water, that's box 2?

3   A.  Yes, sir.

4   Q.  And the other is by plane, box 4?

5   A.  Yes, sir.

6   Q.  And during this role that you were playing for the DEA,

7   among other things, you were signaling your ability to arrange

8   transport by plane originating in Panama, correct?

9   A.  Yes, sir.

10  Q.  And that you would be responsible for moving narcotics that

11  were delivered to Panama, right?

12  A.  Yes, sir.

13  Q.  And the movement of those narcotics first, I think as you

14  testified during direct examination, to the west coast of South

15  America, right?

16  A.  I didn't understand what you asked.

17  Q.  Well, you testified on direct examination that part of the

18  plan or one of the alternative plans was to move narcotics from

19  Panama to the west coast of South America?

20  A.  I must have made a mistake because it's the east coast.

21  Q.  I'm sorry, let's try our geography again.

22          The part that borders the Atlantic Ocean, the east

23  coast of South America -- my apologies -- right?

24  A.  Yes, sir.

25  Q.  And I think the country was Senegal, right?

F3JKGAR2                        Jardinero - cross

1          Suriname?  One of the S countries.  Which country was

2     it?

3     A.  Suriname.

4     Q.  Suriname, thank you.  Okay.

5          Again, this was you playing the role that DEA had

6     designated for you, right?

7     A.  Yes, sir.

8     Q.  And you were going to be posing as essentially the delivery

9     service from Panama to the east coast of South America,

10    Suriname, and then from there, across the Atlantic Ocean to

11    West Africa?

12    A.  Yes, sir.

13    Q.  And one of the possibilities of crossing the ocean was

14    either by boat or by plane, right?

15    A.  Yes, sir.

16    Q.  And over onto page 45.  This was covered during your direct

17    examination, and I'll give you a moment to reread it.  This is

18    beginning box 5 through box 9, at the bottom of the page.

19          So in order to do 4,000 kilos by plane, this was the

20    point in the discussion where the issue that was addressed was

21    the need for a larger aircraft, right?

22    A.  Yes, sir.

23    Q.  That was going to be your job?

24    A.  Yes, sir.

25    Q.  And Mr. Garavito says in box 7, on that same page, "That's

F3JKGAR2                    Jardinero - cross

1    why you have to come"?

2    A.  He doesn't say "you."  That's why "it" has to come.

3    Q.  Well, that's not apparently the English translation, but

4    maybe that's what he says in Spanish.  I don't speak Spanish,

5    so I don't know.

6              Then over to page 50, on box 5 of that page,

7    Mr. Garavito responds, "That's it, done, period," right?

8    A.  Yes, sir.

9    Q.  And your understanding of what it was that "it" was that he

10   was referring to was the movement of 4,000 kilos from Panama to

11   West Africa, right?

12   A.  Yes, sir.

13   Q.  Specifically Guinea-Bissau?

14   A.  Yes, sir.

15   Q.  Because that's where you were at this time, this meeting

16   occurred in Guinea-Bissau, right?

17   A.  Yes, sir.

18   Q.  Okay.  Now over to page 56.

19             Now, this is the second time that you mentioned the

20   United States portion or aspect of the agreement that you were

21   trying to involve Mr. Garavito in, right?

22   A.  I'm just going to read it, please.

23   Q.  Sure.  Box 2 and then -- yes, let's just stay with box 2.

24   A.  Yes, sir, that's correct.

25   Q.  And the response that comes comes from Serifo, and he says,

Fej0gar3                         Juardinero - cross

1              Do you see that box number 17, on page 75?

2    A.  You mean 74.  Starting on 17?  Or what.

3    Q.  I'm sorry, I was confusing.  If you just take a look now,

4    focusing in, I want to provide some context.  I want to direct

5    your attention to page 75, box number 17.

6              Now, once more.  You are back to a discussion

7    involving the alternate route; right?  In other words, an

8    alternate route around Mexico?

9    A.  Yes, sir.

10   Q.  And you continue with that discussion all of the way over

11   to page 76 and 77.  And you talk about Canada, the United

12   States, and an alternate route here through Africa.  Right?

13   A.  Yes, sir.

14   Q.  And then over to page 77, you talk about the way in which

15   that can be accomplished, one of which is by boat; right?

16   A.  Yes, sir.

17   Q.  Mario says, on box 21:  It's safer with a boat, less of a

18   headache.

19              Do you see that?

20   A.  What did he say?

21   Q.  Box 21.  It's safer with a boat, less of a headache.

22   A.  Yes, sir.

23   Q.  The boat that we are talking about is a boat going from

24   Africa, back across the Atlantic ocean to North America.

25              Right?

Fej0gar3                          Juardinero - cross

1   A.  Yes, sir.

2   Q.  And Mario then says in box number 25: But there is one

3   thing to consider with a boat, and that's that it takes long.

4         Right?

5   A.  Yes, sir.

6   Q.  And the reason it takes a long time is because it was

7   travelling back across the Atlantic ocean, correct?

8   A.  Yes, sir.

9   Q.  All right.  Okay, let's go to 11 -- I'm sorry 100T-K, which

10  is a recorded telephone conversation.  And during this

11  conversation, you talk about uniforms, right, on page 7, box

12  number -- box number 10?

13  A.  Yes, sir.

14  Q.  And these uniforms, again, were being used in part to

15  disguise the delivery of cocaine?

16  A.  Yes, sir.

17  Q.  From South America to Guinea Bissau?

18  A.  To be exact, from Panama.

19  Q.  Well, originating in Panama.  Okay, correct.  And over to

20  page 11, the government directed your attention to this portion

21  of the conversation beginning on page 10 of line 14, and

22  carrying over onto page 11 through page 12, box number 5.  And

23  your testimony on direct examination was that --

24  A.  Could I finish reading it, please?

25  Q.  Oh, sure.  Yes, of course.

Fej0gar3                       Juardinero - cross

 1   A.  Yes, sir.

 2   Q.  And your testimony on direct examination was that this

 3   portion of the conversation was in code, and that references to

 4   pipes, and plumbing, and elbows, and the materials, that was

 5   all code for armaments; correct?

 6   A.  Yes, sir.

 7   Q.  And then over to page 13 and 14, beginning at the bottom of

 8   the page on 13, box number 10, and continuing onto page 14

 9   through the end of the page, just take a moment to read that

10   first.

11   A.  Yes, sir.

12   Q.  You say, in box number 10, on page 13, tell the man not to

13   worry, because everything is full steam ahead.  And you said

14   that, do you recall that?

15   A.  Yes, sir.

16   Q.  That was not exactly true, though, was it?

17   A.  No, sir.

18   Q.  And the reason is that there had been, as you have

19   described later on, we have had a little delay.

20   A.  Yes, sir.

21   Q.  Okay.  Now, let's go to -- I'm sorry, over to page 2 of

22   100T-M, which is August 27th.  And box number 7, on page 2,

23   this is where Mr. Garavito says: This fellow, Mario, needs to

24   talk to you urgently about the matter of the letter of credit.

25   And that letter of credit referred to what?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Fej0gar3                          Juardinero – cross

 1   A.  The way the uniforms were going to be paid for.

 2   Q.  And that letter of credit was necessary in order to have

 3   the uniforms available as part of the shipment, together with

 4   the narcotics; right?

 5   A.  No, sir.

 6   Q.  Well the uniforms were to be purchased, were they not, to

 7   accompany the narcotics into Guinea Bissau?

 8   A.  Yes, sir.

 9   Q.  And in order to make the purchase for the uniforms, you had

10   to have the letter of credit in order to do it?

11   A.  It was not going to be done with a letter of credit.  What

12   I said to them, specifically, was that we were going to do it

13   by means of a transfer.  We had discussed a number of ways.  We

14   had not finalized exactly how we were going to do it.  And

15   because I was the person who was going to be purchasing the

16   uniforms, I was the person who was going to make the final

17   decision as to how to pay for them.

18   Q.  But in truth, and in fact, there was never any intention on

19   your part to actually purchase uniforms, was there?

20   A.  Yes, obviously.

21   Q.  In other words, you were not actually, with the DEA, going

22   out to have a contract with some company in China or elsewhere

23   to actually have uniforms manufactured; right?

24   A.  We did handle all of the paperwork, though.  I did send an

25   invoice, I created a company on line.

Fej0gar3                         Juardinero – cross

1   Q.  I understand all of that.  But just my question is it was

2   never your actual intention to be purchasing and arrange for

3   the production of any uniforms for the Guinea Bissau military?

4            MR. GRAFF:  Objection as to relevance, your Honor.

5            THE COURT:  Overruled.

6   A.  I never had the intention of buying uniforms.

7   Q.  This was part of the ruse?

8   A.  It was part of the instructions from the agents.

9   Q.  Okay, fair enough.  All right, now, over to page 23, on

10  100T-N, August 31, 2012.

11           MR. GRAFF:  Objection, your Honor.  The defendant was

12  not present at this meeting, nor did he testify about it on

13  direct.

14           MR. RAY:  Well, my apologies.  I guess that's right.

15  Okay, we'll skip that.

16  Q.  Let's try page 24, on 100T-O.  And if you would just read

17  box number 2.

18  A.  Box two?

19  Q.  Yes.

20  A.  Yes, sir.

21  Q.  And this is also a reference by you here with regard to the

22  uniforms; correct?

23  A.  Yes, sir.

24  Q.  You indicate that transactions have been going on for over

25  3 months; right?

Fej0gar3                           Juardinero - cross

1    A.  Yes, sir.

2    Q.  And, so far, no military uniforms?

3    A.  Yes, sir.

4    Q.  And the reason there were no military uniforms was because

5    neither you, nor the DEA, had any intention of producing any

6    uniforms?

7    A.  Yes, sir.

8    Q.  And you were receiving instructions, were you not, at this

9    time, by the DEA, to slow this transaction down?

10   A.  Yes, sir.

11   Q.  Okay.  So let's go to -- let's go over to 100T-P.  And

12   beginning on page 18, box number 4.  And it's box number 4 on

13   page 18, through box number 9 on that page, which carries over

14   just briefly onto the following page, 18.  I'm sorry, 19.  And

15   yet again, you return to the conversation about clients in the

16   United States and Canada; right?

17   A.  Yes, sir.

18   Q.  And Mr. Garavito is not a participant in this portion of

19   the conversation?

20   A.  No, sir.

21   Q.  And you're speaking with Mario about it?

22   A.  Yes, sir.

23   Q.  You ask that's what we agreed to.  And he says yes.

24   A.  Where is that?

25   Q.  Try box number 5, on 18.  And box number 6, on 18.  You

Fej0gar3                         Juardinero - cross

1   say: that's what we agreed to.  And he says:  Yes.

2           Correct?

3   A.  Yes, sir.

4   Q.  Okay.  Now let's go to November.  Now, prior to November 1,

5   2012, you were aware, were you not, regarding Mr. Garavito's

6   health issues?

7   A.  Yes, sir.

8   Q.  And further, is it not true that a request was made for the

9   advancement of funds regarding those health issues?

10  A.  Yes, sir.

11  Q.  And, in fact, isn't it also true that a request was made of

12  you to advance funds in connection with Mr. Garavito's health

13  issues?

14  A.  I don't remember to whom that request was made.  I do

15  remember that he was sick, and he needed money for a doctor.

16  It could have been to me, or to Juancho.  But I do remember

17  there was a request for such money.

18  Q.  And the request came from Mr. Garavito?  Or did it come

19  from someone else on Mr. Garavito's behalf?

20  A.  If I say that I can't remember to whom it was made, I also

21  can't remember who made it.  I do, however, remember that Mr.

22  Garavito was having health issues.

23  Q.  And you do remember, irrespective of the basis of your

24  recollection, that such a request was made for funds?

25  A.  Yes, sir.

Fej0gar3                         Juardinero - cross

1   Q.  And what did you do with that request?

2   A.  I conveyed the fact that there was a problem, because he

3   had health issues, to the DEA agents.  Actually, in truth, I

4   don't remember who told me, but someone told me that he had had

5   a fainting spell.  I don't remember exactly who told me.

6   Q.  All right.  But in any event, in addition to characterizing

7   his medical situation, you also conveyed the request to the DEA

8   regarding funds?

9   A.  I must have done that.

10  Q.  And as a result of that request being conveyed, you in turn

11  ultimately wired funds to Mr. Garavito; did you not?

12  A.  Yeah, some money was sent to him.

13  Q.  Well, what's sent to him, it was sent to him by you; right?

14  A.  Sir, I don't remember.

15  Q.  But you do remember that money was sent to him.

16  A.  Yes, sir.

17  Q.  You just don't remember whether or not you sent it?

18  A.  Yes, sir.

19  Q.  And do you recall how much money was sent to him?

20  A.  I think it was $5,000.

21  Q.  And do you recall whether or not that money was sent in

22  cash, by check, or by wire?

23  A.  It had to have been wired, because back then nobody was

24  going to Guinea Bissau.

25  Q.  What was your understanding as to where Mr. Garavito was

Fej0gar3                    Juardinero - cross

1   located at or about the time that money was wired to him?

2   A.  He was in Guinea Bissau when he was sick.  I couldn't tell

3   you where he was when the money was wired to him.

4   Q.  And the purpose of wiring him money was, in part, to have

5   him continue with the negotiations, correct?

6   A.  Yes, sir.

7   Q.  I mean it was for his health, obviously in part because he

8   had made a request that he was ill, but the reason that you and

9   the DEA wired him the funds was to keep him negotiating; right?

10          MR. GRAFF:  Objection as to form, your Honor.

11          THE COURT:  Sustained.  Compound.

12          I think the question really is the second part.  So

13  why don't you rephrase it.

14  BY MR. RAY:

15  Q.  The reason the funds were wired to Mr. Garavito was to have

16  him continue negotiating with you and Juancho; right?

17  A.  Yes, sir.

18  Q.  So that you could continue to gather evidence?

19  A.  For him to continue negotiating.

20  Q.  All right.  So now we're to November 1, 2012, 100T-Q

21  page 4.  A big, long box, number 2.  Continuing onto page 5.

22  And why don't you read that there, box number 10 on page 5, and

23  then I'll have a question for you.

24          Finished?

25  A.  Yes, sir.

Fej0gar3                    Juardinero - cross

1   Q.  Now over on page 4, in box number 2, Mr. Garavito refers

2   to:  A very strange script.  I don't like that script.  The

3   situation at this moment is one of a lot of instability, lots

4   of problems.  You all are not holding up any of your end of the

5   deal.

6           Do you see?

7   A.  Yes, sir.

8   Q.  He's talking about you, right, at the bottom of the page,

9   when he says:  You all are not holding up any of your end of

10  the deal?

11  A.  Yes, sir.

12  Q.  And the reason is that, so far, no uniforms; right?

13  A.  Yes, sir.

14  Q.  No plane?

15  A.  Yes, sir.

16  Q.  No arrangements to have the plane take off in Panama?

17  A.  The arrangements were being made.  In fact, all of the

18  documentation was being made.

19  Q.  So far, though, no flight from Panama that took off?

20  A.  No.

21  Q.  And no cocaine that's been delivered to Guinea Bissau?

22  A.  No, sir.

23  Q.  And Ricardo says -- that's you, on page 5, box number 1:

24  Well, that's not a problem.

25          Do you see that?

Fej0gar3                        Juardinero - cross

1   A.  Yes, sir.

2   Q.  But the truth and, in fact, it was a problem; wasn't it?

3          MR. GRAFF:  Objection as to vagueness of the question,

4   your Honor.

5          THE COURT:  I'm sorry.

6          MR. GRAFF:  Objection as to the vagueness of the

7   question.

8          THE COURT:  Sustained.

9   BY MR. RAY:

10  Q.  Well, right above it, on the carry-over block from page 4,

11  at the top of the page, on page 5, Mr. Garavito refers to the

12  first phase of the work; right?

13  A.  Yes, sir.

14  Q.  And the first phase is a reference to the narcotics

15  trafficking transaction?

16  A.  The 4,000 kilos of cocaine; yes, sir.

17  Q.  And so far that hasn't happened; right?

18  A.  No, sir.

19  Q.  And the problem is, is that it's not going to happen

20  without the second phase of the work being in place; isn't that

21  true?

22  A.  Yes, but what he is saying here is that it is going to

23  happen.  That the General has all of the people ready.  And

24  that's why I say:  He says he has the specialists.  And that's,

25  and there is no problem with that.

Fej0gar3                          Juardinero – cross

1              Referring to weapons.

2              And I said:  Well, that's not a problem.

3              And he says:  Well, he is kind of pissed off.

4   Q.  And the reason, in your words, that he is pissed off, or I

5   guess in his words that he is pissed off, is because the

6   narcotics transaction hasn't happened yet; right?

7              MR. GRAFF:  Objection as to relevance, your Honor.

8              THE WITNESS:  Exactly.

9   Q.  Now, over onto page 7, box number 4.  In order to make the

10  transaction happen, you have to talk to the General; right?

11  A.  Yes, sir.  That's what it says there.

12  Q.  Okay.  So, the point is, there is a problem.

13  A.  Yes, sir.

14  Q.  Unless the General is on board and, therefore, Guinea

15  Bissau was on board, this transaction is not going to happen.

16  A.  Yes, sir.

17  Q.  You knew that, right?

18  A.  But I was doing everything necessary to do it.

19  Q.  All right.  And Mr. Garavito knew that, too, right?

20             MR. GRAFF:  Objection, your Honor.

21             THE COURT:  Sustained.

22  Q.  Your understanding was that Mr. Garavito knew that; right?

23  A.  What did Mr. Garavito know?

24  Q.  That unless the General was on board, this transaction

25  could not be made to happen.

Fej0gar3                        Juardinero - cross

```
 1    read, just along with me, middle of that block on page 12.  Did
 2    you guys ever say:  When I told you that there was an
 3    opportunity to buy weapons, did you tell me, quote, tell the
 4    man we will put up the money right away.  You never said that
 5    to me.  You allowed things to go on.  The money from the deal
 6    would be used to pay for the weapons.  You didn't tell me --
 7    nobody told me, rather, sir.  This is the second time I speak
 8    to you.  And the first time we spoke, we never discussed the
 9    fact of me going to buy weapons.  I was going to do a different
10    negotiation.
11            Do you see that?
12    A.  Yes, sir.
13    Q.  And you continue to explain, if I can just finish the
14    thought:  The General agreed to provide the Letter of Intent
15    and --
16            THE INTERPRETER:  Counselor, counselor.
17            Go ahead.
18    Q.  And to take all of the necessary steps to buy the weapons.
19    And that he was going to give us half of it.  Why didn't you
20    tell me, tell them that the money is right here.  And that way,
21    we don't have to wait for the deal to happen.  What's the
22    problem?  And I will be honest with the four of you, if it were
23    done that way, we would then become second fiddle.
24            So what you're talking about here is that this could
25    have been done just as a straight drug transaction, right?
```

Fej0gar3                          Juardinero – cross

1   A.  Yes, sir.

2   Q.  And the fact is that the weapons portion of the

3   negotiations is hanging up the transaction.

4   A.  No, the instructions I got were to do a drug deal.  I did

5   not have to define what should be done or what shouldn't be

6   done in order for it to be carried out.  It was not my

7   decision.  I was following instructions from the DEA agents.

8   That's what had been proposed to me by them.  And that's what I

9   was doing.

10  Q.  Understood.  But you were also being told, by Mario and

11  Serifo, that the drug transaction was not gonna happen unless

12  the weapons transaction could be put into place.

13  A.  Quite the opposite.

14  Q.  Well, then, let's take a look at page 11.  You say that

15  what you were told -- and I'll begin reading: What matters to

16  them the most, right now, is the weapons.  Right now,

17  Mr. Romana doesn't give a damn whether or not we do the deal

18  with the merchandise.

19          And then by the bottom of the page you talk about the

20  details of the narcotics delivery planned for the first or

21  second week of December.

22  A.  Right, I just said that they didn't know that.  I had just

23  told them that.  They didn't know what the delays, why the

24  delays had been caused.  I explained that to them.  That's why

25  I'm talking about that.

F3KKGAR1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4           v.                              12 CR 839 (JSR)

5   RAFAEL GARAVITO-GARCIA,

6                   Defendant.

7   ------------------------------x

8                                       New York, N.Y.
                                        March 20, 2015
9                                       9:45 a.m.

10

    Before:
11
                        HON. JED S. RAKOFF,
12
                                        District Judge
13

14                          APPEARANCES

15

    PREET BHARARA,
16      United States Attorney for the
        Southern District of New York
17  SHANE STANSBURY
    ILAN GRAFF
18      Assistant United States Attorney

19  ROBERT RAY
        Attorney for Defendant
20

21  ALSO PRESENT:

22  MIRTA HESS, Spanish Interpreter
    CRISTINA WEISZ, Spanish Interpreter
23  JASON STAAB-PETERS, DEA Special Agent
    JOSEPH ROSENBERG, USAO Paralegal
24  CONNIE RAICOVICH, Portuguese Interpreter
    ALICIA CUGLIARI, Portuguese Interpreter

25

F3KKGAR3                      Mane - cross

1                (Jury not present)

2                THE COURT:  The witness may step down.

3                (Witness temporarily excused)

4                THE COURT:  Please be seated.

5           So my law clerk will hand to counsel one copy for each

6     side of the first draft of the charge.  Now, I'll give you a

7     more refined draft before lunch on Monday, but this may be

8     helpful to you over the weekend to get a general idea of where

9     I'm going.  And I'll flag one issue for the government.

10          It seemed to me that Count Three should be limited to

11    the antiaircraft missiles, because to the extent that you're

12    also seeking to include cocaine in that count, it seems to me

13    duplicative of Count One.  So in the charge I just gave you,

14    it's limited to the antiaircraft missiles on the grounds of

15    duplicativeness, not to be confused with duplicity, but that's

16    a very tentative ruling, so -- not even a ruling at this point,

17    just a sort of the seat of the pants approach.  You can argue

18    me out of it if you wish to.

19          Very good.  We'll see you on Monday.

20          MR. GRAFF:  Your Honor, just one small note:  I

21    noticed some jurors left their notes in their transcript

22    binders.  Since we're going to be replacing pages in the

23    transcript binders, I was wondering if you could prevail on

24    your deputy to remove the notes and put them in the jury room?

25    I don't want anybody from the government to accidentally see

677

F3o0gar1                        Trial

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  UNITED STATES OF AMERICA,

4          v.                          12 CR 839 (JSR)

5  RAFAEL GARAVITO-GARCIA,

6              Defendant.

7  ------------------------------x

8                                      New York, N.Y.
                                       March 24, 2015
9                                      9:30 A.M.

10

   Before:
11
                       HON. JED S. RAKOFF,
12
                                       District Judge
13

14                    APPEARANCES
   PREET BHARARA,
15      United States Attorney for the
        Southern District of New York
16 SHANE STANSBURY
   ILAN GRAFF
17      Assistant United States Attorney

18 ROBERT RAY
        Attorney for Defendant
19
   PRESENT:
20 MIRTA HESS, Spanish Interpreter
   WEISZ, Spanish Interpreter
21 ANNA MARIA RISO, Spanish Interpreter
   ELIZABETH CARUSO, Spanish Interpreter
22 JASON STAAB-PE DEA, Special Agent
   JOSEPH ROSENBERG, USAO Paralegal
23

24

25

                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

774
F3OKGAR4

1    but it follows from the argument --

2            THE COURT:  Yes.

3            MR. RAY:  -- for purposes of Rule 29.

4            THE COURT:  I agree.

5            MR. RAY:  I just wanted to preserve it now.

6            THE COURT:  Right, and I agree that you have a right

7    to preserve it and it is now preserved but the motion is

8    denied.

9            MR. RAY:  And, obviously, it goes without saying, and

10   I anticipate the Court's ruling but I obviously would make the

11   argument under Rule 29 that with regard to the four counts, the

12   evidence is insufficient.

13           THE COURT:  Yes.  And that motion is also denied.

14           MR. RAY:  Thank you, Judge.

15           THE COURT:  Now, I know you want to make a statement

16   for the record on entrapment.  Anything else before we get to

17   that?  Anything else we need to discuss?

18           MR. STANSBURY:  Not from the government, your Honor.

19           MR. RAY:  No, your Honor.

20           THE COURT:  Okay, so go ahead.

21           MR. RAY:  Your Honor, on entrapment, I just want to be

22   clear for the record that it is my opinion, informed by

23   experience, a review of the relevant case law, and my

24   discussions with counsel, that while for tactical reasons it's

25   appropriate to navigate as closely as one can to the edge of

F3OKGAR4

```
 1    invoking an entrapment instruction, given the state of the law,
 2    I do not believe it is in my client's interests to pursue and
 3    entrapment defense.
 4            I specifically cite the Second Circuit's decision from
 5    2013 in United States versus Cromitie, which is 727 F.3d 194
 6    (2d Cir. 2013).  It's a decision by Judge Newman, over a
 7    vigorous dissent by Judge Jacobs, and your Honor may be
 8    familiar with the case.  In some respects it has factual
 9    circumstances that are at least akin to what is charged in this
10    case.  But basically, the point of the decision is that
11    financial incentive alone is not sufficient to invoke a
12    successful entrapment defense.  And given the instruction which
13    I would not characterize as particularly defendant-friendly, my
14    own professional judgment is that it frankly does more harm
15    than good to have it.
16            So the art of this is to navigate as close as you can
17    to it without invoking it, which is what I have done.  And
18    that's a tactical decision which people are free to disagree
19    with or second-guess, but I think there should be a record of
20    the fact that that's in fact what was done.  It's tactical.
21            Now, there's one aspect to it that might not be so
22    tactical and I should disclose that.  I am aware of
23    circumstances that go beyond simply financial incentive
24    relative to the conduct of one of the informants in this case,
25    Juancho, which I believe bordered on threats, in sum and
```

F3OKGAR4

1    substance, to the effect that if Mr. Garavito stood in the way

2    of a transaction as Ricardo and Juancho had proposed it, that

3    there would be recourse and that he was not to stand in the way

4    and that that was essentially being communicated by the FARC.

5            Whether or not that's true or not, no one will ever

6    know, and the reason no one will ever know is because the

7    informant is deceased.  So, given those circumstances, and

8    whatever it is I think I may have with regard to that, I'm not

9    in a position, frankly, to have presented a defense, given the

10   absence of Juancho, to invoke something other than financial

11   incentive as a basis to assert an entrapment defense.  And so

12   for those reasons, it was not asserted.

13           THE COURT:  Thank you for placing that on the record.

14           I must say, without knowing, of course, all the

15   intricacies of all this, I'm wondering how an entrapment

16   defense could ever be made, given that you have to show an

17   absence of predisposition and given your client's history, all

18   of which would be then opened up by such a defense.  I would

19   think it would not only be extremely difficult to make out that

20   defense but also would have been very harmful to the defense,

21   in terms of the evidence that otherwise did not come in before

22   the jury that would have been then introduced to the jury

23   almost certainly as part of the government's need to show

24   predisposition.

25           Anyway, we have all that now on the record.

F3OKGAR4

1        MR. RAY:  I should just say, although I mentioned it

2   somewhat in the context of an entrapment defense, the issues

3   relative to Juancho, which, given his death, we would not have

4   been in a position to use, probably the only way that it would

5   have been successful, which would be somewhat outside of an

6   entrapment defense, which would be a defense of duress and

7   that's a different defense obviously but obviously that defense

8   also dies with Juancho, we don't have the ability to do that.

9        So, for all of those reasons, the tactical decision

10  was made not to pursue an entrapment defense, given, as your

11  Honor correctly states, what otherwise would have been the

12  evidence of predisposition and other evidence that would have

13  come in in order to rebut that defense, which would not have

14  been favorable to the defendant.

15       THE COURT:  Very good.

16       So I will let you guys go prepare your summations.  We

17  will start at 9:30 tomorrow.

18       I will take the very great liberty of mentioning

19  something that is qualifies as a personal peeve.  When the

20  government gives its summation, usually a bunch of other

21  Assistant United States Attorneys come to the court to watch

22  summations, and that, of course, is perfectly appropriate and,

23  indeed, given how relatively rare trials are these days, very

24  much to their benefit.  And then the assistants always leave at

25  the close of the government's summation and therefore never

F3OKGAR4

1    have the learning experience of seeing the summation from the

2    other side.

3            Mr. Ray is a very talented lawyer, and it's not as if

4    you have a schoolmarm hanging over you with a whip, you've got

5    to get back to class, we've already given you an hour and a

6    half now, now go back and do your homework.  So I would, most

7    respectfully, suggest that if the government's colleagues are

8    coming out, they might benefit from watching both sides, I

9    think, to the betterment of them as lawyers.

10            MR. STANSBURY:  We will give that instruction, your

11    Honor.

12            THE COURT:  Okay, very good.

13            See you tomorrow.

14            MR. RAY:  Thanks, Judge.

15            (Adjourned to March 25th, 2014 at 9:30 a.m.)

16                                * * *

17

18

19

20

21

22

23

24

25

A-195

CASE NAME: <u>United States v. Garavito</u>

EXHIBIT NUMBER: N-28 June25breakfastmeetinginSaoPaulo

DATE: JUNE 25, 2012

TIME: N/A

PARTICIPANTS: RICARDO
RAFAEL ANTONIO GARAVITO-GARCIA, a/k/a "El Viejo"
JUANCHO
WAITRESS

ABBREVIATIONS: [U/I] Unintelligible in English
[I/I] Unintelligible in Spanish
[PH] Phonetic spelling in English
*[English in Italics in the Original Language side]*

> GOVERNMENT
> EXHIBIT
> **100T-A**
> SS 12 Cr. 839 (JSR)

---

United States v. Garavito

1

A-196

| | NAME | ENGLISH TRANSLATION | ORIGINAL LANGUAGE |
|---|---|---|---|
| 1. | GARAVITO: | Not a damned thing. | Ni mierda. |
| 2. | RICARDO | The, the one who has to do with this is the guy who's there now…what's the jerk's name? Zapata? | El, el que tiene que ver es el que está ahora que es ese… ¿Cómo se llama el huevón? ¿Zapata? |
| 3. | GARAVITO: | [U/I] they just appointed Mario's uncle [U/I] his name is Cerifo [U/I] | [I/I] lo acaban de nombrar al tío de Mario [I/I] se llama Cerifo [I/I]. |
| 4. | RICARDO | What's his name? | ¿Se llama cómo? |
| 5. | GARAVITO: | He doesn't have… he doesn't play a role, the President doesn't play a role in any of this. Each person gives his orders and the one who handles all of the [U/I] the commander in chief officer for all of the armed forces… | Él no tiene… él no pinta nada, el presidente no pinta nada en eso. Cada quien manda y el que maneja todo el [I/I] del estado mayor de todas las fuerzas armadas… |
| 6. | RICARDO | Is he a general? | ¿Es un general? |
| 7. | GARAVITO: | …is named Antonio Indjai [PH] | …se llama Antonio Indjai [PH]. |
| 8. | RICARDO | Antonio? | ¿Antonio? |
| 9. | GARAVITO: | Antonio Indjai. | Antonio Indjai. |
| 10. | RICARDO | Indjai? | ¿Indjai? |

United States v. Garavito

A-197

| | NAME | ENGLISH TRANSLATION | ORIGINAL LANGUAGE |
|---|---|---|---|
| 1. | GARAVITO: | Yes. | Sí. |
| 2. | RICARDO | He's the one who… he's…? | ¿Ese es el que…ese…? |
| 3. | GARAVITO: | It's the same last name of the partner we're going to meet now. I don't know if it's the same family. The man is… is informed of everything that's been done there. The man is ready now, he wants to work and he's been waiting for a while because, because the man is a friend of the guy we spoke to [U/I] permanently and he's worked with El Gato, my partner. | Es el mismo apellido incluso del socio que vamos a ver ahora, no sé si es la misma familia. El hombre es… está enterado de todo lo que se ha hecho por allá. El hombre está ahora, está que se trabaja y está esperando hace rato porque, porque el señor es amigo con el que hablamos [I/I] permanentemente y ha trabajado con el Gato, el socio mio. |
| 4. | RICARDO | Let me, let me see if I can organize myself. Antonio Indjai is the General [U/I] | A, a ver si me organizo. ¿Antonio Indjai es el general [I/I]? |
| 5. | GARAVITO: | Commander in Chief of all the Armed Forces. | Jefe de toda la fuerza militar, del todo estado mayor. |
| 6. | RICARDO | That's something [U/I] I'm just finding that out now. Wasn't it someone named Manuel or Samuel? | Eso yo lo [I/I], ahora me entero. ¿No era un tal Manuel, Samuel? |
| 7. | GARAVITO: | No, no. | No, no. |

A-198

| | NAME | ENGLISH TRANSLATION | ORIGINAL LANGUAGE |
|---|---|---|---|
| 1. | RICARDO | Antonio, Antonio Indjai. | Antonio, Antonio Indjai. |
| 2. | GARAVITO: | Yes, sir. | Sí, señor. |
| 3. | RICARDO | Antonio Indjai is the Commander in Chief of the Armed Forces? | ¿Antonio Indjai es el jefe de la fuerza militar? |
| 4. | GARAVITO: | Before there was a man called Stanley Maguay and they killed him four, five years. | Antes había uno que se llamaba Stanley Maguay, y lo mataron hace rato, cuatro, cinco años. |
| 5. | RICARDO | Antonio Indjai is a friend of whom? | ¿Antonio Indjai es el amigo de quién? |
| 6. | GARAVITO: | A friend of ours. | Amigo de nosotros. |
| 7. | RICARDO | A friend of you people? | ¿Es amigo de ustedes? |
| 8. | GARAVITO: | Of course. He's… he's a close friend, very close of Mario who's been a working who's gotten close to, to El Gato when he took him to work there. [U/I] | Claro. Es… él es muy llave, muy llave con Mario que ha sido un trabajador que ha codeado con el, con el Gato, cuando se lo llevó a trabajar allá [I/I]. |
| 9. | RICARDO | El Gato is his friend? | ¿El Gato es su amigo? |
| 10. | GARAVITO: | El Gato happens to be… | El Gato de pronto los… |
| 11. | RICARDO | Is he also from our country? | ¿También es paisano de nosotros? |

United States v. Garavito

A-199

| | NAME | ENGLISH TRANSLATION | ORIGINAL LANGUAGE |
|---|---|---|---|
| 1. | GARAVITO: | Yes, yes, you may know him. You're going to see im whem, when you get there. Gato has spent his whole life… | Sí, sí de pronto lo conoces. Tú lo vas a ver allá cuando, cuando arrime para allá. Gato lleva toda la vida… |
| 2. | RICARDO | Huh? | ¿Ah? |
| 3. | GARAVITO: | …El Gato has worked his whole life, he brought in… many years ago El Gato worked with Pancho Herrera, con Evaristo, with all of those people. | .. toda la vida lleva, el Gato trabajó, traía, hace muchos años el Gato trabajó con Pancho Herrera, con Evaristo, con toda esa gente. |
| 4. | RICARDO | In what time period? | ¿En qué época? |
| 5. | GARAVITO: | He brought things in from Bolivia, from Peru. | Él traía de Bolivia, de Perú. |
| 6. | RICARDO | In what time period, more or less? I worked with that group too, did you know that? I did too, I [U/I] | ¿En qué época más o menos? Yo trabajé con ese combo, ¿usted sabia? Yo también, yo [I/I]. |
| 7. | GARAVITO: | The thing is the pilot…Pancho's pilot was the cousin of, Pancho's pilot was el Gato's cousin. El Gato was a blondish guy who [U/I] | Es que el piloto… el piloto de Pancho era primo de, el piloto de Pancho era primo del Gato, el Gato era un monito que [I/I]… |
| 8. | RICARDO | Wasn't that JJ? A guy who they call "El Tio". | ¿No será JJ? Uno que le decían el tío. |

A-200

| | NAME | ENGLISH TRANSLATION | ORIGINAL LANGUAGE |
|---|---|---|---|
| 1. | GARAVITO: | He's the… he's the key to the man who… | Ese es el… ese es la clave del hombre que… |
| 2. | RICARDO | He's the one who moves things there. | Ese es el que mueve las cosas allá. |
| 3. | GARAVITO: | Not the man who we came with before. He's a… | Ese hombre que venimos ahorita no. Él es un… |
| 4. | JUANCHO | A true countryman. | El paisano es bien natico. |
| 5. | GARAVITO: | Mario is a native of there. Mario is a native. | Mario es nativo de allá. Mario es un nativo. |
| 6. | RICARDO | Oh, Mario is from there. | Ah, Mario es de allá. |
| 7. | GARAVITO: | The President's nephew. | Sobrino del presidente. |
| 8. | RICARDO | Mario is the nephew of the President in power now? | ¿Mario es el sobrino del actual presidente? |
| 9. | GARAVITO: | And he's been associated with El Gato for a long time. They've worked together for many years. | Y ha estado asociado con el Gato mucho tiempo. Han trabajado muchos años. |
| 10. | RICARDO | Now I understand. I'm starting to understand. | Ya le entendí. Ahora ya le voy entendiendo. |
| 11. | GARAVITO: | You see? I also have other people who…he's the nephew of the President who just died, his name is Malan Bacai Sanha. He died in January. He was a | ¿Ya? Yo también tengo otra gente que… es sobrino del presidente que acaba de morir, se llamaba Malan Bacai Sanhá se murió ahora en |

A-201

| | NAME | ENGLISH TRANSLATION | ORIGINAL LANGUAGE |
|---|---|---|---|
| 1. | RICARDO | But it's a good front. | Pero esa es una buena pantalla. |
| 2. | GARAVITO: | Right, yes. | Sí, no. |
| 3. | RICARDO | Excellent. I would discuss it even if I lived there. | Buenísima. Yo se la discuto a pesar que vivo allá. |
| 4. | GARAVITO: | I have a fish processing plant on the border. Ziguinchor [PH] which is a small town which is on the other side of... right on the border between Guinea and Senegal. It's in Senegal. There's an Italian gentleman, I called for him to come because I had already sent him an email to go and get a boat so he could look, take the coordinates and see if, in which one of the, the islands we could put build it. But we have to make the traps. They're not made yet. We have to make them and put together a center for stocking the fish so that, so that they can be working there, so that we won't... | Tengo una planta procesadora de pescado en la frontera, Ziguinchor que es un pueblito que está al otro lado de... en la pura frontera de Guinea con Senegal, está sobre Senegal. Hay un señor italiano, ya lo mandé a llamar porque ya yo le había mandado un correo que fuera buscando un bote para ir a mirar, tomar las coordenadas y mirar que, en cuáles de las, de las islas se puede montar. Pero hay que hacer las caletas, no están hechas. Hay que hacerlas, y montar digamos un centro de acopio del pescado para como... para, para estar trabajando ahí, para no estar uno ahí... |
| 5. | RICARDO | A front, brother, which is fundamental. That's fundamental. | La pantalla hermano que es fundamental, eso es fundamental. |

United States v. Garavito

26

A-202

| | NAME | ENGLISH TRANSLATION | ORIGINAL LANGUAGE |
|---|---|---|---|
| 1. | GARAVITO: | That's… we have that there. The fishing business that we have has a trade name which, which has been there for fifty years. | Eso es, eso lo tenemos ahí. La empresa de pesca que tenemos tiene una razón social que, que la tiene hace cincuenta años. |
| 2. | RICARDO | Fine, so we're going to have an interview with that General. That General is the one who'll organize things for us, whether we want to see the airstrip or if we want to get deeply involved. I mean, one question, Rafa. | Listo, entonces con ese general es que nos vamos a entrevistar. Ese general es el que nos organiza, ya sea que nos vemos la pista o que nos dediquemos a fondo. O sea una pregunta Rafa… |
| 3. | GARAVITO: | He'll put us, he'll put us [U/I] The airstrip, for exampe in [U/I] from a military base that's close to a town called Catió Kofan [PH] The name of the area is Catió. We´re the ones who are going to say to the old man that [U/I] the highway. Over there, there's only one highway that gets you there. You know what we'll do? We'll put [U/I] on the highway and not one single bastard will be able to get into that fucking base. The airstrip, like I told you, is 2,000 meters long. You have to go and look at it [U/I] | Él nos pone, él nos pone [I/I]. La pista por ejemplo de [I/I], de un cuartel militar que está cerca de un pueblo que se llama Catió Kofan [PH] Catió se llama la zona. Nosotros somos los que le vamos a decir al viejo que [I/I] la carretera… allá no es sino una sola carretera que llega allá. ¿Sabes lo que hacemos? Ponemos [I/I] en la carretera y allá a ese hijo de puta cuartel no entra ni un hijo de puta. La pista como te digo, tienen dos mil metros [I/I]. Hay que ir a mirarla [I/I]. |
| 4. | RICARDO | [U/I] man. | [I/I] viejo. |

A-203

| | NAME | ENGLISH TRANSLATION | ORIGINAL LANGUAGE |
|---|---|---|---|
| 1. | GARAVITO: | What? | ¿Cómo? |
| 2. | RICARDO | Over there between [U/I] | Ahí entre [I/I]. |
| 3. | JUANCHO | [U/I] because he had to go to [U/I] | [I/I] porque tenía que ir a [I/I]. |
| 4. | RICARDO | All right [U/I] | Bueno [I/I]. |
| 5. | GARAVITO: | El Gato himself looked at it. He looked at it and beside paving it, uh, as far as I know it's 1800. | Esa la miró el Gato el mismo, la miró por [I/I] aparte de pavimentar, este, hasta donde yo sé tiene mil ochocientos. |
| 6. | JUANCHO | You have to go and look at all of it. [U/I] | Usted tiene que ir a mirar todo. [I/I]. |
| 7. | RICARDO | Oh, no, no, no. You know, man. No you know. | Ah, no, no, no. Usted sabe viejo. No, usted sabe. |
| 8. | GARAVITO: | No. | No. |
| 9. | RICARDO | No, it's not just that, man, you know what a pain in the ass it can be with the people down there. Those bastards from the FARC are such mother fuckers that you can't lose one single kilo [U/I] and those things, brother, they'll tear off our [U/I] | No, yo no solamente eso viejo, usted sabe que el dolor de huevos con esta gente allá. Esos hijos de puta de la FARC son unos... mal paridos que no se les puede perder un cosito [I/I] y esas cosas hermano, nos arrancan los [I/I]. |

United States v. Garavito

A-204

| | NAME | ENGLISH TRANSLATION | ORIGINAL LANGUAGE |
|---|---|---|---|
| 1. | GARAVITO: | Oh, I know what the responsibility is now. Now, for example… | No, yo sé la responsabilidad ahora. Ahorita, por ejemplo… |
| 2. | RICARDO | You know this better than anyone [U/I] | Usted más que nadie sabe eso [I/I]. |
| 3. | GARAVITO: | …I was telling the old man, "Let's talk to the General because he's…he's been waiting for us for a while now" because all the others who have been there before, have made good time [U/I] work. | … que yo le estaba diciendo al viejo, "vamos a hablar con ese General porque él está, hace tiempo que está esperando" porque todos los otros que han estado antes, le han ganado ya el tiempo [I/I] trabajo. |
| 4. | RICARDO | That's good, that's good for us to go and talk to the people and make… throw our, our, our cards on the table and say "Look, brother, things are like this, that and the other and you're the man who can [U/I]" | Eso es bueno, eso es bueno, uno ir  y hablar con la gente y hacerle… abrirle las, las, las cartas y diga, "Vea hermano, la cosa es así, así, así y a usted el hombre se le [I/I]"… |
| 5. | GARAVITO: | Now, I told him, I was going to make things very easy for him [U/I] Listen, we've been working there for several years and because of that I [U/I] guarantee that I can [U/I] on a big flight, I can give him such and such, if it's a small flight, I'll give you such and such". But you have to give me, give me the security… | Ahora yo lo que le dije a él yo le voy a hacer bien fácil [I/I] Vea  nosotros ya llevamos. varios años trabajando allá y yo así que… yo lo [I/I] garantizo que sí yo [I/I] un vuelo grande le voy a dar tanto, si es un vuelo chiquito, le voy a dar tanto". Pero me tienen que dar, dar la seguridad… |

United States v. Garavito

29

A-205

| | NAME | ENGLISH TRANSLATION | ORIGINAL LANGUAGE |
|---|---|---|---|
| 1. | RICARDO | Yes, after we sit down and talk to him, we'll know, after we sit down with him, we'll know what the old man is capable of doing [U/I] You know [U/I] the kind of people you're collecting from. | Sí, después que nos sentemos con él, uno sabe, después que uno se siente con él, uno sabe de qué es capaz el viejo [I/I]… Usted sabe [I/I] es con la gente lleva el cobro. |
| 2. | GARAVITO: | No, he's [U/I] he's the boss of that fucking place there [U/I] | No, él es, [I/I] él es el patrón de allá ese hijo de puta [I/I]. |
| 3. | RICARDO | Making money on everything, everything you're saying. If the man gives me guarantees of [U/I] motorcycles near my house [U/I] the license [U/I] Well, man, I'd actually say I wouldn't give him a fucking penny [U/I] man to have him from here. How do we have him? | El cobro de todo, de todo lo que usted mismo dice. Si el hombre me da a mí las garantías de [I/I] los motores por mi casa [I/I] la licencia [I/I]. Pues hombre, mas diría yo no le daría un hijo de puta centavo a [I/I] *man* que [I/I] para yo tenerlo de aquí. ¿Cómo lo tenemos? |
| 4. | JUANCHO | And after the [U/I] | Y después de lo que [I/I]. |
| 5. | GARAVITO: | The story is, the story is whether we have it…as one group we can count on it. We're not only going to be dealing with that guy. | El tema, el tema es si nosotros lo tenemos… como uno solo se cuenta con eso. No solo se cuenta con ese tipo. |
| 6. | RICARDO | Oh, but if it's [U/I] because I have a whole series of questions. | Ah, pero si es [I/I] porque no [I/I] tengo una cantidad de preguntas. |

United States v. Garavito

30

| | NAME | ENGLISH TRANSLATION | ORIGINAL LANGUAGE |
|---|---|---|---|
| 1. | GARAVITO: | We can finish the matter up here in a moment. In part he's in charge of all of the military forces there, right? I've got the [U/I]. I haven't, I haven't done deals with him. There's a new boss for a while now. So what's the story? I've got the General who's the Chief of Police. The chief of operations for the pólice. I mean the Chief General of the air forces inside there. So what's the story? The head of the air force has the heat on him right now. They have him on the Clinton list. | Terminemos el tema aquí en un momentico. Parte de él que es lo que manda en todas las fuerzas militares de allá, ¿sí? Yo tengo la [I/I]. Yo no, yo no he hecho vueltas con él. Es el nuevo jefe desde hace un tiempo. ¿Qué pasa? Yo tengo al general, jefe de la policía. El jefe operativo de la policía digo el general jefe de las fuerzas aéreas allá dentro... ¿Qué pasa? El jefe de la fuerza aérea de pronto está caliente y ya lo tienen en la lista Clinton. |
| 2. | RICARDO | Oh, no. Not even a bit, a bit, not if I were half dead. | Ah, no, ni medio, ni medio, ni medio muerto. |
| 3. | GARAVITO: | Understand? So what I... [U/I] I'm not going to leave him out [U/I] you start envying what can happen to someone else. There was a bastard there, uh, the Navy Admiral... | ¿Si me entiendes? Entonces yo lo que... [I/I] no la voy a dejar por fuera [I/I] envidias también algo que le puede pasar a uno. Allá había un hijo de puta, eh, almirante de la marina... |
| 4. | RICARDO | [U/I] what happens, he's the one who knows how to do it because he already did it. | [I/I] que pase, es que si él es que sabe cómo se hace, porque ya la hizo. |
| 5. | GARAVITO: | No, no, but the jurisdiction of the... for example... the | No, no, pero la jurisdicción de la... por |

United States v. Garavito

31

|  | __NAME__ | __ENGLISH TRANSLATION__ | __ORIGINAL LANGUAGE__ |
|---|---|---|---|
|  |  | autonomy of, of handling the authority over the airstrip isn't:... he doesn't even have it. Old man Antonio has it. He's the boss of everything. He's the big boss there. | ejemplo, la autonomía del, del manejo de la autoridad sobre la pista no es...ni siquiera la tiene él, la tiene el viejo Antonio. Es el jefe de todo. Es el patrón allá. |
| 1. | RICARDO | Oh, good [U/I]. Listen, brother, I'll be honest with you. When we go there, we're need to work on that end because over here... I have a few people up here... waiting for us up there because a couple of things got damaged. So we can go up to the United States. I know, I know that if we are able to get into the place there... what, what do they make in those countries? | Ah, bueno [I/I]. Mire hermano, le voy a hacer honesto. Cuando nosotros vamos para allá, nosotros necesitamos es trabajar por ese lado porque por acá... Yo tengo un poco de gente aquí arriba... esperándonos arriba porque se nos dañó un par de cosas. Para irnos para arriba para los Estados Unidos. Yo sé, yo sé que si logramos meternos por ahí [I/I] ahí, ¿qué, qué sacan de esos países? |
| 2. | GARAVITO: | The only thing they export from there is fish and [U/I] cashews. The rest is all shit. | Ahí lo único que le exportan es pescado y, [I/I] marañón. El resto no hay ni mierda. |
| 3. | RICARDO | But do they send out containers? | ¿Pero eso sacan en contenedores? |
| 4. | GARAVITO: | No, over there it's not... yes, of course they come in. They come from India and they send their junk. | No, ahí no es... sí, claro ahí vienen, vienen de la India y se llevan todas las chécheres. |

United States v. Garavito

A-208

| | NAME | ENGLISH TRANSLATION | ORIGINAL LANGUAGE |
|---|---|---|---|
| 1. | RICARDO | Oh, but it all goes to that area. | Ah, pero todo van para el área. |
| 2. | GARAVITO: | And the, and the, and the… | Y el, y el, y el… |
| 3. | RICARDO | …and Central America. | …y Centro América. |
| 4. | GARAVITO: | No, for example…I have the fishing Company there and I don't have to talk to the, to the… | No por ejemplo… ahí tengo, tengo la empresa pesquera y yo no tengo que ir a hablar con el, con el… |
| 5. | JUANCHO | [U/I] if he wants to put in a million dollars worth of [U/I] | [I/I] quiere meterle un millón de dólares [I/I]. |
| 6. | RICARDO | With a million dollars we wouldn't even scratch the surface with the old man. He's got an infrastructure that's very well handled by [U/I] | Un millón de dólares no le hacemos ni cosquilla al viejo, él ya tiene una infraestructura bien manejada por [I/I]. |
| 7. | GARAVITO: | A plant [U/I] | A planta [I/I]. |
| 8. | RICARDO | Take the fish out of there and send it out there? Well, and going over there, they'll open the doors for us. That's the problem with the people I… Andres, this guy I have, my partner up there, told me "No, I'm not receiving a container from you ever again from Central or South American but if you send me something from | Sacar pescado de ahí y mandar para allá para arriba y pues… y yendo de allá, nos abren la puerta. Ese es el problema que la gente que yo… Andrés, el muchacho este que tengo, el socio de arriba, me dijo, "No, yo no le vuelvo a recibir a usted un contenedor que venga |

United States v. Garavito

33

A-209

| | NAME | ENGLISH TRANSLATION | ORIGINAL LANGUAGE |
|---|---|---|---|
| | | another part of the world and it won't be… be looked at." So what we can do is move from here into Africa and then bing, bam. How much are the [U/I] in, in Africa? What they have there. 16, 18? | de Centro América ni de Sur América pero usted me manda de cualquier parte del mundo y eso ellos ni… lo miran. Entonces lo que podemos hacer es que tiramos de aquí a África y de ahí chap, chap [PH]. ¿A cómo salen las [I/I] en, en África? Esa que hay por allá, diez y seis, diez y ocho. |
| 1. | GARAVITO: | Yes, a dollar and there's 18,000. | Sí, un dólar y hay dieciocho mil. |
| 2. | RICARDO | Imagine that. Everything that we would make today, from now to [U/I] and from there we can leave for [U/I] | Imagínese, todo lo que haríamos el día de hoy, de aquí hasta [I/I], de ahí salimos para [I/I]. |
| 3. | GARAVITO: | What, what I said to the old man was "I don't know. I have sources over there with the Nigerians". Some people that I'm waiting for you to give them a work agenda. Why? When the percentage comes in that we've discussed with the old man [U/I] for work, the work comes in and I don't… I can pay them. [U/I] The guys can give them, let's say a couple of "kids", and Mario, for example and some guys we can give merchandise to because you guys have to handle it and solve it. Right now the General doesn't | Yo, yo lo que le había dicho al viejo, "No sé. Yo tengo fuentes allá unos nigerianos". Una gente [I/I] que lo estoy esperando a usted, darles una agenda de trabajo. ¿Por qué? Cuando llega el porcentaje que hemos hablado con el viejo [I/I] de trabajo, el trabajo llega y yo no, yo les puedo pagar. [I/I] los muchachos les puedo dar, un par de los muchachos, ahí Mario por ejemplo, y a otros les damos mercancía porque a ustedes… toca manejar y resolverlo. Ya el general |

United States v. Garavito

34

A-210

| | **NAME** | **ENGLISH TRANSLATION** | **ORIGINAL LANGUAGE** |
|---|---|---|---|
| | | have an idea about this. The General comes in, he works and you have to give him his money. So I have… a Nigerian, I let them know in advance, and they have the money ready for me. I return [U/I] to them. Merchandise for money that's ready. | no tiene la idea a eso… el general llegó, él trabaja y hay que darle su plata. Entonces yo tengo… un nigeriano que yo les aviso con tiempo y me tienen la plata lista, les devuelvo [I/I] mercancía con la plata lista. |
| 1. | RICARDO | Listen, man, if these people work for me, the way you're saying they will, we're going to have merchandise left over. | Mire viejo, si esta gente me funciona como usted me está diciendo lo que nos va sobrar es mercancía. |
| 2. | GARAVITO: | The basic thing is security and that's what I'm going to demand as a guarantee from the old man. | Seguridad eso, básico y a eso es que voy a, a exigirle al viejo una garantía. |
| 3. | JUANCHO | A minimum of 50 thousand a year. | Mínimo cincuenta mil al año. |
| 4. | GARAVITO: | Good. | Bueno. |
| 5. | RICARDO | And, and, and who knows, yes, I mean… listen to what I'm telling you. If the stuff is good, and it gets through [U/I], if he wants we can do a flight for him every other day. | Y, y, y de pronto, sí, o sea… Mire lo que le digo, si la cosa es buena, que nos pasa, [I/I]. Si él quiere le metemos un vuelo cada dos días. |
| 6. | GARAVITO: | Listen to me. What's the situation? That airstrip is…I'll show it to you later, on the map. It's not that far | Ponme cuidado, ¿qué pasa? Esa pista está… yo te muestro luego en el mapa. No está tan lejos |

United States v. Garavito

35