# 15-2454-cr

## United States Court of Appeals

*for the*

### Second Circuit

UNITED STATES OF AMERICA,

*Appellee,*

— v. —

GUSTAVO PEREZ-GARCIA, AKA Sealed Defendant 2, AKA Gato, MANUEL
MAMADI MANE, AKA Mario, AKA Quecuto, SALIU SISSE, AKA Serifo,
ANTONIO INDJAI, AKA Antonio Injai,

*Defendants,*

RAFAEL ANTONIO GARAVITO-GARCIA, AKA Sealed Defendant 1,
AKA El Viejo,

*Defendant-Appellant.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF AND SPECIAL APPENDIX
## FOR DEFENDANT-APPELLANT

Fox Rothschild LLP
*Attorneys for Defendant-Appellant*
100 Park Avenue, 15th Floor
New York, New York 10017
(212) 878-7900

# **TABLE OF CONTENTS**

**Page**

JURISDICTIONAL STATEMENT ........................................................................ 1

STATEMENT OF THE ISSUES PRESENTED ...................................................... 1

STATEMENT OF THE CASE .............................................................................. 2

SUMMARY OF THE ARGUMENT ...................................................................... 2

STATEMENT OF FACTS .................................................................................... 3

    A.    Indictment .................................................................................. 3

    B.    Guilty Pleas of Co-Defendants ................................................... 4

    C.    Arrest and Extradition ............................................................... 5

    D.    The Trial .................................................................................. 7

        i    The DEA Sting Operation ................................................... 9

        ii    Trial and Jury Charge ....................................................... 17

        iii    Jury Deliberations ........................................................... 19

    E.    Sentencing ............................................................................. 21

    F.    Appeal ................................................................................... 22

ARGUMENT ..................................................................................................... 22

POINT I    The District Court Improperly Denied Appellant's Motion to Dismiss
the Indictment for Lack of Jurisdiction Resulting from Colombia's
Violation of the Extradition Treaty with the United States ............... 22

    A.    Standard of Review ................................................................. 22

    B.    The District Court Failed Properly to Apply the Extradition Treaty
with Colombia, the Violation of which Divested the United States
of Jurisdiction to Prosecute the Appellant ................................. 23

i

POINT II    Evidence at Trial was Insufficient to Prove That Appellant
            Knowingly Participated in Any of the Charged Conspiracies ........... 26

    A.      Standard of Review .......................................................... 27

    B.      The Trial Evidence was Insufficient to Prove Beyond a
            Reasonable Doubt the Requisite Knowing Participation Element
            of the Charged Conspiracies ............................................... 28

POINT III   The District Court's Supplemental
            "Mere Presence" Instruction Was Improper ...................................... 31

    A.      Standard of Review .......................................................... 31

    B.      The district court's instruction allowed the jury to convict
            Appellant based on insufficient evidence ........................................... 33

POINT IV    Count Three, as Charged to the Jury, Was Multiplicitous of
            Count One Resulting in Duplicative Punishment ............................. 35

    A.      Standard of Review .......................................................... 36

    B.      Appellant was Convicted on Count One and Count Three Based
            on the Same Offense.......................................................... 36

CONCLUSION              39

ACTIVE 32710165v1 12/10/2015

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Arroyo v. Jones,*
  685 F.2d 35 (2d Cir. 1982) ...............................................................38

*Ball v. United States,*
  470 U.S. 856 (1985)...........................................................................41

*Blockburger v. United States,*
  284 U.S. 299 (1932)...........................................................................39

*Bollenback v. United States,*
  326 U.S. 607 (1946) ..........................................................................35

*Hudson v. New York City,*
  271 F.3d 62 (2d Cir. 2001) ...............................................................35

*in United States v. Walker,*
  191 F.3d 326 (2d Cir. 1999) .............................................................30

*Jackson v. Virginia,*
  443 U.S. 307 (1975)...........................................................................30

*Kahn Lucas Lancaster, Inc. v. Lark Int'l, Ltd.,*
  186 F.3d 210 (2d Cir. 1999) .............................................................25

*Lopez v. United States,*
  373 U.S. 427 (1963)...........................................................................32

*Nat'l R.R. Passenger Corp. v. One 25, 900 Square Foot More or Less
  Parcel of Land,*
  766 F.2d 685 (2d Cir. 1985) .............................................................35

*Tart v. McGann,*
  697 F.2d 75 (2d Cir. 1982) ...............................................................36

*United States v. Alvarez-Macain,*
  504 U.S. 655 (1992) (reaffirming *United States v. Rauscher,* 19
  U.S. 407 (1886)) ................................................................................27

*United States v. Cangiano*,
  491 F.2d 906 (2d Cir. 1974) .............................................................30

*United States v. Chacko*,
  169 F.3d 140 (2d Cir. 1999) .............................................................39

*United States v. Coppola*,
  671 F.3d 220 (2d Cir. 2012) .............................................................35

*United States v. Cromitie*,
  727 F.3d 194 (2d Cir. 2013) .............................................................32

*United States v. D'Amato*,
  39 F.3d 1249 (2d Cir. 1994) .............................................................30

*United States v. Dixon*,
  509 U.S. 688 (1993)...........................................................................39

*United States v. Gaviria*,
  740 F.2d 174 (2d Cir. 1984) .............................................................34

*United States v. Hastings*,
  918 F.2d 369 (2d Cir. 1990) .............................................................38

*United States v. Hastings*,
  981 F.2d 369 (2d Cir. 1990) .............................................................36

*United States v. Holmes*,
  44 F.3d 1150 (2d Cir. 1995) .............................................................39

*United States v. Josephberg*,
  459 F.3d 350 (2d Cir. 2006) .............................................................40

*United States v. Kopstein*,
  759 F.3d 168 (2d Cir. 2014) .......................................................35, 36

*United States v. Kopstein*,
  76 F.3d 168 (2d Cir. 2014) ...............................................................38

*United States v. Leftkowiz*,
  284 F.2d 310 (2d Cir. 1960) .............................................................36

iv

*United States v. Mulheren*,
    938 F.2d 364 (2d Cir. 1991) .............................................................30

*United States v. Perrone*,
    936 F.2d 1403 (2d Cir. 1991), *clarified on other grounds*, 949 F.2d
    36 (2d Cir. 1991).............................................................................30

*United States v. Rommy*,
    506 F.3d 108 (2d Cir. 2007) .............................................................29

*United States v. Samaria*,
    239 F.3d 228 (2d Cir. 2001) .............................................................34

*United States v. Schreiber*,
    191 F.3d 103 (2d Cir. 1999) .............................................................25

*United States v. Soto*,
    716 F.2d 989 (2d Cir. 1983) .............................................................34

*United States v. Umeh*,
    762 F.Supp.2d 658 (S.D.N.Y. 2011), *aff'd*, 527 Fed. Appx. 57 (2d
    Cir. 2013) ....................................................................................28

*United States v. Wallace*,
    85 F.3d 1063 (2d Cir. 1996) .............................................................32

*United States v. White*,
    552 F.3d 240 (2d Cir. 2009) .............................................................35

**Statutes**

18 U.S.C. §§ 2332g(a)(1), (b), (c), and 3238....................................5, 7

18 U.S.C. §§ 2339(a)(1), (d)(1) .............................................................7

18 U.S.C. §§ 2339(a)(1), (d)(1), and 3238 .............................................5

18 U.S.C. § 3231 ..................................................................................4

21 U.S.C. § 960(a) ............................................................................5, 6

21 U.S.C. § 963..................................................................................5, 6

28 U.S.C. § 1291..................................................................................4

**Other Authorities**

Fifth Amendment ...................................................................................................39

*available at*
    http://www.newyorker.com/magazine/2015/12/14/trafficking-in-
    terror ...................................................................................................................12

Confidential Source, "Juancho," .............................................................................12

Confidential Sources, "Juancho" .............................................................................13

Jed S. Rakoff, *J.* .......................................................................................................4

THE NEW YORKER, Dec. 14, 2015, 60-69 .................................................................12

Prove That Appellant Knowingly Participated in Any of the Charged
    Conspiracies ........................................................................................................29

U.S. Const. art. VI, cl. 2 ....................................................................................26, 27

U.S. Constitution ......................................................................................................29

United States Constitution ........................................................................................26

ACTIVE 32710165v1 12/10/2015

## **JURISDICTIONAL STATEMENT**

Defendant-Appellant Rafael Garavito-Garcia ("Garavito-Garcia" or "Appellant") appeals from a final judgment of conviction, entered on July 22, 2015, following a jury trial on Indictment (S5) 12 Cr. 839, before the United States District Court for the Southern District of New York (Jed S. Rakoff, *J*.).  A timely notice of appeal was entered on August 4, 2015.

Jurisdiction in the district court was conferred by 18 U.S.C. § 3231. Appellate jurisdiction in this Court is invoked pursuant to 28 U.S.C. § 1291.

## **STATEMENT OF THE ISSUES PRESENTED**

1.      Whether Colombia's violation of the extradition treaty with the United States divested the district court of jurisdiction over Appellant.

2.      Whether the evidence presented at trial was sufficient to support the jury's determination of knowing participation in the conspiracies charged in the Superseding Indictment.

3.      Whether the district court's supplemental instruction, in response to a jury note during deliberations, was improper.

4.      Whether the district court erred in instructed the jury on the scope of the "material support" element on Count Three resulting in duplicative punishment for the same conduct charged multiplicitously as narco-terrorism in Count One.

## STATEMENT OF THE CASE

Appellant was convicted in the United States District Court for the Southern District of New York before the Honorable Jed S. Rakoff and a jury, following an eight-day trial on Indictment (S5) 12 Cr. 839 (JSR), of conspiracy to commit a narco-terrorism offense (21 U.S.C. § 960(a)) ("Count One"); conspiracy to import cocaine from the West African country of Guinea-Bissau into the United States (21 U.S.C. § 963) ("Count Two"); conspiracy to provide material support to a Colombian foreign terrorist organization known as the "FARC" (18 U.S.C. §§ 2339(a)(1), (d)(1), and 3238) ("Count Three"); and conspiracy to acquire and transfer anti-aircraft missiles (18 U.S.C. §§ 2332g(a)(1), (b), (c), and 3238) ("Count Four").  He was sentenced to three hundred (300) months, or twenty-five (25) years, in prison followed by a five-year term of supervised release.  Garavito-Garcia currently is serving his sentence.

## SUMMARY OF THE ARGUMENT

Appellant challenges his conviction and sentence on four separate grounds. First, Appellant challenges the district court's jurisdiction over him as the result of Colombia's violation of the extradition treaty.  Second, Appellant argues that the evidence at trial was insufficient to prove beyond a reasonable doubt that Appellant knowingly participated in the conspiracies charged in the Superseding

2

Indictment with the intent to commit a narco-terrorism offense, import cocaine into the United States, provide material support to a foreign terrorist organization and acquire and transfer anti-aircraft missiles. Third, Appellant argues that the district court's supplemental jury instruction, in response to a jury note requesting clarification on "mere presence" and the knowing participation element of conspiracy charges was defective. Fourth, Appellant contends that the district court's jury instruction related to Counts One and Three resulted in Appellant's conviction on multiplicitous charges.

## STATEMENT OF FACTS

### A.    Indictment

On January 8, 2013, a grand jury returned a four-count Indictment (S5) 12 Cr. 839 (JSR) (the "Indictment"), filed in the United States District Court for the Southern District of New York, charging Garavito-Garcia with one count of conspiracy to commit a narco-terrorism offense, in violation of 21 U.S.C. § 960(a); one count of conspiracy to import cocaine into the United States, in violation of 21 U.S.C. § 963; one count of conspiracy to provide material support to a foreign terrorist organization, in violation of 18 U.S.C. §§ 2339(a)(1), (d)(1); and 3238;

3

and one count of conspiracy to acquire and transfer anti-aircraft missiles, in violation of 18 U.S.C. §§ 2332g(a)(1), (b), (c), and 3238.  (A. 18).[1]

### B.    Guilty Pleas of Co-Defendants

On October 31, 2013, Guinea-Bissau citizen Saliu Sisse pleaded guilty to conspiracy to commit a narco-terrorism offense, conspiracy to import cocaine into the United States, conspiracy to provide material support or resources to terrorists, and conspiracy to acquire and transfer anti-aircraft missiles.  ((S7) 12 Cr. 839-04 (JSR)).  On May 22, 2015, Sisse was sentenced to 32 months in prison on each count to run concurrently and five years of supervised release.

On April 18, 2014, Colombian citizen Gustavo Perez-Garcia pleaded guilty only to conspiracy to commit a narco-terrorism offense and conspiracy to provide material support or resources to terrorists.  (Counts One and Three of (S7) 12 Cr. 839-12 (JSR)).  On May 22, 2015, Perez-Garcia was sentenced to 36 months in prison on each count to run concurrently and five years of supervised release.

On April 18, 2014, Guinea-Bissau citizen Manuel Mamadi Mane pleaded guilty to conspiracy to commit a narco-terrorism offense, conspiracy to import cocaine into the United States, conspiracy to provide material support or resources

---

[1] Hereinafter, "A." refers to exhibits in the Appendix; "SPA" refers to the Special Appendix; "PSR" refers to the U.S. Probation Office's Presentence Report filed separately under seal; "Tr." refers to the transcript at trial; and "GX" refers to Government Exhibits introduced at trial.

4

to terrorists, and conspiracy to acquire and transfer anti-aircraft missiles. ((S7) 12 Cr. 839-03 (JSR)). On May 22, 2015, Mamadi Mane was sentenced to 32 months in prison on each count to run concurrently and five years of supervised release.

Guinea-Bissau citizen and military General Antonio Indjai was charged with conspiracy to commit a narco-terrorism offense, conspiracy to import cocaine into the United States, conspiracy to provide material support or resources to terrorists, and conspiracy to acquire and transfer anti-aircraft missiles. General Indjai has yet to be rendered here to the Southern District of New York and currently is located beyond the reach of law enforcement and the extradition authority of the United States. He has been the subject of a United Nations' travel ban since May 2012.

### C.    Arrest and Extradition

On April 5, 2013, Garavito-Garcia was arrested and detained by Colombian authorities, pursuant to a provisional arrest warrant issued on the then-sealed Superseding Indictment returned in the United States District Court for the Southern District of New York. The United States thereupon requested Garavito-Garcia's formal extradition through a May 31, 2013 diplomatic note. Garavito-Garcia opposed the extradition request through counsel in Colombia, arguing, among other things, that he should not be extradited due to his poor health.

On December 26, 2013, Colombian authorities issued an extradition order for the transfer of Garavito-Garcia from Colombia to the United States for

5

prosecution in this case.  (A. 39).  Five days later, on December 31, 2013, Garavito-Garcia suffered a stroke while in prison in Bogota, Colombia.  (A. 39).

On February 14, 2014, the Colombian government formally made Garavito-Garcia "available" to the United States for extradition.  (A. 140).  Less than two weeks later, the National Institute of Legal Medicine and Forensic Science in Colombia provided a medical report stating that Garavito-Garcia had to transported in a "medical aircraft" to ensure his safety while being transported to the United States.  (A. 139)

On February 26, 2014, Garavito-Garcia's "availability" for extradition was "suspended," pending the United States Government satisfying the conditions of transfer designed to safeguard Garavito-Garcia's health.  (A. 40).  Garavito-Garcia challenged his continued detention in Colombia, arguing that he should either have been extradited within the time prescribed by law or released, under Article 511 of the Colombia Criminal Code, requiring that the subject of an extradition request be transferred to the requesting state within thirty days of when "the person was made available to the requesting state."  (A. 41, 140).

Before the thirty-day time limit had expired, the Attorney General of Colombia directed that the time limit imposed by Article 511 had been suspended as a result of the medical report.  (A. 140).  Garavito-Garcia further argued that

ACTIVE 32710165v1 12/10/2015

Article 511 admits of no exceptions, "neither explicitly nor implicitly," thereby mandating his release. (A. 141).

On June 26, 2014, the National Institute of Legal Medicine and Forensic Science in Colombia produced a second medical report stating that "[t]he risk of complications [would be] reasonably low" if Garavito-Garcia traveled by medical airplane with trained personnel. (A. 141). As a result of this report, Garavito-Garcia was once again made available to the United States. (A. 141). On July 22, 2014, Garavito-Garcia was transported to the Southern District of New York, had his initial appearance before a magistrate judge and was detained pending trial. (A. 141).

### D.     The Trial

In its case against Garavito-Garcia, the Government contended that between June 2012 and January 2013, Appellant participated in four separately charged conspiracies with his co-defendants, Saliu Sisse, Gustavo Perez-Garcia, Manuel Mamadi Mane and General Antonio Indjai, along with two Drug Enforcement Administration (DEA) confidential sources posing as FARC associates (collectively the "Confidential Sources"), to facilitate and coordinate the international movement of cocaine, purportedly owned by the Fuerzas Armadas

Revolucionarias de Colombia (the "FARC"),[2] from Colombia to intermediaries in Guinea-Bissau and then to customers elsewhere in Africa, Europe, the United States and Canada. Garavito-Garcia, the other co-defendants and the Confidential Sources also agreed to obtain weapons with the assistance of Guinea-Bissau's military leadership, General Indjai, and General Indjai's son to be provided to the FARC. During the course of the conspiracy, Garavito-Garcia, along with the other co-defendants, met with Guinea-Bissau military officials to discuss the proposed drug and weapons scheme. (Tr. 139, 218).

This was not a case where the accused narco-terrorist was caught in the act. Indeed, the entirety of the purported narco-terrorist scheme was a contrivance of the DEA, implemented through its paid confidential informants, who enlisted Garavito-Garcia with no intention of bringing the plan to fruition. Furthermore, as with other alleged narco-terrorism cases arising out of series of DEA sting operations, "the only links between drug trafficking and terrorism entered into evidence were provided by the D.E.A., using agents or informants who were paid … to lure the targets into staged narco-terrorism conspiracies."[3] The "substance"

---

[2] It was stipulated at trial that the FARC has been and continues to be designated as a foreign terrorist organization by the United States Secretary of State. (Tr. 133-34; GX 1001).

[3] Ginger Thompson, *Trafficking in Terror (Are Drug Traffickers Terrorists?): How closely entwined are the drug trade and global terrorism (D.E.A. stings in West*

8

of the Government's allegations was borne on rhetoric gratuitously interposed and interspersed by the DEA informants into each recorded conversation offered into evidence against Garavito-Garcia at trial. Garavito-Garcia was an unwitting dupe—but an alleged "player" nonetheless—in the DEA's staged narco-terrorist ruse, with Confidential Sources feeding him lines eventually to be used against him at trial.

Trial commenced on Monday, March 16, 2015. The Government's evidence at trial consisted mainly of testimony from cooperating co-defendants, one of the two Confidential Sources,[4] and transcripts of recorded communications between the Confidential Sources and Garavito-Garcia which allegedly demonstrated Appellant's circumstantial assent to the planned conspiracies proposed by the Confidential Sources.

### i    The DEA Sting Operation

As its first witness, the Government called DEA Special Agent Stephen Casey, who as part of the DEA's international Special Operations Division was one of the case agents assigned to this investigation. (Tr. 43, 46). Agent Casey testified that "[t]he focus of this particular investigation was to identify

---

*Africa)?*, THE NEW YORKER, Dec. 14, 2015, 60-69, at p. 62, *also available at* http://www.newyorker.com/magazine/2015/12/14/trafficking-in-terror.

[4] The other Confidential Source, "Juancho," apparently was killed prior to trial in an unrelated homicide. (Tr. 64).

9

organizations and individuals from Colombia that had knowledge of trafficking routes into West Africa, specifically Guinea-Bissau." (Tr. 46). Once the DEA identified and targeted individuals there, including Garavito-Garcia, the sting operation commenced. The DEA enlisted two paid Confidential Sources, "Juancho" LNU ("Last Name Unknown") and Ricardo Jardinero. The DEA supplied the Confidential Sources with identities and cover stories: Juancho was given the role of a "high-level member of the FARC … [with] the ability to get large amounts of cocaine and, with assistance, distribute it" (Tr. 64-65); and Ricardo posed as "an associate member of the FARC who was in charge of logistics." (Tr. 66). Agent Casey indicated that the DEA had the Confidential Sources pretend to be members of "the FARC because the FARC is involved in narcotics trafficking and the procurement of weapons." (Tr. 65). The Confidential Sources were instructed to "go to Guinea-Bissau, identify the individuals, the ranking military officials and political figures that assisted them in facilitating the trafficking" of narcotics from Colombia. (Tr. 67). According to Agent Casey, the DEA typically supplied these sources with concealed recording devices and "debrief[ed] them prior to going into these operations, … explain[ing] to them certain aspects and directions that they should take during these meetings." (Tr. 58).

10

Agent Casey testified that throughout this operation, the DEA was in contact with the Confidential Sources at least once a day (Tr. 57-58), and would explicitly instruct the sources on the specific topics that they should raise during their meetings with the targeted individuals.  (Tr.  94).  Significantly, here, Agent Casey testified that the DEA instructed the Confidential Sources deliberately to reference the United States in these meetings, "so that we would have a nexus to the United States to charge these individuals" by alluding to diversion of cocaine to the United States.  (Tr. 72).   The DEA further instructed the Confidential Sources to initiate discussions regarding weapons systems, which included specific instructions to mention certain types of weapons as well as surface-to-air missiles.  (Tr. 94-96).

The bulk of the Government's case at trial focused on the testimony and recorded communications of Confidential Source Ricardo Jardinero,[5] an admitted former drug and weapons trafficker in Colombia whose testimony spanned the first four days of the trial.  Ricardo testified that he and fellow Confidential Source Juancho first met with Appellant on June 25, 2012 in Brazil.  (Tr. 135-37; GX 100T-A).   Ricardo testified that before this meeting, he had been instructed that it was critical to address the issue of importation into the United States.  (Tr. 345-46).  Thus, during this meeting, Ricardo first attempted to involve Appellant in his

---

[5] Ricardo Jardinero testified under an assumed name pursuant to a protective order, at the request of the Government.  (Tr. 53-54).

11

hidden design at the behest of the DEA that a portion of the load of narcotics would be transported to the United States. (GX 100T-A at 32). As Ricardo testified, Appellant, on the other hand, never said anything about the United States throughout this first conversation. (Tr. 347). And, as it became apparent throughout the remainder of these conversations, Appellant never directly indicated his assent or acquiescence to this portion of the agreement.

On the morning of June 30, 2012, five days after their initial meeting with Appellant, the Confidential Sources arrived in Guinea-Bissau, and Appellant introduced them to Mario and Serifo. (Tr. 161; GX 100T-C). The FARC, according to Ricardo, produced "the majority of cocaine in our country [Colombia]," "and [Ricardo and Juancho] are the ones who sell it." (A. 148; 226). Ricardo explained that "part of the arrangement we have with the FARC is to get them weapons. And in order to be able to do that, we could do it through the Guinea-Bissau government." (A. 150-51). According to Ricardo, Appellant previously had told the Confidential Sources, in an unrecorded conversation, that "he had some Nigerian customers that could buy large amount of drugs [in Guinea-Bissau]." (A. 152).

At the DEA's direction, Juancho supposedly took charge and defined each person's role in their proposed scheme: Ricardo would be "Juancho's representative … the person who would handle his things in Guinea Bissau … [and

12

Appellant would] take charge of things with Mario and Serifo in Guinea Bissau."
(A. 153). They discussed disguising 4,000 kilos of cocaine as a shipment of
military uniforms. (A. 153-55). Throughout this meeting, on instructions from
and at the insistence of the DEA, Ricardo repeatedly returned to the subject of
exporting narcotics from Guinea-Bissau to Canada or the United States. (A. 239);
(A. 242) ("The same thing in the United States, because in the United States, we've
got several customers."); (A. 243) ("We need to open up another outlet, for
example, to get to Canada or to get to the United States….").

As he testified, Ricardo attempted in vain to justify:

> the reason why we wanted to use Guinea Bissau as a jumping-off
> point to send containers of fish or cashews to the United States so that
> – and I knew, in their eyes, they didn't think that this was very normal
> that we go to Africa and then to the United States. What had been
> done, forever, for trafficking from Colombia, was to use the Pacific
> and the Atlantic [Oceans], to also drive the stuff up through Mexico. I
> am trying to justify why we're trying to find a new route, which I
> attribute to the trouble we're having in Mexico with the Mexican[s].
> And I'm saying they [the Mexicans] are mixed up in their own silly,
> stupid wars among themselves …. And I'm saying that we don't want
> the United States government to start looking at us because we're
> involving ourselves with the Mexicans in their problems, in their
> mess.

(A. 156-57); *see also* (A. 161).

13

Despite Ricardo's repeated, futile attempts—at the specific behest of the DEA[6]—to involve Appellant in the portion of the plan regarding the export of narcotics to the United States, Appellant responded to Ricardo's elaborate justification for avoiding Mexico only to observe that "[the Mexicans] are killing each other every day." (A. 157; 235).

Ricardo further testified that Appellant then told them in another unrecorded conversation that "he had the means of getting a license to export fish to the United States and to hide the drugs in there." (A. 158). While there was demonstrated express consent from co-defendants Serifo and Mane to this portion of the plan (A. 242-43), at no point in the transcripts presented at trial did Appellant signal his assent to export narcotics from Guinea-Bissau to the United States.

In fact, co-defendant Manuel Mamadi Mane, a/k/a "Mario" testified that on September 21, 2012, when Ricardo suggested that Mane and Serifo open the export company in their names, Appellant and co-defendant Perez-Garcia, a/k/a "Gato" vehemently warned Mane and Serifo not to do so, "because if they were going to send the drugs to Canada and to the United States we were going to be in trouble"; "they are saying to us no, no, we are going to – we are going to put the

_____

[6] Ricardo later testified that "[t]he DEA asked me to mention many things." (Tr. 264).

14

things [narcotics] – send them to the United States and then we are going to have

very serious problems." (Tr. 501-502; A. 294).

As with the purported plan to import narcotics into the United States, the

DEA's persistent design required Ricardo and Juancho to repeatedly vocalize their

intention of using the money from the narcotics transaction to purchase weapons

on behalf of the FARC. Garavito-Garcia, for his part, remained disinterested, if

not frustrated by the distraction of this tangentially related portion of the narcotics

transaction. (Tr. 387). When Ricardo tried to interject during one of their initial

meetings to express his interest in obtaining weapons on behalf of the FARC,

Garavito-Garcia abruptly and firmly cut him short, treating the mention of

weapons as a fruitless distraction: "Forgive me for … interrupting you. For now,

I'm thinking that we should start to … organize this work." (GX 100T-C at 25).

Later in this same meeting, Garavito-Garcia attempted to re-focus the discussion

back to the narcotics transaction: "[F]or now, this topic about the weapons is

something that we're going to mention as a … second phase of this work. We

really have to concentrate well on *this work*." (A. 248) (emphasis added). There

was nothing in the transcripts presented at trial indicating that Garavito-Garcia ever

agreed to the aspect of the scheme involving weapons. He, at best, tolerated

discussion on the topic. However, by November 2012, Garavito-Garcia's initial

annoyance with Ricardo's insistence on grafting a weapons purchase onto their

15

originally narcotics transaction had boiled over. As Garavito-Garcia eventually said at one point in exasperation to Ricardo: "I'm not complicating things for you. I'm just going to ask you something. I have a question for you … that I ask myself and keeps me awake at night. What the fuck are we going to gain from the business with the weapons? Because nobody has said to me 'I'm going to give you a dollar for that business.'" (A. 298).

Ricardo further testified on cross-examination that rather than purchase weapons with the money from the narcotics shipment, the deal could be accomplished just as a straight drug transaction. (A. 185). It was not Ricardo's decision, however, as he testified that he was "following instruction from the DEA agents. That's what had been proposed to me by them. And that's what I was doing." (A. 185-86).

In addition to feeding the Confidential Sources with the story line, the DEA also manipulated the pace at which the scheme would unfold. Ricardo testified that in late August 2012, he was receiving instruction from the DEA to slow down the transaction involving the purchase of military uniforms that were to disguise the shipment of narcotics to Guinea-Bissau. (A. 178). In fact, Ricardo testified neither he nor the DEA had any intention of producing any uniforms. (A. 176-78). The DEA, through its Confidential Sources, continued to manipulate the circumstances in order to further the ruse. When Garavito-Garcia began

16

experiencing health issues and requested money for his medical care, Ricardo testified that he reported Garavito-Garcia's medical issues and relayed his request for money back to his supervising DEA agents. (A. 179-80). Garavito-Garcia was soon wired $5,000 care of the United States for medical expenses so that he would continue negotiating with Ricardo and Juancho. (A. 181).

The DEA sting operation continued into 2013, with none of the various schemes, as designed, ever coming to fruition. Nearly an entire year after the Confidential Sources first approached Garavito-Garcia and began recording their communications, the operation concluded in April 2013, with the arrests of Garavito-Garcia and co-defendants, Gato, Serifo, and Mario. (Tr. 68-69). The investigation never actually led to the seizure of narcotics; no weapons were ever obtained or produced; and no payments were made for the purchase of narcotics. (Tr. 92). The investigation did, however, result in approximately 10½ hours of recorded meetings between the DEA's Confidential Sources and Garavito-Garcia. (Tr. 55).

In summation, the defense even conceded that Garavito-Garcia was an international narcotics trafficker in order to bring into full relief the plain fact that any evidence of Garavito-Garcia's assent was only to consummate a narcotics transaction in Guinea-Bissau and nothing more.

### ii    Trial and Jury Charge

Over an eight-day trial, the Government called five witnesses, submitted dozens of physical exhibits into evidence, including transcripts with English translations covering more than ten hours of recorded conversations.

On the afternoon of March 20, 2015, after excusing the jury for the day, Judge Rakoff presented counsel with copies of a draft jury charge ("Draft Charge"), specifically noting that:

> It seemed to me that Count Three should be limited to the antiaircraft missiles, because to the extent that you're also seeking to include cocaine in that count, it seems to me duplicative of Count One.  So in the charge I just gave you, it's limited to the antiaircraft missiles on the grounds of duplicativeness.

(A. 188).  Judge Rakoff's draft charge for Count Three thus provided that "the alleged object of the conspiracy was to provide material support or resources, namely, providing weapons, to a foreign terrorist organization, here, the FARC." (A. 331).

Late in the evening of March 20, 2015, the Government filed a letter with its proposed jury instructions.  (A. 305).  Regarding Count Three of the district court's Draft Charge, the Government requested that the jury charge be amended to state: "In this Count, the alleged object of the conspiracy was to provide to the FARC material support or resources, namely weapons, logistical support for cocaine distribution, and facilitation of the sale of cocaine in the United States."  (A. 306). The Government also acknowledged that, "as the Court has suggested, there is a

18

narrow set of circumstances under which the jury could conclude that the elements of both Count One and Count Three have been met by an identical factual showing." (A. 307).

Ultimately, during the afternoon on March 25, 2015 following summations, the district court charged the jury, with respect to Count Three, as follows:

> [T]he alleged objective of the conspiracy was to provide material support or resources to a foreign terrorist organization, here, the FARC. Specifically, the government charges that the conspirators intended to supply the FARC with [1] weapons, and with [2] transportation and equipment for the distribution of cocaine. The government need not prove that the conspiracy had both of these objects. It is enough for you to find that it had at least one of these objects; that is, supplying the FARC with weapons or supplying the FARC with transportation and equipment for the distribution of cocaine.

(A. 355-56).

The district court further cautioned the jury, in the context of membership in the conspiracy, that:

> mere association by the defendant with a conspirator does not make the defendant a member of the conspiracy even when coupled with knowledge that a conspiracy is taking place. In other words, knowledge without participation is not sufficient. What is necessary is that the defendant has participated in the conspiracy with knowledge of its unlawful purpose and with an intent to aid in the accomplishment of its unlawful objective.

(A. 352-53).

### iii    Jury Deliberations

19

After the district court instructed the jury, the jury retired to begin its

deliberations.  (Tr. 905).  Just before 5:00 p.m., the court received a note from the

jury requesting:

> clarification on conspiracy charges in general … [specifically]
> whether someone's presence during a conversation is enough to
> convict someone of those charges.  Is the only way that someone
> without specific participation could escape such a situation, [is] to
> physically leave the room or to specifically state their lack of consent
> to the topic under discussion?  I feel I am unable to differentiate
> different situations in which someone is implicated in a conspiracy or
> not.

(Tr. 918, 929).  The jury note further clarified a previous note requesting "the

portion of testimony pertaining to Serifo and Mario's reference to where narcotics

were to be transported, which countries."  (Tr. 918).   The jury continued

deliberations through 5:00 p.m.

On the following morning, March 26, 2015, after consulting the parties and

soliciting their respective positions, the district court provided the jury (over

defendant's objection to the "mere presence" language as given) with the following

response to the note:

> Mere association by the defendant with a conspirator does not make
> the defendant a member of the conspiracy, even when coupled with
> knowledge that a conspiracy has taken place.  Rather, as I previously
> instructed you, the defendant has to *actually participate* in the
> conspiracy unlawfully, intentionally, and *knowingly*. Since the essence
> of a conspiracy is an agreement to carry out certain unlawful
> objectives, a defendant [–] to participate in a conspiracy unlawfully,
> intentionally, and knowingly [–] must agree to one or more of those
> objectives as something he hopes to bring about. Put another way,

20

participating in a conspiracy means joining in an agreement or understanding to carry out its unlawful objectives – more specifically, the object or objects specified in any particular conspiracy charge you are considering.

Because the burden of proof is always on the government, a defendant who is present where a conspiratorial agreement is being planned by others does not have any burden to show that he affirmatively denied consent to the agreement or physically left the room when it was being discussed; the burden is always on the government and *mere presence without participation* in the unlawful plan *is not sufficient* to meet that burden. On the other hand, the government, in order to fulfill its burden of proving the defendant's intentional participation in the conspiracy, does not have to show that he used any specific words like "I agree."  More generally, there is no requirement that the defendant attended any particular meeting or used any particular words or gestures to show his agreement.  It can be shown circumstantially.  But in order to convict on a given conspiracy charge, the Government must show that at some point in the conspiratorial period, the defendant evidenced such agreement and participation beyond a reasonable doubt.

(A. 373-75; 377) (emphasis added).

The jury returned later that morning and delivered a unanimous verdict finding Garavito-Garcia guilty on all counts.  (Tr. 934-36).

### E.  Sentencing

Sentencing was held on July 20, 2015.  (A. 413).  At sentencing, the district court noted that "the scope of [the illegal operation] was really the concoction of others, not of the defendant."  (A. 425); "this was an inchoate offense, it was a sting operation, it was an operation that would never in fact result in any actual substantive delivery of drugs or weapons or the like.  It was, in that sense, different

21

from crimes of this magnitude that are actually carried out or attempted to be carried out to beyond the stages of this sting operation."  (A. 426-27).

The district court, additionally noting its "dismay[]" at being bound to impose the statutory mandatory minimum sentence on each of the counts (A. 431), thereupon sentenced Appellant to 240 months on Count One; 120 months on Count Two; 120 months on Count Three; and 300 months on Count Four, all at the respective mandatory minimums and all to run concurrently.  (SPA 3).

### F.    Appeal

On August 4, 2015, Appellant filed a timely notice of appeal of the July 22, 2015 judgment of conviction against him.  (A. 436).

## ARGUMENT

## POINT I

**The District Court Improperly Denied Appellant's Motion to Dismiss the Indictment for Lack of Jurisdiction Resulting from Colombia's Violation of the Extradition Treaty with the United States**

### A.    Standard of Review

This case involves a single, purely legal issue of statutory interpretation, for which the standard of review is *de novo*.  *See United States v. Schreiber*, 191 F.3d 103, 104 (2d Cir. 1999); *Kahn Lucas Lancaster, Inc. v. Lark Int'l, Ltd.*, 186 F.3d 210, 215 (2d Cir. 1999).

22

**B.     The District Court Failed Properly to Apply the Extradition Treaty with Colombia, the Violation of which Divested the United States of Jurisdiction to Prosecute the Appellant**

As Appellant argued in his pre-trial motion to dismiss the Superseding Indictment, the district court lacked jurisdiction over Appellant, because Colombia violated its own law, Article 511 of the Colombian Criminal Code, and thereby violated the Extradition Treaty between Colombia and the United States, which expressly incorporates Article 511 by reference.  Article 12 of the Extradition Treaty mandates that the "surrender of the person shall take place within such time as may be prescribed by the laws of the Requested State" and that if so prescribed and "the person is not removed from the territory of the Requested State within such time," then "that person **shall be set at liberty**."  (A. 41) (emphasis added).

While Colombia was free to violate the treaty or even not to invoke it at all under recognized principles of international comity, neither the United States nor this Court is free to ignore or sidestep applicable treaty provisions that carry with them the force of binding federal law enforceable under the Supremacy Clause to the United States Constitution.  U.S. Const. art. VI, cl. 2.  Garavito-Garcia was entitled under the law to be released unconditionally after March 15, 2014 for failure to comply with the extradition treaty and Colombia's Criminal Code. Colombia's refusal to release Appellant and the resulting further detention

23

constituted mandatory grounds for the district court to have declined jurisdiction and release him back to Colombia.

The district court, however, erroneously deferred to Colombia's prior determination of the lawfulness of Appellant's extradition, relying on this Court's ruling in *United States v. Campbell*, holding that "courts cannot second-guess another country's grant of extradition to the United States." 300 F.3d 202, 209 (2d Cir. 2002); (A. 142). "[T]he question of whether an extradition treaty allows prosecution for a particular crime that is specified in the extradition request is a matter for the extraditing country to determine." *Id.* Appellant thus acknowledges that when a treaty calls for the exercise of discretion by the extraditing country in deciding whether to extradite by interpreting that treaty, its decision in that regard is not to be second-guessed by the court in the United States, in accordance and deference to the principles of international comity. The district court here, however, failed to recognize that these principles fall by the wayside, when the treaty language is clear, self-executing and mandatory (rather than permissive), such as the extradition treaty with Colombia is here. Thus, an extradition treaty— given that, under the Supremacy Clause, it carries with it the "force of law"—must be enforced "on behalf of the individual regardless of the offensiveness of the practice of one nation to the other nation." *United States v. Alvarez-Macain*, 504 U.S. 655, 667 (1992) (reaffirming *United States v. Rauscher*, 19 U.S. 407 (1886)).

24

Self-executing provisions of an extradition treaty are binding, enforceable in courts of the United States, and provide standing for redress by defendants contesting jurisdiction over their extradition. It is undoubtedly true, as the district court recognized, that principles of comity under international law do not ordinarily countenance or look with favor on courts in this country, for example, being "responsible for ensuring that a foreign sovereign complies with its internal laws in issuing an extradition or expulsion." *United States v. Umeh*, 762 F.Supp.2d 658, 664 (S.D.N.Y. 2011), *aff'd*, 527 Fed. Appx. 57 (2d Cir. 2013). That principle does not apply, however, when the procedural rule applicable in Colombia is incorporated into the treaty. In that event, *Rauscher* governs, and the same principles that guide application of the rule of specialty apply here.

This is so irrespective of whether or not Colombia raised any objection to the procedural violation. Just as in *Rauscher*, courts in the United States are not free to ignore a self-executing provision of a governing extradition treaty that has been invoked just because the other party to the treaty has ignored it, declined to invoke it, or otherwise failed to register any objection to its self-executing provisions. The district court's conclusion to the contrary notwithstanding, Appellant *does have the right* to "re-litigate" that issue in a court of a country that is a party to the treaty—here, the United States. Thus, this case stands as an exception to the "strong presumption against inferring individual rights from

25

international treaties." *Cf. United States v. Rommy*, 506 F.3d 108, 129-30 (2d Cir. 2007). This is so because the treaty and thus the Treaty Clause to the U.S. Constitution make it so.

Finally, that Colombia presented an expedient alternative by withdrawing its prior decision to make the defendant available to the U.S. Embassy for extradition and then re-submitting it at a later time does not change the fact that no such delayed surrender procedure for medical necessity exists in the language of the treaty and none can be fairly implied given the explicit, limited and inapplicable exceptions to delayed surrender already specified (Article 13) in the treaty. In any event, were this Court to read such a medically necessary delay of surrender term into the treaty, it would effectively render the procedural protections afforded by Article 12 of the treaty a dead letter.

Garavito-Garcia was entitled to be released in March 2014 under the provisions of Article 12 and, as incorporated by reference, Article 511 of the Colombian Criminal Code. Because his right to release was denied and the extradition and transfer proceeded in contravention of that right under the treaty, his extradition was contrary to law. The Indictment returned against him thus should have been dismissed as jurisdictionally defective.

## POINT II

### Evidence at Trial was Insufficient to Prove That Appellant Knowingly Participated in Any of the Charged Conspiracies

26

### A.    Standard of Review

To sustain a criminal conviction on appeal, the trial evidence must be sufficient to allow a rational jury to have found each essential element of the crime charged beyond a reasonable doubt.  *See Jackson v. Virginia*, 443 U.S. 307, 319 (1975); *United States v. D'Amato*, 39 F.3d 1249, 1256 (2d Cir. 1994); *United States v. Perrone*, 936 F.2d 1403, 1408 (2d Cir. 1991), *clarified on other grounds*, 949 F.2d 36 (2d Cir. 1991).  The verdict in a conspiracy prosecution must be supported by evidence from which the jury could reasonably infer that the defendant "knew of the scheme alleged in the indictment and knowingly joined and participated in it." *Perrone*, 936 F.2d at 1408; *see also United States v. Cangiano*, 491 F.2d 906, 909 (2d Cir. 1974) ("Where the crime charged is conspiracy, a conviction cannot be sustained unless the Government establishes beyond a reasonable doubt that the defendant had the specific intent to violate the substantive statute.").  While knowledge or intent may be proven by circumstantial evidence, "the government must do more than introduce evidence 'at least as consistent with innocence as with guilt.'" *D'Amato*, 39 F.3d at 1256, *quoting United States v. Mulheren*, 938 F.2d 364, 372 (2d Cir. 1991). Otherwise, the jury would have to guess at the defendant's state of mind; thus, "a conviction based on speculation and surmise alone cannot stand."  *Id., quoted in United States v. Walker*, 191 F.3d 326, 333 (2d Cir. 1999).

27

**B.** **The Trial Evidence was Insufficient to Prove Beyond a Reasonable Doubt the Requisite Knowing Participation Element of the Charged Conspiracies**

The purported evidentiary basis for the charged conspiracies—to commit a narco-terrorism offense, to import narcotics into the United States, to provide material support to a terrorist organization, and to acquire and transfer anti-aircraft missiles—was manufactured by the DEA through its Confidential Sources. Throughout the recorded communications, the Confidential Sources repeatedly and gratuitously invoked the contrived pretense that the narcotics transaction would not only result in importation of cocaine to the United States, but would eventually and indirectly provide weapons and anti-aircraft missiles to the FARC, who in turn would use these weapons to shoot down American military helicopters over Colombia. Nearly all references to these purported objectives were raised by the Confidential Sources themselves in an increasingly insistent attempt to elicit incriminating statements and assent from Garavito-Garcia and his co-defendants.

To the extent that the basis for the criminal charges and for United States jurisdiction was manufactured by the DEA sting operation, this Court has previously noted that:

> the "manufactured jurisdiction" concept is properly understood not as an independent defense, but as a subset of three possible defense theories: (i) the defendant was entrapped into committing a federal crime, since he was not predisposed to commit the crime in the way necessary for the crime to qualify as a federal offense; (ii) the defendant's due process rights were violated because the government's

28

actions in inducing the defendant to commit the federal crime were outrageous; or (iii) an element of the federal statute has not been proved, so federal courts have no jurisdiction over the crime.

*United States v. Wallace*, 85 F.3d 1063, 1065-66 (2d Cir. 1996).

While Garavito-Garcia did not pursue an entrapment defense at trial,[7] and Appellant does not argue here that the actions of the DEA were "so outrageous" as to constitute a violation of due process, Appellant **does contend** that the Government nevertheless failed to establish Garavito-Garcia's knowing participation in each of the charged conspiracies, the proof of which depended exclusively on the DEA's Confidential Sources' pernicious attempts to elicit Garavito-Garcia's assent during recorded communications.

Appellant was convicted essentially based on the ruse created by the DEA, who instructed its Confidential Sources to propose and lure Appellant into involvement in multiple conspiracies. As Judge Rakoff remarked at sentencing, "this was a concocted scheme, it was a scheme that involved a defendant who did not appear to have previously had much interest in criminal activity affecting the United States," and "the scope of it was really the concoction of others, not of the

---

[7] As counsel stated on the record at trial, the defense chose not to assert an entrapment defense, to avoid an unfavorable entrapment instruction, and in light of established Second Circuit precedent that a defendant's financial incentive alone to engage in a narcotics trafficking scheme is insufficient to invoke a successful entrapment defense and overcome evidence of predisposition. (A. 190-93); *see, e.g.*, *United States v. Cromitie*, 727 F.3d 194, 204 (2d Cir. 2013); *see generally, Lopez v. United States*, 373 U.S. 427, 434-35 (1963).

29

defendant." (A. 431, 425). As DEA Special Agent Casey testified at trial, the DEA identified and targeted Garavito-Garcia as someone with knowledge of trafficking routes into West Africa, specifically Guinea-Bissau. (Tr. 46). As the defense conceded in summation, Garavito-Garcia was, after all, a narcotics trafficker. The Government neither alleged nor provided evidence that Garavito-Garcia, at any time prior to 2012, had been interested in, let along involved with, terrorist activity, weapons trafficking or importing narcotics into the United States. These unlawful conspiratorial objectives were, instead, the contrivances of the DEA, that is, pretenses artfully employed to establish a jurisdictional nexus to the United States. Similarly, the assumed identities of the Confidential Sources as members of the FARC were designed to provide an evidentiary basis for prosecuting Garavito-Garcia on charges involving narco-terrorism and providing material support to terrorist organizations.

The DEA's design was then carried out through its Confidential Sources, who disctated and interposed the subject matter and specific details at each and every meeting, *viz.*, weapons, surface-to-air missiles, FARC and the importation of cocaine into the United States. As shown throughout these communications, their repeated attempts to raise these issues all but fell on deaf ears. The record at trial is all but bereft of any indication that Appellant assented to, or even expressed interest in, the aspects of the scheme involving weapons or importing narcotics to

30

the United States. When these discussions were initiated by the Confidential Sources, Appellant was merely present, at best left signaling neither objection, to nor endorsement of, the planned scheme. *See United States v. Gaviria*, 740 F.2d 174, 183 (2d Cir. 1984) ("there must be some evidence from which it can reasonably be inferred that the person charged with conspiracy knew of the existence of the scheme alleged in the indictment and knowingly joined and participated in it"), *citing United States v. Soto*, 716 F.2d 989, 991 (2d Cir. 1983); *see also United States v. Samaria*, 239 F.3d 228, 235 (2d Cir. 2001) ("This Court has repeatedly emphasized … that a defendant's mere presence at the scene of a criminal act or association with conspirators does not constitute intentional participation in the conspiracy, even if the defendant has knowledge of the conspiracy."). Even when viewing the evidence in the light most favorable to the Government, the evidence on this record was simply insufficient to support the jury's verdict, beyond a reasonable doubt, that Appellant conspired to commit a narco-terrorism offense, to import narcotics into the United States, to provide material support to a terrorist organization or to acquire and transfer anti-aircraft missiles.

## POINT III

### The District Court's Supplemental "Mere Presence" Instruction Was Improper

### A. Standard of Review

31

"To secure reversal based on a flawed jury instruction, a defendant must demonstrate both error and ensuing prejudice." *United States v. White*, 552 F.3d 240, 246 (2d Cir. 2009) (internal citations omitted). This Court reviews an objected to jury instruction challenge *de novo*. *See United States v. Coppola*, 671 F.3d 220, 247 (2d Cir. 2012). "Instructions are erroneous if they mislead the jury as to the correct legal standard or do not adequately inform the jury of the law." *Hudson v. New York City*, 271 F.3d 62, 67 (2d Cir. 2001). "Reversal is required where, based on a review of the record as a whole, the error was prejudicial or the charge was highly confusing." *Id.* at 67-68; *Nat'l R.R. Passenger Corp. v. One 25, 900 Square Foot More or Less Parcel of Land*, 766 F.2d 685, 688 (2d Cir. 1985) ("A charge that appears likely to have left the jury 'highly confused' may, on that ground alone, be reversed."). As for review of supplemental jury instructions, this Court will vacate a conviction if "the initial jury instructions are faulty, the jury expresses confusion, and the [district] court's supplemental instruction fails to alleviate the jury's concerns or only adds to the already-existing confusion." *United States v. Kopstein*, 759 F.3d 168, 172 (2d Cir. 2014).

Where, as here, "a jury makes explicit its difficulties [through written inquiry,] a trial judge should clear them away with concrete accuracy." *Bollenback v. United States*, 326 U.S. 607, 612-13 (1946). This Court has noted in particular that supplemental jury instructions prompted by a jury question can be especially

32

potent and influential. *See, e.g., Kopstein*, 759 F.3d at 172 ("A jury's interruption of its deliberations 'to seek further explanation of the law' is a 'critical moment in a criminal trial'; and we therefore ascribe 'crucial importance' to a completely accurate statement by the judge at that moment.") (quoting *United States v. Leftkowiz*, 284 F.2d 310, 314 (2d Cir. 1960). Accordingly, "the district court must exercise special care to see that inaccuracy or imbalance in supplemental instructions do not poison an otherwise healthy trial. This is especially true since the judge's last word is apt to be the decisive word." *Tart v. McGann*, 697 F.2d 75, 77 (2d Cir. 1982).

Even if an initial jury instruction is not in itself erroneous or highly confusing, a supplemental instruction given in response to a jury question may be so muddled as to warrant vacatur. *See Kopstein*, 758 F.3d at 172. As this Court has explained, "[i]f the court's instructions … had been confined to those contained in its original charge to the jury, a reversal would not be required. … However, in its supplemental instructions to the jury after the deliberations had begun, the district court left the issue … in further confusion … so as to make the charge, viewed as a whole, inadequate." *United States v. Hastings*, 981 F.2d 369, 371-73 (2d Cir. 1990).

> **B.** **The district court's instruction allowed the jury to convict Appellant based on insufficient evidence**

<center>33</center>

The district court's initial "mere presence" jury instruction evidently resulted in confusion amongst the jurors, as reflected in the jury note sent to the district court soon after deliberations had commenced. Given that Garavito-Garcia was charged in four conspiracy counts and the fact that the evidence at trial predominantly consisted of recorded meetings at which Garavito-Garcia had been present it was incumbent upon the district court conclusively to dispel any juror confusion on this point.

The district court's supplemental mere presence instruction to the jury failed to address the source of the jury's confusion, that is, whether proof of mere acquiescence was enough. The jury's note asked "[whether] the only way that someone without specific participation could escape such a situation [is] to physically leave the room or to specifically state their lack of consent to the topic under discussion?" (A. 364). In response, the district court provided little more than a recitation of its initial mere presence instruction. The supplemental instruction did not address the question as to whether or not a person has to physically leave the room in order to escape being considered a conspirator, or whether or not a person has to explicitly state their lack of consent to the discussion. Rather, the response generally discussed the elements of a conspiracy and the burden of proof. These general statements could not possibly have addressed the gravamen of the jurors' confusion and this unaddressed jury

34

confusion warrants reversal. *See, e.g.*, *United States v. Hastings*, 918 F.2d 369 (2d Cir. 1990) (reversing conviction because supplemental jury instructions in response to juror question did not answer question and possibly left jury unclear on requirements in order to convict); *United States v. Kopstein*, 76 F.3d 168 (2d Cir. 2014) (vacating conviction where jury expressed confusion and court's supplemental instruction failed to address jury's concerns).

Further, as the jury reached its verdict on all four conspiracy counts within an hour and a half after having been provided the inadequate supplemental instruction, it is highly likely that the defective supplemental mere presence charge here was determinative in the jury's finding Garavito-Garcia guilty on all counts. *See Arroyo v. Jones,* 685 F.2d 35 (2d Cir. 1982) ("in light of the jury's decision on the attempt count less than one-half hour after having heard the improper charge, it seems highly likely that the supplemental charge was in the forefront of the jurors' minds").

Thus, the district court's supplemental instruction was demonstrably incomplete and misleading so as to render the charge, viewed as a whole, inadequate with respect to Garavito-Garcia's alleged knowing participation in the charged conspiracies.

## POINT IV

### Count Three, as Charged to the Jury, Was Multiplicitous of Count One Resulting in Duplicative Punishment

35

## A.     Standard of Review

"An indictment is multiplicitous when it charges a single offense as an offense multiple times, in separate counts, when, in law and fact, only one crime has been committed." *United States v. Chacko,* 169 F.3d 140, 145 (2d Cir. 1999); *see also United States v. Holmes,* 44 F.3d 1150, 1153-54 (2d Cir. 1995). Multiplicitous counts violate the Double Jeopardy Clause of the Fifth Amendment because they subject a person to punishment for a single crime more than once. *United States v. Dixon,* 509 U.S. 688, 696 (1993); *Chacko,* 169 F.3d at 145. Where there are two statutes that proscribe the same conduct, double jeopardy is implicated and the test for multiplicity becomes whether each count requires proof of an additional fact that the other does not.  *See Blockburger v. United States,* 284 U.S. 299, 304 (1932).

## B.     Appellant was Convicted on Count One and Count Three Based on the Same Offense

According to the district court's jury charge, for both Count One and Count Three, the government had to prove beyond a reasonable doubt (1) the existence of the charged conspiracy and (2) that the defendant unlawfully, intentionally, and knowingly joined and participated in the conspiracy.   (A. 355).  Based on the district court's instruction to the jury, all four conspiracy counts required these two elements.  (A. 357).  The conspiracies differ only in their alleged unlawful objective.

36

Count One required proof beyond a reasonable doubt of an unlawful objective "to distribute five kilograms or more of cocaine with *intent to provide something of pecuniary value to the FARC*." (A. 349) (emphasis added). Count Three required proof beyond a reasonable doubt of an "unlawful *objective to provide material support or resources to a foreign terrorist organization*." (A. 355) (emphasis added).

While Appellant acknowledges that the statutory language underlying Counts One and Three are subtly distinguishable, any distinction between these two offenses, as contained in the district court's final jury charge, rendered that distinction superfluous. As the Government conceded at trial, "If the jury were to conclude that the defendant only conspired to distribute cocaine on behalf of the FARC and in doing so intended to provide the organization money or cocaine, he would have met the elements of both statutes." (A. 308). Indeed, it would be difficult to conceive of a situation in which the jury could convict Appellant on Count One and not convict on Count Three. As the district court's jury charge rendered Counts One and Three multiplicitous, Appellant's ensuing conviction on both counts resulted in precisely the duplicative punishment that the district court had initially intended to avoid.

Accordingly, although the resulting sentences run concurrently, this Court in any event should vacate Appellant's conviction on Count Three. *See United States*

37

ACTIVE 32710165v1 12/10/2015

*v. Josephberg*, 459 F.3d 350 (2d Cir. 2006), *citing Ball v. United States*, 470 U.S. 856, 865, (1985) ("The separate conviction, apart from the concurrent sentence, has potential adverse collateral consequences that may not be ignored.").

38

## <u>CONCLUSION</u>

For the foregoing reasons, Defendant-Appellant Garavito-Garcia

respectfully submits that his judgment of conviction should be reversed.

Dated:  New York, New York
         December 10, 2015

<div style="margin-left:40%">

Respectfully submitted,
FOX ROTHSCHILD LLP

By: /s/ Robert W. Ray_____
    Robert W. Ray
    100 Park Avenue, Suite 1500
    New York, New York 10017
    (212) 878-7900
    *Attorneys for Defendant-Appellant*
    *Rafael Antonio Garavito-Garcia*

</div>

39

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Rule 32(a)(7)(C) of the Federal Rules of Appellate Procedure, the foregoing brief is in <u>14-Point Times New Roman</u> proportional font and contains 8,621 words and thus is in compliance with the type-volume limitation set forth in Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure.

Dated: December 10, 2015
      New York, New York

                              /s/ Robert W. Ray
                              ROBERT W. RAY

# Special Appendix

**i**

**SPECIAL APPENDIX**
**TABLE OF CONTENTS**

**Page**

Judgment, entered July 22, 2015, Appealed From..... SPA-1

AO 245B    (Rev. 09/11) Judgment in a Criminal Case
Sheet 1

# UNITED STATES DISTRICT COURT

Southern District of New York

UNITED STATES OF AMERICA

v.

Rafael Antonio Garavito-Garcia

)
)
)
)
)
)
)
)

## JUDGMENT IN A CRIMINAL CASE

Case Number:  I:S5 12CR00839-00I(JSR)

USM Number: 71263-054

Robert  Ray, Esq.
Defendant's Attorney

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 7/22/11

## THE DEFENDANT:

☐ pleaded guilty to count(s)

☐ pleaded nolo contendere to count(s)
   which was accepted by the court.

☑ was found guilty on count(s)        1, 2, 3, and 4
   after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| (21 U.S.C. 960(a) | Conspiracy to Commit Narco-Terrorism | 1/8/2013 | 1 |
| (21 U.S.C. 963) | Conspiracy to Import Cocaine into the U.S. | 1/8/2013 | 2 |
| (18 U.S.C. 23398(a)(1), | Conspiracy to Provide Material Support to a Foreign Terroris | 1/8/2013 | 3 |

The defendant is sentenced as provided in pages 2 through _6_ of this judgment.  The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s)

☐ Count(s)                                    ☐ is   ☐ are  dismissed on the motion of the United States.
☐ Underlying                                  ☐ is   ☐ are  dismissed on the motion of the United States.
☑ Motion(s)    at 58 and in limine at 66      ☐ is   ☑ are  dismissed on the motion of the United States.

   It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid.  If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

7/20/2015
Date of Imposition of Judgment

Signature of Judge

Hon. Jed S. Rakoff,                    U.S.D.J,
Name and Title of Judge

7/22/15
Date

SPA-2

AO 245B     (Rev. 09/11) Judgment in a Criminal Case
            Sheet 1

DEFENDANT: Rafael Antonio Garavito-Garcia
CASE NUMBER: I:S5 12CR00839-00l(JSR)

Judgment—Page   AO   of   6

## ADDITIONAL COUNTS OF CONVICTION

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| (18 U.S.C. 2332g(a)(t) | Conspiracy to Acquire and Transfer Anti-Aircraft Missile | 1/8/2013 | 4 |

AO 245B   (Rev. 09/11) Judgment in Criminal Case
Sheet 2 — Imprisonment

Judgment — Page ___ of ___

DEFENDANT:  Rafael Antonio Garavito-Garcia
CASE NUMBER:  I:S5 12CR00839-00I(JSR)

# IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of:

On Count 1- Two Hundred Forty (240) months.
On Count 2 - One Hundred Twenty (120) months.
On Count 3- One Hundred twenty (120) months.
On Count 4- Three Hundred (300) months.     TO RUN CONCURRENT TO EACHOTHER.

☑  The court makes the following recommendations to the Bureau of Prisons:

Incarceration in FMC Carswell, Texas.
The defendant shall receive credit for the approximately 16 months spent in jail in Colombia awaiting extradition.

☑  The defendant is remanded to the custody of the United States Marshal.

☐  The defendant shall surrender to the United States Marshal for this district:

☐  at _____  ☐ a.m.  ☐ p.m.  on _____ .

☐  as notified by the United States Marshal.

☐  The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

☐  before 2 p.m. on _____ .

☐  as notified by the United States Marshal.

☐  as notified by the Probation or Pretrial Services Office.

# RETURN

I have executed this judgment as follows:

Defendant delivered on _____  to _____

a _____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

**SPA-4**

AO 245B     (Rev. 09/11) Judgment in a Criminal Case
            Sheet 3 — Supervised Release

Judgment—Page __3__ of __6__

DEFENDANT:  Rafael Antonio Garavito-Garcia
CASE NUMBER:  I:S5 12CR00839-00I(JSR)

## SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of :

On Counts 1, 2 and 4 - Five (5) years.
On Count 3 - Three (3) years.   TO RUN CONCURRENT TO EACHOTHER

    The defendant must report to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

The defendant shall not commit another federal, state or local crime.

The defendant shall not unlawfully possess a controlled substance.  The defendant shall refrain from any unlawful use of a controlled substance.  The defendant shall submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.

☐    The above drug testing condition is suspended, based on the court's determination that the defendant poses a low risk of future substance abuse.  *(Check, if applicable.)*

☑    The defendant shall not possess a firearm, ammunition, destructive device, or any other dangerous weapon.  *(Check, if applicable.)*

☑    The defendant shall cooperate in the collection of DNA as directed by the probation officer.  *(Check, if applicable.)*

☐    The defendant shall comply with the requirements of the Sex Offender Registration and Notification Act (42 U.S.C. § 16901, *et seq.*) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in which he or she resides, works, is a student, or was convicted of a qualifying offense.  *(Check, if applicable.)*

☐    The defendant shall participate in an approved program for domestic violence.  *(Check, if applicable.)*

    If this judgment imposes a fine or restitution, it is a condition of supervised release that the defendant pay in accordance with the Schedule of Payments sheet of this judgment.

    The defendant must comply with the standard conditions that have been adopted by this court as well as with any additional conditions on the attached page.

## STANDARD CONDITIONS OF SUPERVISION

1)   the defendant shall not leave the judicial district without the permission of the court or probation officer;

2)   the defendant shall report to the probation officer in a manner and frequency directed by the court or probation officer;

3)   the defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;

4)   the defendant shall support his or her dependents and meet other family responsibilities;

5)   the defendant shall work regularly at a lawful occupation, unless excused by the probation officer for schooling, training, or other acceptable reasons;

6)   the defendant shall notify the probation officer at least ten days prior to any change in residence or employment, or if such prior notification is not possible, then within five days after making such change.

7)   the defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any controlled substance or any paraphernalia related to any controlled substances, except as prescribed by a physician;

8)   the defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;

9)   the defendant shall not associate with any persons engaged in criminal activity and shall not associate with any person convicted of a felony, unless granted permission to do so by the probation officer;

10)  the defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view of the probation officer;

11)  the defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer;

12)  the defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court; and

13)  as directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement.

SPA-5

AO 245B     (Rev. 09/11) Judgment in a Criminal Case
            Sheet 3C — Supervised Release

Judgment—Page     4     of     6

DEFENDANT:  Rafael Antonio Garavito-Garcia
CASE NUMBER:  I:S5 12CR00839-00I(JSR)

## SPECIAL CONDITIONS OF SUPERVISION

1. The defendant shall comply with the directives of the Department of Homeland Security - Bureau of Immigration and Customs Enforcement and obey the immigration laws.  If deported, the defendant is not to reenter the United States without the permission of the U.S. Attorney General.

2. The Court recommends the defendant be supervised in his district of residence.

**SPA-6**

AO 245B    (Rev. 09/11) Judgment in a Criminal Case
           Sheet 5 — Criminal Monetary Penalties

Judgment — Page  6  of  7

DEFENDANT: Rafael Antonio Garavito-Garcia
CASE NUMBER: I:S5 12CR00839-00I(JSR)

## CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

| | **Assessment** | **Fine** | **Restitution** |
|---|---|---|---|
| **TOTALS** | $ 400.00 | $ | $ |

☐  The determination of restitution is deferred until _____. An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☐  The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| **Name of Payee** | **Total Loss\*** | **Restitution Ordered** | **Priority or Percentage** |
|---|---|---|---|
| | | | |
| **TOTALS** | $ | $ | |

☐  Restitution amount ordered pursuant to plea agreement  $

☐  The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐  The court determined that the defendant does not have the ability to pay interest and it is ordered that:

    ☐  the interest requirement is waived for the  ☐ fine  ☐ restitution.

    ☐  the interest requirement for the  ☐ fine  ☐ restitution is modified as follows:

\* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

**SPA-7**

AO 245B    (Rev. 09/11) Judgment in a Criminal Case
Sheet 6 — Schedule of Payments

Judgment — Page  6  of  6 

DEFENDANT: Rafael Antonio Garavito-Garcia
CASE NUMBER: I:S5 12CR00839-00I(JSR)

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

**A** ☑ Lump sum payment of $   400.00   due immediately, balance due

      ☐ not later than        , or
      ☐ in accordance   ☐ C,   ☐ D,   ☐ E, or   ☐ F below; or

**B** ☐ Payment to begin immediately (may be combined with  ☐ C,   ☐ D, or   ☐ F below); or

**C** ☐ Payment in equal     *(e.g., weekly, monthly, quarterly)* installments of $        over a period of
      *(e.g., months or years)*, to commence       *(e.g., 30 or 60 days)* after the date of this judgment; or

**D** ☐ Payment in equal     *(e.g., weekly, monthly, quarterly)* installments of $        over a period of
      *(e.g., months or years)*, to commence       *(e.g., 30 or 60 days)* after release from imprisonment to a
      term of supervision; or

**E** ☐ Payment during the term of supervised release will commence within       *(e.g., 30 or 60 days)* after release from
      imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

**F** ☐ Special instructions regarding the payment of criminal monetary penalties:

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐ Joint and Several

      Defendant and Co-Defendant Names and Case Numbers *(including defendant number)*, Total Amount, Joint and Several Amount,
      and corresponding payee, if appropriate.

☐ The defendant shall pay the cost of prosecution.

☐ The defendant shall pay the following court cost(s):

☐ The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal,
(5) fine interest, (6) community restitution, (7) penalties, and (8) costs, including cost of prosecution and court costs.